# EXHIBIT 3

Excerpts of Zach Conine Deposition Transcript

# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT

2                          DISTRICT OF NEVADA

3                                      )
     SHEILA SALEHIAN,                  )
4                                      )
                       Plaintiff,      )
5                                      )
                  vs.                  )   CASE NO.:
6                                      )   2:21-cv-01512-CDS-NJK
     STATE OF NEVADA, NEVADA           )
7    STATE TREASURER'S OFFICE;         )
     ZACH CONINE, STATE                )
8    TREASURER; DOES 1-50; and         )
     ROE CORPORATIONS 1-50,            )
9                                      )
                       Defendants.     )
10   _____    )

11

12

13                   DEPOSITION OF ZACH CONINE

14                   THURSDAY, JUNE 16, 2022

15                          10:15 A.M.

16          AT 3960 HOWARD HUGHES PARKWAY, SUITE 700

17                     LAS VEGAS, NEVADA

18

19

20

21

22

23   REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876
                    JOB NO. 888696A
24

25

ZACH CONINE - 06/16/2022

Page 2

```
 1                 DEPOSITION OF ZACH CONINE,
 2   taken at 3960 Howard Hughes Parkway, Suite 700,
 3   Las Vegas, Nevada, on THURSDAY, JUNE 16, 2022, at
 4   10:15 a.m., before Michelle R. Ferreyra, Certified
 5   Court Reporter, in and for the State of Nevada.
 6   APPEARANCES:
 7   For Plaintiff:
 8        LAW OFFICES OF MICHAEL P. BALABAN
          BY:  MICHAEL P. BALABAN, ESQ.
 9        10726 Del Rudini Street
          Las Vegas, NV 89141
10        (702) 586-2964
          (702) 586-3223 Fax
11        mbalaban@balaban-lawcom
12
     For Defendants:
13
          OFFICE OF THE ATTORNEY GENERAL
14        BY:  JUDY A. PRUTZMAN, ESQ.
          5420 Kietzke Lane
15        Suite 202
          Reno, NV 89511
16        (775) 687-2113
          (775) 688-1822 Fax
17        jprutzman@ag.nv.gov
18
19
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2   WITNESS:  ZACH CONINE
 3   EXAMINATION                                    PAGE
     Examination By Mr. Balaban                        4
 4   Examination By Ms. Prutzman                     155
     Further Examination By Mr. Balaban              158
 5
 6               INDEX TO EXHIBITS
 7     EXHIBIT                                      PAGE
 8   Exhibit 1   Letter to Ms. Salehian from Dan     40
                 Schwartz, State Treasurer, dated
 9               January 10, 2017
10   Exhibit 2   Letter of recommendation for Ms.    45
                 Salehian
11
12   Exhibit 3   Prohibition and Penalties          57

     Exhibit 4   Email to both Treasurer Conine     62
13               and Mr. Dickson and Beth Yeatts
14   Exhibit 5   Letter from Thomas Dermatology     66
15   Exhibit 6   FMLA paperwork                     67
16   Exhibit 7   Email from Miles Dickson to Beth   68
                 Yeatts and Sheila Salehian
17
     Exhibit 8   Interrogatory responses for the    96
18               State of Nevada
19   Exhibit 9   Separation Agreement and Release  115
                 Of All Claims
20
     Exhibit 10  Statement from Ms. Yeatts         119
21
     Exhibit 11  Reference letter for Ms. Salehian 139
22               from Ms. McDowell
23   Exhibit 12  Job announcement                  140
24
25
```

Page 4

```
 1         LAS VEGAS, NEVADA, THURSDAY, JUNE 16, 2022;
 2                     10:15 A.M.
 3                      -oOo-
 4   (Prior to the commencement of the deposition, all of
 5   the parties present agreed to waive statements by the
 6   court reporter pursuant to Rules 30(b)(5)(A) and
 7              30(b)(5)(C) of the NRCP/FRCP.)
 8
     Whereupon,
 9                     ZACH CONINE,
10   having been first duly sworn to testify to the truth,
11   the whole truth and nothing but the truth, was examined
12   and testified as follows:
13
14                    EXAMINATION
15   BY MR. BALABAN:
16        Q.   Let's get started, Mr. Conine.  I'm the
17   attorney for Sheila Salehian, and let's get started.
18        Do you understand that you're under oath and
19   that these proceedings are being recorded by the court
20   reporter?
21        A.   Yes.
22        Q.   Do you understand that you should not answer
23   a question unless you completely understand it?
24        A.   Yes.
25        Q.   Do you understand that you should not
```

Page 5

```
 1   speculate or guess at an answer, but are required to
 2   give me your best estimate or approximation if a
 3   question calls for an estimate or an approximation?
 4        A.   Yes.
 5        Q.   Do you understand that once the deposition is
 6   finished and transcribed, you will be sent a copy in
 7   the mail -- either it will go to you or the attorney
 8   for State of Nevada, and you will have a chance to
 9   correct or make changes to your answers?
10        A.   Okay.
11        Q.   You understand that?
12        A.   Yes.
13        Q.   Okay.
14        Do you also understand that I'm able to
15   comment at trial on any changes or corrections you
16   make; and, thus, it is to your advantage to give your
17   best answer today, so as not to appear inconsistent
18   with your answer at trial, which could affect your
19   credibility with the jury?
20        A.   Yes.
21        Q.   As far as I know, you're still Treasurer,
22   still employed by Nevada State Treasurer?
23        A.   I am the Treasurer, yes.
24        Q.   Yes.
25        Do you fear any retaliation from your
```

ZACH CONINE - 06/16/2022

Page 14

1 et cetera, et cetera.
2          But those are the, sort of, big five.
3     Q.   Okay.
4          And do you -- does the State Treasurer have
5 to answer to any -- I mean, I know the voters, but do
6 you have a --
7     A.   I have no boss, other than -- no.
8     Q.   You don't have a supervisor?
9     A.   Correct.
10    Q.   Okay.
11         And can you -- on a normal day, can you
12 describe for me what your day would consist of?
13         You know, you went over the job -- you know,
14 the statutory job functions, but I wanted to know,
15 like, what type of -- on a day-to-day basis, what type
16 of things are you doing in the job?
17    A.   Yeah.  It really depends on the day, right?
18 So we have deputies, most of them who are very capable,
19 who are responsible for their individual section;
20 right?  So each of those five areas has a deputy over
21 it.
22         There's a leadership team that helps with
23 those deputies, and, of course, they all have
24 employees, about 46 people, in general.  Usually my day
25 involves working with them on whatever projects we're

Page 15

1 working on, whether it's the day-to-day functionality;
2 right?  Checking in with the investments team about
3 what the world looks like and what we're doing,
4 preparing for a new bond issuance, helping for a
5 program the State is doing.  It really does change
6 almost every day.
7     Q.   You mentioned -- I think you mentioned -- how
8 many employees does the --
9     A.   There are, I believe, 46.  We might be up to
10 47.
11    Q.   Forty -- so that's 46 in the State
12 Treasurer's office?
13    A.   Correct.
14    Q.   And that includes everyone from secretaries
15 up to yourself?
16    A.   We call them "executive assistants" at the
17 State, but yes.
18    Q.   Or executive --
19    A.   Yes.  To myself, to the chief of staff, to
20 all the deputies, the non-classified folks, the
21 classified folks, et cetera.
22    Q.   Okay.
23         And so, I mean, you know -- from reviewing
24 the documents in this case, it seems like you have at
25 least something to do with personnel decisions and

Page 16

1 getting involved in personnel.
2     A.   Yes.
3     Q.   Can you describe that for me?
4     A.   Sure.  So, typically, we draw the line
5 between individuals who are unclassified, serving at
6 the pleasure of the Treasurer, versus individuals who
7 don't.
8          Individuals who don't, I might be kept
9 apprised of what's been happening in the situation,
10 certainly if we have an employee who is, you know,
11 accused of doing something illegal or causing trouble
12 or something like that, I might -- it might come to my
13 attention.
14         But if it's a general personnel thing, I'll
15 probably only hear about it in passing, unless it's at
16 the deputy level, in which case it's myself, the chief
17 of staff, and the chief deputy who are having those
18 conversations.
19    Q.   Okay.  So unclassified employees, what is
20 your role in that?
21    A.   Well, unclassified employees, sort of, under
22 the law serve at my discretion; right?  And so whenever
23 we're having a conversation about either hiring one or
24 hiring one, firing one, making a change to job duties,
25 increasing someone's compensation, whatever, right,

Page 17

1 that's my call.  And as such, that ends up on my desk.
2     Q.   So you would make the final decision in all
3 hiring or firings of unclassified employees?
4     A.   Yes.  It's sort of by the definition, they
5 serve at my pleasure, right?  So it has to be a
6 determination that I want them to be there or I don't
7 want them to be there.  That's the line.
8     Q.   I get it.  Okay.
9          So, I mean -- I am trying to understand
10 somebody might make a recommendation, but it would
11 first go to you before a decision was made?
12    A.   Correct.
13    Q.   Okay.
14         And just an overview of why would a decision
15 be made to retain or not retain an unclassified
16 employee?
17         In other words, I mean, I know the State
18 Treasurer, of course, is a political office or
19 some -- when a new administration comes in, is that why
20 a lot of unclassified employees are let go, or how does
21 that work?
22    A.   I think it depends on the role and it depends
23 on the Treasurer.  I can only, kind of, speak to what
24 I've done.  But I know in past roles, like the chief of
25 staff, the executive assistant, folks that are working

ZACH CONINE - 06/16/2022

Page 22

```
1   Mark Hutchison.  Lieutenant Governor Hutchinson was
2   leaving office; he wasn't running again.  And so this
3   woman, whose name is Kirsten Van Ry, found herself on
4   the street, but in State service.  In other words, she
5   was going to be unemployed, but she was currently in
6   State service.
7       Q.   Okay.
8            And wasn't Ms. Van Ry 29 at the time?
9       A.   I have absolutely no idea.
10      Q.   Did she appear under 40 to you?
11      A.   Yes.
12      Q.   And who -- so you would have been the person
13  that made the final call or decision on hiring or
14  having Ms. Van Ry transfer into the treasurer's office?
15      A.   Correct.  After Sandy made the decision to
16  leave on her own, I made the decision to hire Kirsten
17  Van Ry.
18      Q.   Since we're on the subject of executive
19  assistant, did you hire a Matthew DeFalco to take the
20  place of Ms. Van Ry sometime around October 2019?
21      A.   I couldn't tell you the date, but, yes.  At
22  some point, Matthew DeFalco was in that role.
23      Q.   Okay.
24           And was his age approximately 32 at the time?
25      A.   I have absolutely no idea.
```

Page 23

```
1       Q.   Did he appear to be under 40 to you?
2       A.   Yeah.
3       Q.   Okay.
4            And -- where was I?  I forgot.  Let me see.
5            And in March of '22, did somebody by the name
6   of Emily Nagel become the new executive assistant?
7       A.   Yes.
8       Q.   And was Ms. Nagel approximately 29 at the
9   time?
10      A.   No idea.  Yes, under 40.
11      Q.   You think she was -- okay.
12           And so the executive assistant is -- you said
13  they're called "executive assistants," but they're
14  essentially secretaries?  They do secretarial type
15  tasks?
16      A.   It -- it depends on the person.  And so
17  because the executive assistant is unclassified, it
18  doesn't have duties laid out by statute.  We have used
19  them in this office.  And I'm sure different offices do
20  different things, but we have used them as effectively
21  a fill-in role in other places.
22           Kirsten Van Ry, for instance, is a law
23  graduate who had done policy work at some of the
24  highest levels in this State.  She's an exceptionally
25  bright individual.  And so she did almost no
```

Page 24

```
1   secretarial work, but she did a lot of additional help
2   from legislative session work and the rest because she
3   had the skill set, and because she was on the same page
4   as far as the -- general goals in the office, which
5   of course, are goals I set out and she agreed and wrote
6   in that direction.
7            It wasn't the case with all the deputies or
8   all the unclassified staff.  Emily, in that role, does
9   more secretarial duties, but also does things like,
10  constituent outreach and managing the inflow of emails
11  that come through the office from people that need
12  help, right?  So sometimes that's connecting people to
13  services, sometimes that's direct constituent work,
14  sometimes it's helping point people in the direction of
15  Social Security office, right?  So she's more in a
16  constituent service role than others.
17      Q.   Okay.
18           And so these executive assistants that we
19  went over, and I'm assuming -- and tell me if I am
20  wrong -- since Emily Nagel was hired in March of '22,
21  that she's the current executive assistant?
22      A.   She is.
23      Q.   And so is that your executive assistant?
24      A.   So because it's a relatively small office
25  that executive assistant provides duties for myself and
```

Page 25

```
1   often for the Chief of Staff Kirsten Van Ry and also
2   for Terry and other people in the office, right?  There
3   just aren't that many people who work in the Treasury.
4   And so somebody who's got a little bit of bandwidth is
5   often pulled in different directions by different
6   folks.
7       Q.   Let me ask you this:  Is there any executive
8   assistant, besides the three we have gone over, that
9   has been your executive assistant since you took
10  office?
11      A.   Yes.  There was a gentleman named Michael
12  Hawk who was the executive assistant for about a month
13  before he had a catastrophic personal tragedy and had
14  to leave the office.
15      Q.   And when was he hired?
16      A.   Between Matthew and Emily; so around the
17  beginning of '22, maybe end of '21.
18      Q.   And would you say that Mr. Hawk was under 40?
19      A.   I have absolutely no idea.  I don't think so,
20  but I have no idea.
21      Q.   Do you at all prefer to have younger
22  employees that -- do you relate better to younger
23  employees or --
24      A.   No.  Most of my employees are older than I
25  am.  I relate well to competence.
```

ZACH CONINE - 06/16/2022

1    Q.   Okay.
2         For example, give me some examples of your
3    current staff that are older than you?
4    A.   So let's talk about unclassified staff --
5    Q.   Yeah, unclass- --
6    A.   -- because there's --
7    Q.   Let me make sure I under -- classified is
8    someone that is --
9    A.   Classified are -- and I'll give you my best
10   definition, although I'm sure there's probably a better
11   legal one.  Classified staff are individuals who are
12   subject to all of the employment rules of the State of
13   Nevada around progressive discipline, pay stages,
14   et cetera, et cetera.
15        Unclassified employees serve with the
16   pleasure of the Treasurer, right?  And so they are,
17   typically, separated in two groups because these
18   employees are sort of effectively "at will," in the
19   unclassified role and classified employees aren't,
20   right?
21        And so when we are thinking about those
22   employees, the duties they do, how they do them, they
23   are more flexible, typically, at least in our
24   experience.
25   Q.   Okay.  But a classified employee, is that

1    someone that is -- that's not someone that's elected
2    or --
3    A.   No, no, no.  Elected -- elected is a totally
4    separate thing.  Classified employees are a majority of
5    State employees, right, who are not -- who do not serve
6    with the pleasure of.  So, like, I can't fire a
7    classified employee.  I can't walk in and say, "you no
8    longer work here."
9         Individuals who are unclassified serve at the
10   pleasure of the Treasurer or the Governor or the
11   Attorney General or whomever else are subject to that.
12   Q.   So --
13   A.   And it's a -- it's a bright line difference
14   in State government.
15   Q.   Okay.
16        So I understand -- so a classified employee
17   is someone that would be hired by someone other than
18   you?
19   A.   Typically, by an unclassified employee or by
20   another classified supervisor.  So if you look at,
21   like, the org chart of the Treasury and if -- it's
22   pretty similar, I think, in most places.  The Attorney
23   General's office, almost everyone is unclassified.
24   Just, you know, a fight for a different day.  But
25   the -- within the Treasury, the deputies, which are

1    effectively department heads, are all unclassified and
2    then the executive assistant.  And then everybody under
3    that line -- account techs, constituent services folks,
4    accountants, whatever -- investors -- are classified
5    employees.
6    Q.   Okay.
7    A.   So going back to your original question in
8    the unclassified staff, Tara Hagan, who's the Chief
9    Deputy, is older than I am and a woman.
10        Lori Chatwood, when I came in, who is the
11   Deputy of Debt, was older than I am and a woman.  She
12   retired reaching the end of her civil service and was
13   replaced by Jeff Landerfelt, who is older than I am and
14   a man.
15   Q.   Let me go first.  Tara Hagan --
16   A.   Sure.
17   Q.   -- is she still there?
18   A.   She is.
19   Q.   Okay.
20        But you didn't hire her?
21   A.   I did not.
22   Q.   Okay.
23   A.   I retained her.  I kept her.
24   Q.   Yeah, you retained her.  Okay.
25        And you said she's older than you, do you

1    know her age?
2    A.   No idea.  I know she's older than I am.
3    Q.   Okay.
4         And the second one that you said?
5    A.   Lori Chatwood, who I did not hire who was
6    here before I was, was the Director of Debt, right?
7    The debt deputy, she retired at the end of her service
8    and was replaced by another State employee by the name
9    of Jeff Landerfelt, who is the Deputy of Debt now, who
10   is older than I am.
11   Q.   And let me stop you there.
12        Were you responsible for hiring him?
13   A.   Yes.
14   Q.   Okay.
15        And you just know that he -- I haven't asked
16   you, but since it's relevant in this case --
17   A.   He has a child in his 20s.
18   Q.   The what?
19   A.   He has a child in his 20s.
20   Q.   Okay.
21        But how old are you?
22   A.   I'm 40.
23   Q.   Forty.  Okay.
24   A.   The -- the Deputy of Cash when I took office
25   was Amber Law, who is older than I am.  I don't know

ZACH CONINE - 06/16/2022

Page 30

1  how much older than I am, but older than I am based on
2  the age of her children and science.
3      Q.   And you said you hired Amber?
4      A.   I did not hire Amber.  Amber was in the
5  office when I got there as the deputy of cash.  She is
6  now a senior deputy; so I promoted her into another
7  role within the office.
8      Q.   Okay.
9      A.   The current deputy of cash is a woman named
10  Tami Law, and Tami -- I don't know how old Tami is.
11  Tami's probably around my age, give or take a couple
12  of years.
13           The --
14      Q.   And Tami, did you --
15      A.   Tami was a classified employee --
16      Q.   Oh, classified?
17      A.   -- who I promoted into an unclassified
18  position.
19      Q.   Okay.  I got you.
20      A.   We have our Investment Deputy, who when I
21  came in was a woman named Kim, and Kim took a job in
22  the Controller's Office.  She transferred out under her
23  own volition.  And she was replaced by a man named
24  Steven Hale.  Steven Hale is an African American man
25  who is older than I am.  I'm not sure how much older

Page 31

1  than I am.
2      Q.   And he's unclassified?
3      A.   He's unclassified.  These are all
4  unclassified people.
5      Q.   And you made the decision to --
6      A.   Hire him.
7      Q.   -- hire Him?
8      A.   Yes.
9      Q.   And he was hired from within -- inside the
10  State or as --
11      A.   He was not.  He was a new hire to the State.
12      Q.   A new hire.  Okay.
13      A.   The other deputies -- a deputy named Erik
14  Jimenez, who is younger than I am, and he is the senior
15  deputy in the -- he's, effectively, the Chief Policy
16  Deputy, which was a -- a shifting of roles and
17  responsibilities we undertook after -- after
18  Ms. Salehian and Ms. Yeatts left the office.
19           We have Kirsten Van Ry, who's my Chief of
20  Staff.
21      Q.   Was Erik chief of staff at any point?
22      A.   No.
23      Q.   No?  Okay.
24           And you are saying you were responsible for?
25      A.   All of these.

Page 32

1      Q.   But -- for Erik, you -- he wasn't a transfer.
2  You were responsible for hiring?
3      A.   He was hired by Treasurer Schwartz prior
4  to -- prior to my coming on, but he was hired for me.
5  Treasurer Schwartz brought him on board because there
6  was an open position to help with the transition.
7      Q.   Okay.
8           And you retained him?
9      A.   Correct.
10      Q.   And you're saying he is under 40?
11      A.   Yes.
12      Q.   Okay.  Okay.  Go on.  Sorry to interrupt.
13      A.   No.  Quite all right.
14           Kirsten Van Ry, who is my Chief of Staff,
15  we've already talked about.  And so she moved from the
16  unclassified position of executive assistant to the
17  unclassified position of Chief of Staff.
18           And Dr. Tya Mathis-Coleman, who runs
19  our -- who is the deputy over the College Savings --
20  is -- I'm not sure how old she is.  She's around my
21  age.
22      Q.   Okay.
23           And she was hired by you?
24      A.   Correct.
25      Q.   Okay.

Page 33

1           And anyone else you can think of?
2      A.   The deputy of Unclaimed Property who,
3  actually, her last day was yesterday, was Linda Tobin.
4  She resigned after -- retired after 25 years of State
5  service.  She had her -- bought the additional years;
6  so she could claim out a pension and she retired
7  yesterday.  She was older than I am.  She is older than
8  I am.
9      Q.   Okay.
10           And she is someone who was in the Treasurer's
11  office before you?
12      A.   Correct.
13      Q.   Okay.
14      A.   Yeah.  That's everybody.
15      Q.   That's everyone?
16      A.   Yeah.  I just wanted to make sure.
17      Q.   Okay.  And so I wanted to get into
18  Ms. Salehian, since that's obviously what the case is
19  about, and wanted to first ask you when you remember
20  first meeting Ms. Salehian?
21      A.   Ms. Salehian and I met with Beth Yeatts at a
22  restaurant called "Eat," which is no longer open, in
23  the Trails Village Center on a weekend, I believe, for
24  breakfast sometime between the time -- if I remember
25  correctly, that I was elected and I took office.

Page 34

1    Q.    Okay.
2    A.    So November, December of that year --
3    Q.    Okay.
4    A.    -- is my recollection.  It was years ago,
5    but --
6    Q.    Okay.
7          And do you recall what you discussed at that
8    meeting?
9    A.    Relatively vividly.  So at that meeting was
10   one of the first times I had met Ms. Salehian.  I
11   believe we had met before in some office visit or
12   another, but she and Beth Yeatts, basically, unloaded
13   this series of concerns that they had about the way
14   they had been treated by past Treasurers, the way that
15   their duties were confusing.  This was one of the first
16   times that Beth shared that she wasn't really sure what
17   her job was.
18         Sheila -- excuse me, Ms. Salehian and
19   Ms. Yeatts both advocated for the firing of Grant
20   Hewitt.  There was conversation about Ms. Salehian
21   taking Mr. Hewitt's job.  There was also kind of a
22   litany of, you know, "the North is doing these things
23   to me."  You know, Chief Deputy Hagan, is making --
24   Q.    Can you explain for me -- because I read a
25   lot of the -- some -- there's reference to North and

Page 35

1    South.  What is that?
2    A.    Yeah.  So half the staff of the Treasury is
3    in Carson City and half the staff of the Treasury is
4    in --
5    Q.    Oh.  I got you.
6    A.    -- is in Las Vegas.
7          And in the period of time prior to
8    Ms. Salehian and Ms. Yeatts leaving State service,
9    there was a massive amount of toxicity between the
10   North and the South.  I believe part of my decision was
11   based on the fact that that toxicity was coming
12   primarily from Ms. Salehian and Ms. Yeatts.
13         And so we were dealing with some pretty --
14   Q.    And they were both South?
15   A.    Correct.
16         Some pretty hazardous toxic work environment
17   problems up North and State deputies, long with State
18   service, classified and unclassified individuals coming
19   into my office crying because of the screaming and
20   abuse that they were receiving from the South.  And so
21   that was one of the things that lead to it.
22         But getting back to the first thing, that was
23   the --
24   Q.    And let me just stop you.  So I -- you said
25   there's 46 total employees?

Page 36

1    A.    It's about 50/50.
2    Q.    So that's between the North and the South?
3    A.    Yes.
4    Q.    Sorry for interrupting.
5    A.    Oh, not at all.
6    Q.    Go ahead.
7    A.    So that was the majority of the conversation
8    in the morning.  We talked a little bit about where the
9    College Savings Department was going, changes I wanted
10   to see, things that I needed to understand; right?
11   Like, how metrics were going and also, you know, this
12   discussion around where the -- where the department
13   could grow.
14         And one of my big focuses coming in, one of
15   the things I ran on, was I wanted the office to expand
16   its focus in College Savings to be less about selling
17   products and more about providing services.  And so we
18   talked about different ways to do that in financial
19   literacy, going into underserved communities,
20   increasing the number of people in the office who spoke
21   Spanish.  At the time, only one person in the office
22   spoke Spanish, which was sort of unfortunate in a State
23   that had as much Spanish-speaking people that we have.
24   And so we talked through all of those things.
25         The conversation was primarily led by

Page 37

1    Ms. Salehian.  Ms. Yeatts was present, but as happened
2    most of the time when the two of them were together, it
3    was a Salehian driven conversation, and Ms. Yeatts,
4    effectively, agreed, which was fine.  It didn't matter
5    to me, but I noticed it because of the internal org.
6    chart standpoint.  Ms. Yeatts was supposed to be in
7    charge of that department, but didn't seem to be.
8    Q.    At this breakfast meeting, did you tell
9    Ms. Salehian that, that under your administration
10   that -- that everyone was starting with a clean slate
11   and everyone would be held responsible to let go of the
12   past or words to that effect?
13   A.    Yes, absolutely.  And -- and that was one of
14   my major sources of frustration because while my
15   direction to staff broadly was, Hey, look.  I
16   understand there was some agita, especially from the
17   old chief of staff and the old treasurer, there was
18   some agita.  I wanted everybody to let go of that.  One
19   of my major frustrations and one of the areas that led
20   to Ms. Salehian's termination was her inability to do
21   that.  And so we kept picking at these old wounds,
22   which stopped us from doing our real job, which was
23   helping Nevadans.
24   Q.    Okay.
25         But as far as performance or what happened

ZACH CONINE - 06/16/2022

Page 46

1  clarify.  A lot of times, Grant -- when I talked to
2  Grant would say Treasurer Schwartz and I, right,
3  believe X or believe Y, some of which involved
4  Ms. Salehian.  But Treasurer Schwartz never said
5  anything directly to me about it.
6          MR. BALABAN:  Okay.  This is Exhibit 2.
7  BY MR. BALABAN:
8      Q.  And there's your copy.
9      A.  Thanks.
10     Q.  And have you seen Exhibit 2 before today,
11  Mr. Conine?
12     A.  I don't remember seeing it before today.
13     Q.  Okay.
14         I mean, it sounds like a -- looks like a
15  letter of recommendation for Ms. Salehian.
16         Do you have reason to disagree with anything
17  that he says in here?
18     A.  I haven't read it carefully.  I would --
19     Q.  Why don't you take a second and read it.
20     A.  -- definitely go out of my way to not speak
21  for Treasurer Schwartz.
22         The first paragraph is factual.  Second
23  paragraph is -- is factual, except for the fact that
24  the program doesn't have -- or didn't have 170,000
25  claimed accounts.  It had 170,000 ledger accounts,

Page 47

1  which most children had no idea about.
2          I can't speak to anything in the third
3  paragraph.
4      Q.  How about the last paragraph, where it talks
5  about her leadership, would you -- in your experience
6  with Ms. Salehian, was -- did she appear to be good at
7  leadership?
8      A.  Not from a staff perspective.  Not bad at
9  leadership from a staff perspective, but her team was
10  fine, right, and did have any complaints or any praise.
11         I think one of the -- one of the major things
12  that I look for in a leader is an ability to
13  communicate and work well with peers, and that was
14  pretty toxic.  We created a toxic environment in the
15  North and the South, and that -- that came down to
16  employees.  So there were employees under
17  Ms. Salehian's responsibility who were perpetrating or
18  prop- -- continuing the toxic environment.  And post
19  her departure, that toxicity removed itself.  And so I
20  would generally consider that to be a facet of
21  leadership.
22     Q.  Okay.
23     A.  I can't speak about her leadership in the
24  Treasurer's office's statewide financial literacy
25  efforts or the women's money conferences or anything

Page 48

1  else there.  That was pre-me.
2          MADAM COURT REPORTER:  Over, what, women's?
3          THE WITNESS:  The women's money conferences
4  or any of the rest of this.  This is all pre-me.
5  BY MR. BALABAN:
6      Q.  So between the North and the South -- Tara
7  Hagan, she was located in North?
8      A.  In the Carson City, yes.
9      Q.  Okay.
10         Do you think that was the main source of the
11  toxicity between Ms. Salehian and she, for whatever
12  reason, had a personality conflict or whatever?
13     A.  No.  Most of the -- I'm sure that was some of
14  it.  Most of the toxic behavior we saw was directed
15  towards a woman by the name of Amber Law and members of
16  her staff.  It was in the Cash Management department.
17     Q.  And she was North?
18     A.  Correct.
19     Q.  Okay.
20         And did you -- did you have an opinion as to
21  the -- why that was the case?  I mean, why her and
22  Ms. Law didn't get along?
23     A.  I -- I --
24         MS. PRUTZMAN:  I'm going to object to the
25  form of the question.  It calls for speculation.  I

Page 49

1  don't think he can speak to what she thought.
2  BY MR. BALABAN:
3      Q.  Well, again, I -- so you know the protocol in
4  depositions --
5      A.  Uh-huh.
6      Q.  -- she can make objections to the form.  If
7  you can answer, answer.
8      A.  Yeah.  I -- I can't speak for how anyone else
9  felt.  I can speak to what I saw.
10     Q.  Well, I mean, that's what I'm looking for --
11     A.  Right.
12     Q.  -- your interpretation.
13     A.  Which was a continued persistent belittling
14  of staff from Ms. Salehian to peers and people who
15  worked for peers in the northern office.
16     Q.  Including Ms. Law?
17     A.  Including Ms. Law -- including Ms. Law and
18  people who worked for her.
19     Q.  Okay.
20         Some of the other aspects, I mean, I'm
21  assuming in your position as Treasurer, you were able
22  to assess Ms. Salehian's job performance?
23     A.  Yes.
24     Q.  Was Ms. Salehian punctual to work?
25     A.  I found Ms. Salehian's timeliness to work and

ZACH CONINE - 06/16/2022

Page 50

1 to events to be kind of substantially similar to the
2 timeliness today. So most of the time, on time;
3 sometimes not on time, but not in the sort of way you
4 would find traumatic.
5     Q.   How about her attendance, did she have any
6 attendance issues as far as --
7     A.   Not that I'm aware of.
8     Q.   Okay.
9     Q.   How about her work product, to the extent you
10 saw her work product, would you say her work was
11 performed accurately and well?
12     A.   I would say that a majority of the work
13 product that Ms. Salehian created was scattered, best
14 way I can describe it.
15     Q.   Can you --
16     A.   Often well intentioned, but not quickly
17 getting to -- getting to the point or the goal. And we
18 talked about this a lot internally, starting as early
19 as March. During the legislative session, we would
20 make a request for a piece of information and get a ton
21 of information back that wasn't necessarily responsive,
22 right? And so we would say, "Well, what's the growth
23 in the program between A and B," and we would get back
24 reams and reams of reports that didn't actually answer
25 the underlying question. Or "where are new accounts

Page 51

1 coming from?" And we would get a ton of information
2 back that wasn't responsive. "How many people who have
3 College Kickstart accounts have 529 accounts?" Again,
4 reams and reams of information.
5          And so one of the things that Chief of Staff
6 Miles Dickson did at the time did was work with her and
7 Beth Yeatts, and again, this was a weird thing because
8 we usually work -- you know, help Beth and Beth
9 would -- would guide lead, but as I said, that
10 relationship was very strange, in which, you know,
11 Sheila seemed -- Ms. Salehian seemed to be the
12 supervisor in that relationship. In fact, Ms. Yeatts
13 had said in that original meeting "maybe we should just
14 switch jobs," which is concerning from a leader
15 perspective, right, that someone in a leadership role
16 thinks that they should be in another role and that the
17 other person agrees with them and that nobody else sees
18 it.
19     Q.   Let me stop you there. Besides that, what do
20 you think Ms. Salehian and Ms. Yeatts worked good
21 together or how did -- did you assess that at all?
22     A.   So that's a fair question. Let me answer
23 that in two parts. There was no toxicity between the
24 two of them. There is no daylight between the two of
25 them. The work product was suboptimal and the ability

Page 52

1 to pivot the office to focus on the things I wanted to
2 focus on. Remember, serving at the pleasure was
3 nonexistent.
4          And so when we said things like, Hey, we want
5 to reach out to Nevadans around the state and talk to
6 them about other things that exist besides just buying
7 a prepaid college tuition program or investing, we
8 would get resistance. And the biggest resistance we
9 would get is, Well, our budget's too small to do that.
10 That hasn't been the case. And when we went back and
11 looked at how we were spending money and where we were
12 spending money, we found a lot of opportunities to do
13 that thing better.
14     Q.   Well, let me ask you this: I mean, we've
15 been over the relationship between Ms. Salehian and
16 Ms. Hagan and Ms. Salehian and I forget her --
17     A.   Ms. Law?
18     Q.   Law. Compared to those type of
19 relationships, how would you -- I mean, what
20 was -- didn't Ms. Salehian and Ms. Yeatts seem to get
21 along a lot better than the other two?
22     A.   Yes. I cannot think of a time when
23 Ms. Yeatts came into my office sobbing because
24 Ms. Salehian had yelled at her.
25     Q.   Okay.

Page 53

1          So you said that although -- as far as their
2 work product, you're saying it didn't get to the point,
3 but it was -- it was basically accurate? Is that --
4 no?
5     A.   I would say it was basically inaccurate.
6     Q.   Because it didn't get to the point?
7     A.   Yeah. And I think we've got to back up a
8 little bit as to what the purpose of any public servant
9 office is, right? We're using taxpayer dollars to
10 provide a service. We're trying to do something. And
11 if we are unable to do that thing efficiently and
12 quickly, we have to look at the opportunity cost.
13          In this case, there's -- you know, about
14 5,000 K through 12 students in the state of Nevada, and
15 I believe they were being underserved traumatically,
16 which has proven to be the case, given what we've been
17 able to achieve given under the most recent deputy.
18     Q.   Okay.
19          MADAM COURT REPORTER: What we've been able
20 to do -- sorry.
21          THE WITNESS: Achieve under the most recent
22 deputy.
23 BY MR. BALABAN:
24     Q.   And so with respect to counseling -- and I'm
25 going to get into the termination in a little while,

ZACH CONINE - 06/16/2022

Page 62

1  Sheila was very frustrating is that -- Ms. Salehian,
2  excuse me, was frustrating to us was that she was great
3  at talking the talk, but absolutely unwilling or unable
4  to walk the walk.
5       Q.   Okay.
6            Okay.  So then I wanted to get into her
7  disability and ask you, when -- when were you -- when
8  do you recall first being aware that Ms. Salehian had
9  skin cancer and needed treatment for it?
10      A.   I believe the first time that Ms. Salehian
11 told us that she had something that she was dealing
12 with -- and I don't remember if she had it was skin
13 cancer at the time or something else -- was in the
14 middle of October.
15      Q.   Okay.
16           I --
17      A.   Early, middle October, around the 10th.
18           MR. BALABAN:  Okay.  Let's mark Exhibit 4.
19           (Exhibit 4 marked.)
20           MR. BALABAN:  Yeah, that's yours.
21           MS. PRUTZMAN:  Okay.
22           THE WITNESS:  Thank you.
23 BY MR. BALABAN:
24      Q.   And so take a second and look at Exhibit 4,
25 if you need to.

Page 63

1       A.   Mm-hmm.
2       Q.   This was the only document that I found that
3  in writing that Ms. Salehian indicated -- it's to --
4  it's an email to both you and Mr. Dickson and,
5  actually, Beth Yeatts too.  Do you recall receiving
6  this email from her?
7       A.   I do, yes.
8       Q.   Okay.
9            And would you say prior to this email is
10 dated October 22, 2019.
11           Would you say that prior to this email, she
12 verbally told you and Mr. Dickson about --
13      A.   Yeah.  A few days before this.  I couldn't
14 tell you the exact on how many days before, but a few
15 days before this, she told us verbally.
16      Q.   Okay.
17           And so how I understand it, and correct me if
18 I'm wrong, you guys -- you two -- I think it was one of
19 you -- allowed her to work from home and whatnot
20 because of this?
21      A.   She asked and we said yes.
22      Q.   Okay.
23           Are you familiar with the Americans With
24 Disabilities Act?
25      A.   Broadly, but not as a practitioner.

Page 64

1       Q.   Well, let me ask you this:  Did you feel that
2  when she was asking to work at home and whatnot and to
3  accommodate her treatments or -- or her recovery or
4  whatever that you were making accommodation for her
5  disability under the law?
6            MS. PRUTZMAN:  I'm going to object to the
7  form of the question.
8            THE WITNESS:  No.
9  BY MR. BALABAN:
10      Q.   Okay.  So why -- so when you allowed her to
11 work from home, what -- that was just -- I mean,
12 let -- let me ask you this:  Normally, a person has to
13 come in the office; right?
14      A.   No.  We had a fair amount of people who
15 worked remotely.  Certainly, currently we have a fair
16 amount of people who work remotely.  We try to be
17 flexible around people's lives.  Obviously, there's
18 documentation and other things that folks have to go
19 through if they're taking time off or if they're
20 working outside of hours.  And that was one of the big
21 frustrations we had with Ms. Salehian, is her sort of
22 inability to fill out that paperwork on a consistent
23 basis.  But if someone says they need a couple of days,
24 we give them a couple of days, if we can.
25      Q.   So if Ms. Salehian came to you and just said,

Page 65

1  Hey, I want to work home for the next week or so
2  because I -- you know, I don't know, something with
3  my --
4       A.   My plumbing broke.
5       Q.   Yes.
6       A.   We would say yes.
7       Q.   All right.
8       A.   And, in fact, that does happen with deputies.
9  They'll have a -- death in the extended family or we
10 had a deputy last week whose dog passed away or parents
11 dog passed away, and so she needed to work from home
12 for a day.  Fine.
13      Q.   Okay.
14           But -- but you, obviously, were aware that
15 she had this condition?
16      A.   Yes.
17      Q.   Okay.
18           And did -- you said you're broadly aware of
19 the ADA.  Did you at all -- you or Miles at all assess
20 that as a disability under the law, or how did you --
21      A.   No.
22      Q.   And why wouldn't you if it -- if it -- I
23 mean, it, obviously, was a medical condition; right?
24      A.   I'm not a medical professional or an ADA
25 attorney.  I didn't spend any time thinking about it at

ZACH CONINE - 06/16/2022

Page 66

1  all.
2       Q.   As far as procedurally at the Treasurer's
3  office, is -- is there a formal procedure that is
4  followed as far as somebody asking for accommodations
5  under the ADA?
6       A.   I don't know.
7       Q.   Okay.
8            So since you've been at the Treasurer's
9  office, which it sounds like three years now -- or
10 almost going on four, do you recall any individual
11 being out on any type of ADA or FMLA leave during the
12 time you've been there?
13      A.   I don't recall.
14      Q.   Okay.
15           Is that -- are there -- would there be
16 specific people that would handle that if that was the
17 case?
18      A.   Yeah.  It was direct supervisor which would
19 handle it.  The chief of staff, the deputy chief of
20 staff, the sort of administrative functionality, I
21 don't typically get involved in.
22      Q.   Okay.
23           MR. BALABAN:  Let's mark Exhibit 5.
24           (Exhibit 5 marked.)
25 \\

Page 67

1  BY MR. BALABAN:
2       Q.   And my question to you, Mr. Conine, have you
3  ever seen Exhibit 5 before today?
4       A.   I have no recollection of it.
5       Q.   Okay.
6            MR. BALABAN:  And let's mark 6.
7            (Exhibit 6 marked.)
8  BY MR. BALABAN:
9       Q.   And as far as Exhibit 6, for the record, is
10 FMLA paperwork.
11           Prior to today, have you ever seen Exhibit 6?
12      A.   No.
13      Q.   The Complaint alleges that Ms. Salehian was
14 intending to give you and/or Mr. Dickson Exhibit 6 on
15 October 28th, the day she was informed she was
16 terminated, but was -- wasn't able to do that because
17 she was told she was terminated prior to that.  Did she
18 ever mention prior to the 28th that she needed to go
19 on FMLA?
20      A.   No.
21           And to clarify she also didn't mention on the
22 28th that she needed to go on FMLA.  She has never
23 mentioned to me that she needed to go on FMLA.  And at
24 the meeting on the 28th, did not try to hand me work a
25 piece of paper or say, "Here's my FMLA paperwork," or

Page 68

1  "I have to give you this," or any version of that.
2  There was no intention -- well, I can't speak to
3  intention.  There was no act to hand the document to
4  myself or Mr. Dickson.
5       Q.   You didn't -- you didn't see in a folder or
6  her holding this paperwork?
7       A.   She did not try to hand us anything.
8       Q.   Okay.
9            MR. BALABAN:  Okay.  Let's mark next in
10 order, Exhibit 7.
11           (Exhibit 7 marked.)
12 BY MR. BALABAN:
13      Q.   And Exhibit 7, I know it's not -- you're not
14 involved in this email.  It's from Miles Dickson to
15 Beth Yeatts and Sheila Salehian.
16           But were you aware that this email was going
17 to be sent by Mr. Dickson before it was sent?
18      A.   Yes.  This was the third attempt we made to
19 terminate Ms. Salehian.
20      Q.   Wait.  Let me stop you there.  You said
21 something -- what -- the third attempt that you --
22      A.   So we -- I had -- or have a desire to
23 terminate people in person.  And so we had a number of
24 times -- I believe this was a third -- where I was
25 planning to fly down from Carson City to terminate

Page 69

1  Ms. Salehian.  We wanted to do it in person.
2       Q.   Let me stop you there, also just to get
3  clarification.
4            So is -- your main office is the North?
5       A.   I go back and forth at the time.  During
6  2019, I lived and worked in Carson City a majority of
7  the time.
8       Q.   Okay.  Okay.  Sorry about that.
9       A.   Sure.  And so this was an additional attempt
10 to try to do that in person.
11      Q.   Okay.  So tell me about the first two
12 attempts?
13      A.   So the first attempt was earlier in the month
14 of October-- and I guess I should start the process
15 from the beginning.
16           So after the legislative session, we had come
17 to Jesus with the executive team about all of the
18 deputies and how they were performing.  At that time,
19 it was identified that Ms. Salehian and Ms. Yeatts were
20 not up to the standards that we wanted them to be.
21 We're not rowing in the same direction.
22           In the beginning of August, after we had
23 started the process of doing the annual reports, it
24 became clear in that -- that annual strategic planning
25 session, which is around the same time that -- that

Page 70

1 Ms. Salehian -- that was the day where she took the
2 oath of office, again, reaffirming that she served at
3 the pleasure of the Treasurer. At that meeting and at
4 that time, we're, like, this isn't going to work. The
5 beginning --
6    Q.    And so just to put the time frame in
7 perspective, this was -- you -- you said, you took
8 office in February of 2000 --
9    A.    January of 2019.
10    Q.    So this is around eight months after you took
11 office?
12    A.    Seven, yeah.
13    Q.    Seven, eight. Okay.
14    A.    The end of the legislative session happens
15 right -- beginning of July, started having these
16 conversations. Wanted to give everybody one more shot
17 with the strategic planning gripe, maybe. We would get
18 something out of that process different than what we'd
19 seen before; we didn't.
20         So towards the middle of August, we made the
21 determination internally and started going down the
22 process of understanding. On September 3rd, we
23 reached out to counsel to understand, basically, how to
24 effectuate -- so when I say "counsel," the Attorney
25 General, the Deputy Attorney General of our office.

Page 71

1    Q.    Can you stop there? So is there any -- I
2 mean, because I haven't seen anything. Is there
3 anything in writing, either notes from anyone or email
4 to the Attorney General, that indicates that you
5 were -- on this date, you were inquiring how we
6 terminate Ms. Salehian?
7    A.    I'm not sure what's privileged and what's not
8 privileged here; so I want to be --
9         MS. PRUTZMAN: I provided a privilege log,
10 and there -- some of these emails are on the privilege
11 log that's provided with our response to the Request
12 For Production of Documents.
13         MR. BALABAN: Okay. I'll have to look
14 at -- I mean, is it just -- it --
15         MS. PRUTZMAN: I mean, those emails are
16 privileged, obviously, privileged communications.
17         MR. BALABAN: Well, yeah. But, I mean, it
18 seems like that's at issue here, as far as when -- I
19 mean, I know I'm hearing that in August they had made
20 the decision to terminate Ms. Salehian, but it -- it
21 seems that an email that -- without disclosing
22 privileged information, it seems like something could
23 be produced that indicate, Hey, we -- we made the
24 decision to terminate Ms. Salehian as of this date, and
25 we wanted to find out how to do it, or whatever.

Page 72

1         MS. PRUTZMAN: Right. Well, I think, we
2 could maybe meet and confer and discuss how we could do
3 that. I agree the dates and whose -- you know, maybe.
4 I'm not -- we're not going to hand over the privileged
5 communication, itself, but there are some documents
6 that were also produced that are responsive to your
7 request for documents that would be around that time
8 frame.
9         MR. BALABAN: Okay.
10 BY MR. BALABAN:
11    Q.    Well, let me ask you this, Mr. Conine: Did
12 you take any notes that would have been dated around
13 August of 2019 that indicate, Hey, we discussed --
14 myself and Mr. Dickson discussed, Hey, we're going to
15 go in a different direction with Ms. Salehian or
16 Ms. Yeatts or --
17    A.    No. As is my typical practice, right, I
18 don't take notes on conversations with in- --
19 individual people. I take a lot of constituent notes,
20 but not a lot of notes about staff and things.
21    Q.    So how do you remember stuff, then, if
22 you -- just through your -- in your head, that you had
23 a conversation with so and so about this staff member
24 or --
25    A.    Well, it's a relatively big decision to make

Page 73

1 a choice. The only terminations I've done since I've
2 been Treasurer -- we spent a lot of time talking about
3 it, looking for alternatives; couldn't find any.
4    Q.    So let me stop you there.
5         You're saying Ms. Salehian and Ms. Yeatts
6 are -- since you've taken office are the only two
7 people that have been terminated by you?
8    A.    Yes.
9    Q.    Involuntarily?
10    A.    Yes.
11    Q.    Okay. Go ahead. I didn't mean to cut you
12 off.
13    A.    I -- I guess I'm thinking about Grant, right,
14 because Grant resigned. But, obviously, we asked him
15 to. The --
16    Q.    So the only two where it was an involuntary
17 termination --
18    A.    Correct.
19    Q.    -- meaning that you terminated -- or the
20 Treasurer's office terminated them, the only
21 terminations since you -- you took office in January of
22 2019 are Ms. Salehian and Ms. Yeatts?
23    A.    Unclassified. I can't speak to classified.
24    Q.    Yeah.
25    A.    There may have been a termination on the

ZACH CONINE - 06/16/2022

1 Unclaimed Property and College Savings.  And so we were
2 looking to replace that body with somebody I trusted,
3 who had a skill set.  And so Miles' focus from the
4 beginning was Unclaimed Property and legislative stuff,
5 occasionally.  Although, he wasn't as involved with
6 that in person, mostly on the phone.  But the Unclaimed
7 Property department and the College Savings department,
8 and then over time it became almost completely College
9 Savings to fill that void.
10       Q.   Okay.
11            So with respect to Mr. Dickson, did you have
12 him in mind as chief of staff when you were elected?
13       A.   Mr. Dickson and I talked about him being
14 chief of staff around November of 2018, maybe December.
15 We had dinner, Mr. Dickson, his partner, my wife at
16 Nitaya's, at the old location, table in the back room.
17 I don't know if you ever had the secret salad there,
18 but they have a spinach salad with tempura.  It's off
19 the charts.  It doesn't matter.
20            Anyway, so we were there and we were there
21 for a couple of hours and talking about what that
22 office could do or not.  Miles was on -- at least our
23 understanding was -- Miles was on a short list to
24 potentially take a senior advisory role in the
25 Governor's office to work on federal funds, and so we

1 were waiting to see what happened there.
2       Q.   Okay.
3            But it -- but it sounds like -- it sounds
4 like you -- Grant Hewitt, he wasn't even terminated
5 until -- until you took office; right?
6       A.   Grant, I believe --
7       Q.   It sounds like you had made the decision to
8 replace Mr. Hewitt before -- before he even terminated
9 at --
10       A.   Mr. Hewitt, I believe, resigned.
11       Q.   Well, resigned?
12       A.   Regardless, Mr. Hewitt's a Republican
13 operative.  I'm a Democratic elected official; right?
14 Mr. Hewitt was helping my opponent in the election,
15 right?  He's a -- he's a Republican through and
16 through.  And I don't have a problem with Republicans,
17 but I wasn't going to hire one to be my Chief of Staff.
18       Q.   Yeah.  Well, no.  I think before you had
19 given another reason.  That's what I was trying to get
20 at.  It was -- it sounds like it was political,
21 basically.
22       A.   It's trust based, right?
23       Q.   Yeah.
24       A.   So, I mean, this is a person who I then heard
25 from all the staff was not in a role, right?  Because,

1 certainly, one thing that Grant was suggesting was that
2 we let go Ms. Salehian and that Grant take over the
3 College Savings department.  He understood that I
4 needed a Chief of Staff that I knew and I trusted.  He
5 had worked with Treasurer Schwartz, apparently, at some
6 point on their campaign.  And that's usually where that
7 type of person comes from, right?  It's a relationship
8 that you already have.  Elected officials don't make a
9 lot of new friends.
10       Q.   Okay.
11            Is it fair to say that you made the decision
12 to replace the Chief of Staff with Mr. Dickson when you
13 were elected?  When you got -- you already had that in
14 your mind that you were going to replace --
15       A.   Yeah.  That's fair.
16       Q.   -- and that Mr. Dickson was going to become
17 your Chief of Staff?
18       A.   Not that Mr. Dickson was going to be the
19 Chief of Staff, but that someone else besides Grant was
20 going to be the Chief of Staff.  I talked to a number
21 of people besides Mr. Dickson at the time.
22       Q.   Okay.
23            And Mr. Dickson's age is?
24       A.   I don't know.  He's around my age.
25       Q.   Around your age.  Okay.

1            Okay.  And Mr. Hewitt, I think you said
2 he -- you didn't know his age, but you thought he was
3 around --
4       A.   Around my age.
5       Q.   Oh, you think he's around your age too?
6       A.   Yeah.  Maybe a couple of years older, but I
7 don't know.
8       Q.   Okay.
9            Okay.  And sorry about getting off that --
10 getting onto that tangent.  But at any rate, so we were
11 discussing -- and you can pick up -- we were discussing
12 the process that led to your decision to -- and -- and
13 since you mentioned Ms. Hewitt, I mean, I think it's
14 somewhat relevant here.  You could add her into the
15 discussion as far as the decision to terminate.  I
16 mean, wasn't it a joint type of decision that you were
17 going to terminate both of them?
18            MS. PRUTZMAN:  I'm sorry, you said
19 Ms. Hewitt.  I think you mean Ms. Yeatts.
20            MR. BALABAN:  I mean, Ms Yeatts, excuse me.
21            MS. PRUTZMAN:  Okay.
22            THE WITNESS:  The decision to terminate were
23 for different reasons.  And we're, obviously, not here
24 to talk about Ms. Yeatts, but --
25            I can answer that?

ZACH CONINE - 06/16/2022

Page 82

1    MS. PRUTZMAN:  Yeah, you can answer that.
2    THE WITNESS:  Okay.
3    The decision to terminate Ms. Yeatts is
4  because she didn't know what her job was supposed to be
5  and had no interest in finding it.  She said numerous
6  times like, "I'm not sure what I'm supposed to be doing
7  here," which is not the sort of the response that we
8  want to hear from an employee making over $100,000 in
9  taxpayer money, right?
10 BY MR. BALABAN:
11   Q.   So let me stop you there.  What I'm
12 understanding, and correct me if I'm misstating, that
13 Ms. Hewitt -- Ms. Yeatts was terminated for more of
14 competence reasons and Ms. Salehian was more because
15 she didn't get along with people?
16   A.   No.  They were both -- they were both
17 terminated for competence reasons.
18   Q.   Competence.  Okay.
19   A.   Different competence reasons, right?
20 Ms. Yeatts was not aggressive; Ms. Yeatts was not
21 hostile.  Ms. Yeatts did not continually bring up
22 things that happened half a decade ago.  But Ms. Yeatts
23 was in a leadership role and seemed to not want to be.
24 It was very strange.
25   I've never had an employee quit like

Page 83

1  Ms. Yeatts, but that's not why we're here.  The --
2    Q.   And then Salehian was because of focus
3  issues -- or I don't want to put words into your mouth.
4    A.   No, I appreciate that.
5    Q.   What was her reason?
6    A.   The "for what" reason on Salehian is we
7  believed; right?  A, serves at the pleasure, and it was
8  not my pleasure that she continue the employment.  B,
9  she wasn't doing the job we needed her to do.
10   And after repeated attempts to try and shift
11 that focus, right, because we wanted to take that
12 office and help people who didn't have access to
13 education get access to education.  We didn't want to
14 just sell product; we wanted to talk to people.  And we
15 were unable to shift her mindset away from all these
16 grievances in the past into helping people of color and
17 poor kids go to school.
18   Q.   Okay.
19   A.   And -- too much time was spent on stuff
20 that we had said didn't matter and not on stuff that we
21 had said matters, that I had said matters.
22   Q.   Okay.
23   So we have the August time frame where you
24 saying you initially talked with Mr. Dickson about it.
25   A.   And Ms. Hagan.

Page 84

1    Q.   And Ms. --
2    A.   Hagan.
3    Q.   Hagan.  Okay.
4    A.   And then we started --
5    Q.   And then these were usually on the phone?
6    A.   Almost completely.
7    Sometimes Ms. Hagan and I would be in the
8  same place and Mr. Dickson would be in Southern Nevada.
9    Q.   So Mr. Dickson's main office was southern?
10   A.   Correct.
11   Q.   And you and Ms. Hagan were Northern?
12   A.   At the time, we're Northern, yeah.
13   The --
14   Q.   And that's changed?
15   A.   Yes.  My main office is down here now.
16   Q.   Down here now.  Okay.
17   A.   But goes back and forth, right?
18   Q.   Okay.
19   A.   The -- so conversation, determination made.
20 In August, start the process -- end of August, started
21 the process the beginning of September.  That process
22 takes awhile, documents are exchanged, discussions
23 on -- on severance and things like that, which are not
24 always offered, but we wanted to offer it in this case.
25 Specifically --

Page 85

1    Q.   Let me -- let me stop you there.
2    As far as the process goes, I mean, what is
3  the process, as far as you make the decision, is there
4  paperwork that -- I mean, you said you had the final
5  approval; so there wouldn't be any other approval
6  besides you approving it; right?
7    A.   Yeah.  And so when we make the decision, then
8  it becomes a conversation of how, right, which is the
9  conversation we had with counsel, the creation of the
10 separation agreement, et cetera, et cetera.
11   And then I'm sure there was some
12 administrative work that needed to be done by Chief of
13 Staff Dickson or Chief Deputy Hagan.  I don't know what
14 that -- I'm sure there's some systemic, you know,
15 turning off access and emails, things like that, but
16 that's not -- I don't focus on that kind of -- and so
17 that, you know -- that all starts happening.
18   We --
19   Q.   So they should know about that because, I
20 mean, it seems a long time from, basically, making the
21 decision in August-- what part of August again?
22   A.   The end of August.
23   Q.   End of August until almost the end of
24 October delaying the decision?
25   A.   Two -- and two pieces went into that, right?

ZACH CONINE - 06/16/2022

1  One, it's the State.  State doesn't move as quickly as
2  you would expect folks to move, typically.  And so we
3  wanted to make sure -- we had not done one of these
4  before.  We wanted to make sure we did it right.
5  That's why we wanted to involved counsel.  We had not
6  offered severance before, I've not; so we wanted to
7  make sure we got that right.  Needed to make sure that
8  in the -- in the -- after that termination that there
9  were plans about who would talk to who so we didn't
10 have a missing piece, right?  That we were able to
11 reach out to vendors and tell them, et cetera,
12 et cetera, right?  So, I mean, it's transitioned to two
13 people in the office, it's a relatively small office.
14 You have to make sure you do that right.
15      And separately, we tried to terminate
16 Mrs. Salehian and Ms. Yeatts a number of times.  We
17 wanted to do it on the same day, we wanted to do it on
18 a Friday, and I wanted to be there in person.  And so
19 those three things moved it back to back into the end
20 of October after trying to do twice before that.
21      Q.   Okay.
22           And the two attempts before that -- why --
23 can you explain those?
24      A.   One attempt before I flew down -- that's a
25 while back; so I'm going to get this wrong.  But I flew

1  down, and Ms. Salehian called out of work that day.
2  And so I was here, she wasn't here; so I couldn't do it
3  in person.
4       Q.   And let me stop you there.
5            Would you have a copy of your flight receipt
6  or anything indicating that you flew down?
7       A.   Yeah.
8       Q.   So you'd be able to produce that to your
9  attorney?
10      A.   Yes.  It should either the -- I can't
11 remember if I actually flew down or we caught it
12 before -- I don't remember when Ms. Salehian called
13 out.  I don't remember if I flew down and sat around or
14 if I canceled it right before.  But either way, we got
15 a record of that -- of that travel request.
16      Q.   Okay.
17           But, of course, I mean, you fly down for a
18 number of reasons -- or you flew down for a number of
19 reasons, didn't you?
20      A.   Yeah.  Not usually on a Friday for one
21 specific purpose, which was terminating Ms. Salehian
22 and Ms. Yeatts.
23      Q.   Okay.
24           But there's not going to be any documentation
25 notes from you or emails or anything where you say

1  "hey, I've -- hey, Grant.  I'm flying down today."
2       A.   Grant was no longer at the office.
3       Q.   I mean, I misspoke.
4       A.   Mr. Dickson.
5       Q.   To Mr. Dickson, "Hey, I'm flying down so we
6  can terminate Ms. Salehian."
7       A.   No.
8       Q.   Okay.  Go ahead.  So that was the first time.
9            Do you remember a date on that, approximate
10 date?
11      A.   So that would have been around the 11th,
12 October 11th.
13      Q.   So October 11th would have been the initial
14 date?
15      A.   Yeah.  And we tried again, I believe, on the
16 18th and was unsuccessful.  And then --
17      Q.   And on the 18th, why is that?
18      A.   The 28th was the actual -- this is -- I might
19 have got the dates wrong.  But, basically, we were
20 trying to do it on a Friday.  It is less disruptive, in
21 my experience, when you terminate senior leadership
22 folks on a Friday.  It's usually less embarrassing for
23 them.  And they are going for sort of less of a scene.
24 And we had a concern, based on experience that we had
25 with Ms. Salehian, the potential of a -- a scene,

1  a -- you know, an employee wanted to make it as -- as
2  -- as unemotional as possible.
3       Q.   Okay.  So why didn't it work on the 18th?
4       A.   If I remember correctly, she wasn't in the
5  office, but I -- there were two attempts.  One was on
6  the 11th, one was in the middle, and then -- and then
7  the attempt that worked.
8       Q.   Well, let me ask you this:  On the 18th,
9  why would you make an attempt when you knew
10 Ms. Salehian was not in the office and you said
11 yourself you wanted to do it in person?
12      A.   If I remember correctly, there was some back
13 and forth that she may be coming in or not coming in.
14 We didn't know.  And so we were going to do it that
15 day.  I don't believe I ever ended up flying down for
16 one -- the conversation in the middle.  And then we
17 ended up having the conversation on the 28th.
18           My recollection about the middle one is a
19 little hazy.  I can't remember if that was something we
20 booked and then had to cancel, or we were just like,
21 Well, can we do it next Friday, and we couldn't do it
22 next Friday.
23      Q.   And your testimony is you actually flew down
24 on both of these days?
25           I mean, you said 11th and 18th, but you're

Page 98

1        Is there any documentation you know is going
2 to indicate that?
3     A.   Certainly.  In the back and forth with her
4 deeply unprofessional and unsubstantial and, frankly
5 embarrassing strategic plan responses would speak to
6 that.  But I think you can look at her work product
7 compared to anyone else's work product in the office
8 and show she wasn't picking up what we were putting
9 down.
10     Q.   No, I understand.  And you've told me that
11 before.  But what I'm looking at is anything that
12 indicates -- because you didn't tell her -- you didn't
13 give her any reasons on the termination date; correct?
14     A.   Correct.
15     Q.   So how do -- how do we know that you actually
16 had those reasons when you terminated her and you
17 didn't just create the reasons after the termination?
18        Is there anything that documents either notes
19 from you, notes from Mr. Dickson, notes from Ms. Hagan,
20 that these were reasons that we were terminating her?
21     A.   I can speak to my own notes, which I don't
22 take notes about this sort of thing.  I can't speak to
23 Mr. Dickson's notes, Ms. Hagan's notes.
24     Q.   Okay.
25        Well, let's go through some of these reasons.

Page 99

1 The first one that comes up is (as read):
2        "Plaintiff was terminated because she was not
3 demonstrating the leadership or strategy skills that
4 were necessary to improve the operations and outcome of
5 the college savings department."
6        What -- can you give me specifics on that?
7     A.   Absolutely.  When asked to put together a
8 strategic plan about how she was going to help more
9 Nevadans plan for, save for, pay for college, she put a
10 plan that was both not responsive, and in a lot of
11 ways, absolutely incoherent.
12     Q.   And the plan you're talking about was?
13     A.   The strategic plan in 2019.  But that was
14 simply the most recent version of an inability to
15 demonstrate leadership or strategic skill.
16        Every time we would ask for a piece of
17 information, when we needed help during a legislative
18 session, when we asked about "Hey, what are we going to
19 do to increase the number of people who are getting a
20 certain kind of plan or another kind of plan," her
21 responses were always nonresponsive.  They were always
22 like, "if I had a bigger budget, I could do it."  Not,
23 here's what I can do with my budget.  Or "Well, so and
24 so put me in this position, or, well, Tara doesn't want
25 us to be successful, or, well, Grant did something back

Page 100

1 in the day."
2     Q.   Okay.
3        But getting back to the plan itself, has the
4 plan been produced, the plan that you're saying she
5 that didn't do correctly?
6     A.   I don't know.  I don't know.
7     Q.   Okay.  You don't --
8        MS. PRUTZMAN:  I'm sorry.  Objection to the
9 form.  It's vague.  Can you describe --
10 BY MR. BALABAN:
11     Q.   Well, you are saying she put together a plan;
12 right?
13     A.   A strategic plan, yes.  Yes.
14     Q.   A strategic plan.
15        I'm assuming that's a document; right?
16     A.   Yes.
17     Q.   Has that been produced in this litigation?
18        MS. PRUTZMAN:  Oh, you mean produced?
19        MR. BALABAN:  Yeah.
20        MS. PRUTZMAN:  I'm sorry.  I thought you
21 meant did that ever --
22        THE WITNESS:  That's what I --
23        MS. PRUTZMAN:  I was confused.  No that has
24 not been produced.  The document -- the actual
25 strategic plan.

Page 101

1 BY MR. BALABAN:
2     Q.   Yeah.  So is that document something that you
3 or Mr. Dickson -- well, Mr. Dickson is not at the
4 office any; right?
5     A.   I'm sure we have a copy of that document.
6     Q.   So you would be able to get that to your
7 attorney and produce it what -- so that's the plan
8 you're saying was not done correctly?
9     A.   Correct.
10     Q.   Okay.
11        And with respect to that plan, you're saying
12 you would not have done anything in writing critiquing
13 that plan, why it wasn't done correctly?
14     A.   No.  But Mr. Dickson did at length.
15     Q.   Okay.
16        So that -- those notes should be able to be
17 produced also; right?
18     A.   I would think so, yeah.
19     Q.   Getting -- going down to the second one (as
20 read):
21        "In particular, she lacked initiative to
22 identify and develop solutions to known challenges."
23        Can you give me an example of that?
24     A.   Sure.  We had a program called the College
25 Kickstart, which provides $50 in free college savings

Page 114

1 "Plaintiff was asked to provide a strategic
2 plan for the department in June of 2019. Plaintiff
3 submitted a plan that lacks clarity, priorities, and
4 accountability measures and therefore fell short of
5 what was expected of an unclassified employee in the
6 Plaintiff's position."
7         Didn't we already go over that?
8     A.   I think so, yeah.
9     Q.   And you said you would provide that plan to
10 your counsel where she didn't do it correctly?
11    A.   I think there's a mechanic here, which you
12 request documents and I'm sure however that works,
13 will -- will work.
14    Q.   Okay.
15         And lastly (as read):
16         "Plaintiff also exhibited an unwillingness to
17 adapt to changes by senior management."
18         Do you have examples of that?
19    A.   Stop focusing on financial literacy. We
20 asked you focus on other things. Stop creating a toxic
21 environment for your coworkers; stop yelling at your
22 coworkers; stop making your coworkers cry and sob; stop
23 calling your coworkers incompetent; stop attempting to
24 get funds from the State for travel that you didn't do.
25 Stop doing these things. Stop.

Page 115

1     Q.   And when you say "senior management," you're
2 referring to yourself and Mr. Dickson?
3     A.   And Deputy -- Chief Deputy Hagan.
4     Q.   And Hagan. Okay.
5         I wanted to mark -- because you had mentioned
6 the Separation Agreement. And I -- it seems like it
7 was mostly Mr. Dickson that was in charge of this, but
8 I -- I just had a couple of questions for you on it.
9 Let's see. We're on, I believe 9; is that correct?
10    A.   It is, yes.
11    Q.   Yeah, 9. Okay.
12         (Exhibit 9 marked.)
13 BY MR. BALABAN:
14    Q.   Okay. And Exhibit 9 is the Separation
15 Agreement and Release Of All Claims.
16         And I wanted to ask you first: Have you seen
17 this document before today?
18    A.   Yes.
19    Q.   And what is the procedure on -- on this
20 agreement?
21         Is this given to all unclassified employees,
22 or is it given just to some of them, or how does that
23 work?
24    A.   Since I've been Treasurer, which is the only
25 thing I can speak to, we have given it to both of the

Page 116

1 people that we terminated. That's Salehian and
2 Ms. Yeatts.
3     Q.   So that's the only ones you recall giving it
4 to since you've been Treasurer?
5     A.   That's the only ones I've terminated, yes.
6     Q.   Okay.
7         And it looks like from reading the agreement,
8 if she would have signed this, she would have got more
9 pay or whatnot. It looks like six weeks paid
10 administrative leave, and I think her -- her
11 termination would have indicated she voluntarily
12 resigned or something of that nature.
13         Is that more or less accurate?
14    A.   Yeah. I mean, the contents of the document
15 are the contents of the document.
16    Q.   Okay.
17         So do you know why you would -- why was the
18 decision to do this for employees that you indicated
19 that were involuntarily terminated, why would you have
20 given them the option to sign this and -- and have it
21 indicated that they resigned opposed to -- or
22 involuntarily terminated?
23    A.   In my experience, in higher level positions,
24 when there's a decision to terminate someone, you often
25 give them the opportunity to resign for a series of

Page 117

1 reasons. One, it's better for them from a résumé
2 perspective. Two, typically, there are terms and
3 conditions in a separation agreement that are
4 beneficial for both parties. And if someone chooses to
5 take them, they're able to.
6     Q.   Okay.
7         And were you the one that was interacting
8 with Ms. Salehian on this as far as whether she was
9 going to sign it and whatnot?
10    A.   No.
11    Q.   Or was that Mr. Dickson?
12    A.   It wasn't me.
13    Q.   Okay.
14         So I'll save that -- those questions for
15 Mr. Dickson.
16         Oh, with respect to Exhibit 8, the
17 interrogatory responses and the answer we went over and
18 any other answers, did you have anything to do with
19 preparing any of those answers or giving input to any
20 of them?
21    A.   Yes.
22    Q.   Would No. 1 -- you would have had some input
23 on that one?
24    A.   Yes.
25    Q.   How about any of the other ones?

ZACH CONINE - 06/16/2022

Page 122

1          Do you know what that refers to?
2     A.    I don't.
3     Q.    And then she has (as read):
4          "Desperate treatment of employees based on
5    age.  Leadership circle changed to exclude Senior
6    Deputy South, 63 -- age 63, while continuing to include
7    Deputy North under 40, and began exclusion of newly
8    appointed Executive Assistant under 40."
9          Do you know what that means?
10     A.    I don't.  The Senior Deputy South in this
11    case would have been Beth Yeatts, who's included in all
12    conversations about senior leadership functionality.
13    The executive assistant was included in those
14    conversations from a note taking perspective.  And as I
15    mentioned earlier, they were helping with other special
16    projects, but I'm not familiar with any exclusion.
17          Now, certain people had different duties.  So
18    we were talking about, say, legislative actions we
19    would be talking to the team that was working on
20    legislative priorities, which did not include the
21    Senior Deputy South; did include the Senior Deputy
22    North because of the duties of that job.  Again,
23    decided by and assigned by with the people who serve at
24    the pleasure of, which was me.
25     Q.    Okay.

Page 123

1          Next one it says (as read):
2          "Treasurer Conine refusal of rides to and
3    from CS publicity events and meetings from CS deputy
4    58."
5          I'm assuming that refers to Ms. Salehian.
6    (as read):
7          "One of that position's normal duties while
8    accepting rides from other staff members all under 40."
9          Do you know what that means?
10     A.    I know what all of those words mean.  I can
11    drive a car and typically drive myself to events.  I
12    have thought of one event that happened in Southern
13    Nevada where my Executive Assistant drove me back to
14    the office after the event.
15          Within the duties of anyone in the office, it
16    doesn't include the transport of other people.  I had a
17    car in Northern Nevada and Southern Nevada.  And where
18    I have a car, I typically drive myself.
19          Different Treasurers, it appears over time,
20    have had a different need to be driven to things.  I
21    don't.  And most events I go to, I am unstaffed.  I go
22    by myself.  Occasionally, I go with a staff member, but
23    I do not need to be babysat.
24          And certainly the job -- and this is, I
25    think, a source of some of our frustration, but I think

Page 124

1    it's good.  It's illustrative.  The job wasn't to drive
2    me around.  The job was to help more kids plan for, pay
3    for, and save for higher education.  The job was to
4    help Nevadans.  I didn't need an Uber driver.  I needed
5    a deputy.  I needed a leader.  I needed a competent
6    professional.  And this is the exact same sort of focus
7    on things that aren't actually the job that we dealt
8    with when Ms. Salehian was an employee.
9     Q.    Okay.
10          Let me -- hold on here.  Okay.  I'm reading
11    from the complaint.  This is a specific allegation from
12    Ms. Salehian, and it relates to this -- what we just
13    discussed.  It says (as read):
14          "Plaintiff was never allowed to pick up
15    Treasurer Conine and accompany him to the public-facing
16    meetings or functions, despite the fact it was a main
17    component of her job for the past seven years before
18    Treasurer Conine took office in January 2019.  Instead,
19    other younger staff members, all under 40, were the
20    only employees allowed to accompany Treasurer Conine to
21    public functions or Treasury interviews, even when
22    Salehian sourced and set up the interviews."
23          So the first part of that she's alleging that
24    it was the main component of her job to be able to take
25    you, accompany you to public meetings and functions, I

Page 125

1    guess, when you were in town; is that accurate?
2     A.    No.  The job -- she was the Deputy of College
3    Savings.  She wasn't an Uber driver.  She doesn't need
4    to bring me to an event and stand there behind the
5    camera while I'm answering three questions on College
6    Savings programs or College Kickstart and then leave.
7    That's not her function.
8          And more importantly, nothing in Statutes
9    say's she's supposed to.  Nothing Constitutionally that
10    says she's supposed to.  There was absolutely no need
11    to do it, nor do we need to spend the resources of the
12    State paying someone for mileage that I was going to
13    have to do anyway.
14          But more importantly, that wasn't her
15    direction.  She served at the pleasure, right?  And her
16    duties were doing the things that we needed her to
17    focus on.  Driving me to an event was not a duty that I
18    needed her to focus on.  And in almost all cases, I
19    drove myself to that event.  I drove myself.
20     Q.    Okay.
21          So the second part of the allegation about
22    "instead you allowed younger members of the staff under
23    40 to accompany you to the events," you're saying is
24    not true?
25     A.    It is not true.  And in any case where staff,

ZACH CONINE - 06/16/2022

Page 126

1  younger or -- or any other staff attended an event with
2  me, they did it because we had something else to do
3  there, right?  So we had to talk about a piece of
4  legislation on the way to and from the event.  Or we
5  were going to multiple things, and they needed to be at
6  one.  Or we were going to lunch or we were going to do
7  something, right?  But they certainly weren't doing it
8  to drive me from place to place?
9          And the concept that the State would pay
10 someone more than $100,000 a year to drive me around
11 when I have had a license since I was 18.  I'm okay at
12 it, I've had a speeding ticket, but for what reason,
13 right?
14         And this is -- this is again -- goes back to
15 the fundamental misunderstanding of Ms. Salehian has to
16 the nature of that job.  What she did for other
17 treasurers and what she did for me was going to be
18 different.  She was unable to pick up that direction
19 change.
20    Q.   So, for example, did -- did Tya --
21    A.   Tya --
22    Q.   -- Tya Mathis-Coleman ever drive --
23    A.   Actually, Dr. Mathis-Coleman.
24    Q.   What?
25    A.   She's a doctor.

Page 127

1     Q.   Okay.  Dr. Tya Mathis-Coleman, did she ever
2  drive you around to these events?
3     A.   I've never been driven by Dr. Mathis-Coleman.
4  I don't know what car she has.
5     Q.   How about Kirsten Van Ry?
6     A.   Kirsten picked me up from one College Savings
7  event during Sheila's employment, which was a
8  six-minute interview, I think, about prepaid tuition on
9  one of the morning programs.
10    Q.   Do you ever remember that specifically you
11 told Ms. Salehian that you don't need her to drive you
12 to something or you don't want her to drive you to
13 something?
14    A.   I -- I remember that there were times that
15 she offered to drive me to something and I said, "I
16 don't need you to drive me to something because that's
17 my car right there, and I know how to drive."  I didn't
18 say that, but that's -- I mean, yes.  I'm sure she said
19 do you need me to drive you to this event, and I said
20 no because I didn't need her to drive me to that event.
21    Q.   Okay.
22         And after that happened, you don't remember
23 any time where you were driven to that event by a
24 younger staff member; it was always you just drove
25 yourself?

Page 128

1     A.   I go to hundreds of events any given year.
2  It is certainly possible that some event she offered to
3  drive me to I had other things that were going to
4  happen that I needed other staff there for.  And so I
5  took a ride or gave a ride to another staff member; so
6  we talked about other functionality of the office on
7  the way to or from.  But, again, giving rides to the
8  Treasurer is nowhere near the job duties of a
9  six-figure State employee.
10    Q.   Okay.
11         And next, Ms. Yeatts has down (as read):
12         "Leadership reluctance to sit/talk to older
13 staff members at public events."
14         I assume that's -- that means yourself or
15 possibly Mr. Dickson talking to Ms. Yeatts or
16 Ms. Salehian at public events.
17         Do you recall a reluctance to do that?
18    A.   No.  I talked to Ms. Salehian or Ms. Yeatts
19 at any public event that Ms. Salehian or Ms. Yeatts
20 were together.  Sometimes I would be at an event
21 briefly, talk to everyone briefly, and then leave.
22 Sometimes I would be at an event with my very young
23 children at the time and be taking care of them as
24 opposed to talking to staff, but no.
25    Q.   Do you recall -- I -- I read something -- was

Page 129

1  there a time where Ms. Salehian wanted to meet your
2  children or your wife recently?
3     A.   I -- I saw that in one of the -- maybe an
4  interrogatory or somewhere I saw that allegation, which
5  is completely untrue.
6     Q.   It is?
7     A.   She met my wife.  She met my children, who
8  then had to leave because they were two, and it was
9  8:00 o'clock at night.
10    Q.   Okay.
11         And so once Ms. Salehian was terminated, who
12 replaced her?
13    A.   Dr. Tya Mathis-Coleman.
14    Q.   Okay.
15         And would Ms. -- Dr. Mathis-Coleman be
16 approximately -- well, how old was Ms. Mathis-Coleman
17 when she replaced Ms. Salehian?
18    A.   I have no idea.  We looked at her
19 qualifications and her ability to do the job.  I don't
20 hire people based on age.
21    Q.   Would you be surprised if she was almost
22 39 years old -- 39 -- was 39 years younger than
23 Ms. Salehian when she replaced her?
24    A.   I have absolutely no idea how old she was.
25         But why would that surprise someone?

Page 130

1      Q.    Well, you --
2      A.    It's kind of factual, right?  Like, she's an
3  age or she isn't an age.  I don't know what her age is.
4      Q.    Well, let me ask you this:  As far as
5  experience goes, did Ms. Mathis -- or
6  Dr. Mathis-Coleman have more experience than
7  Ms. Salehian when she replaced her?
8      A.    She had been in the workforce less time and
9  she had exceptionally more applicable experience given
10 her work at the Clark County School District,
11 attracting and recruiting teachers in the space.
12 Math -- Ms. -- Dr. -- excuse me, Dr. Mathis-Coleman
13 also comes from a long line of educators who have deep
14 ties to the community in town; right?  Her parents had
15 a school named after them.  She has been in education
16 almost her entire life, and she does community work in
17 the exact communities that we had not been reaching out
18 to at all.
19     Q.    How did Dr. Mathis-Coleman come to be hired
20 by the State Treasurer?
21     A.    We opened up a public available job
22 description, you know -- we put a job listing out
23 there, and she applied for it.  We interviewed her and
24 a couple of other people.
25     Q.    Who would of made the decision to hire

Page 131

1  Dr. Mathis-Coleman?
2      A.    I did, with counsel of Chief Deputy Hagan and
3  Miles Dickson.
4      Q.    Okay.
5            And at the time of hire, would you agree that
6  Ms. -- or Dr. Mathis-Coleman was under 40 years of age?
7      A.    I have no idea how old Dr. Mathis-Coleman is
8  now or then.
9      Q.    All right.
10           Would you be able to get that information of
11 how -- her date of birth or whatever and -- and we can
12 leave a blank in the transcript to put that information
13 in?
14           MS. PRUTZMAN:  The State Treasurer's office
15 is not the record keeper of that kind of data.  So that
16 would need to come from our division of human resource
17 management of the State.
18           MR. BALABAN:  Okay.  But, I mean, he should
19 be able to get that information.
20           MS. PRUTZMAN:  Not necessarily.  I mean,
21 it -- we can talk about how to get that, but it's --
22 it's not -- it's literally not a record that's ever
23 provided to hiring agencies, if it's reported at all in
24 application form.
25 \\

Page 132

1  BY MR. BALABAN:
2      Q.    Well, is she still there?
3      A.    She is.
4      Q.    Couldn't he just ask her for her date of
5  birth?
6      A.    You want to ask a doctor what -- a woman
7  doctor what her age is?
8      Q.    Well, I mean --
9      A.    It's not -- it's not the kind of question we
10 ask --
11     Q.    Well, you can explain it's for the lawsuit.
12     A.    It's not the kind of question we ask in the
13 Treasury.
14           MR. BALABAN:  Well, we can talk about --
15           MS. PRUTZMAN:  We can talk about how to get
16 the records you're looking for.
17           MR. BALABAN:  Okay.
18 BY MR. BALABAN:
19     Q.    With respect to Ms. Yeatts, do you have any
20 reason to believe that she was not 62 years of age at
21 the time of her termination?
22     A.    I think we can pause it -- for literally any
23 question about age that I have zero idea of how old
24 people are.  I know how old my wife is; I know how old
25 my children are.

Page 133

1      Q.    Did she appear over 40 to you?
2      A.    Yes.  I guess.
3      Q.    But as we sit here today, even though you
4  said you don't know her age, if I represent to you she
5  was 62 years old at the time of her termination, do you
6  have any reason to not believe that?
7            MS. PRUTZMAN:  Objection to the form of the
8  question.
9            THE WITNESS:  I don't understand what you're
10 asking.
11 BY MR. BALABAN:
12     Q.    If I represent to you that she was 62 years
13 of age at the time of her termination, do you have any
14 information that would indicate that's not accurate?
15           MS. PRUTZMAN:  Objection.  That question is
16 confusing.  The termination -- whose termination?
17 BY MR. BALABAN:
18     Q.    At the termination of Ms. Yeatts.
19           MS. PRUTZMAN:  Oh, Ms. Yeatts you're talking
20 about.
21 BY MR. BALABAN:
22     Q.    Yeah.  Do you have any -- if I represent to
23 you that she was 62 years old at the time of her
24 termination, do you have any information that would
25 dispute that fact or dispute that allegation?

Page 134

1    A.    I have no data as to that topic.
2    Q.    Okay.  That's what I wanted to know.
3          Who was Ms. Yeatts replaced by?
4    A.    Ms. Yeatts was -- Ms. Yeatts was not replaced
5    immediately.  But, eventually, we shifted around the
6    functions of the office; so that Amber Law, who is the
7    Deputy of Cash took over a position substantially to
8    hers with different responsibilities.
9          One of the things that Ms. Yeatts --
10   Q.    So it wasn't Kirsten Van Ry that took her
11   place?
12   A.    I just don't remember in what order we did
13   that.  It may have been -- one of the things we
14   realized through that process was that -- and
15   Ms. Yeatts had identified it -- was that that role had
16   no purpose, that it was sort of a strange -- didn't
17   actually have responsibilities kind of role.  And so we
18   started making the shifting around of job duties at
19   that stage.  Ms. Van Ry may have sat in that position
20   for a bit of time before moving in the Chief of Staff
21   role.  I honestly do not remember.
22   Q.    Okay.
23         But you're saying Ms. Law eventually --
24   A.    We have two -- I'm sorry.  I didn't mean to
25   cut you off.

Page 135

1    Q.    Yeah.
2          Ms. Law eventually took the role that
3    Ms. Yeatts formerly held?
4    A.    Yeah.  We have two senior deputies at that
5    level.  Ms. Law is one and Erik Jimenez, who was
6    already in a Senior Deputy role at the time, is the
7    other.
8    Q.    Okay.
9          And both those individuals are under 40 as
10   far as you know?
11         I think Eric you had already testified he
12   was?
13   A.    Mr. Jimenez assuredly is under 40.  Ms. Law
14   almost assuredly is not.
15   Q.    Is not under the age of 40?
16   A.    Just given the age of her children.
17   Q.    Okay.
18         And so you're saying that initially -- I'm
19   trying to understand this.  Initially, Kirsten Van Ry
20   replaced Ms. Yeatts, but that was only for a short
21   period --
22   A.    So Ms. Van Ry is currently the Chief of
23   Staff.  She moved into that role after Mr. Dickson left
24   the office.  And I can't remember if she was in that
25   role for a period of time in between.  It's certainly

Page 136

1    possible.  Functionally, the nature of those jobs moved
2    so much that we replaced the College Savings Deputy
3    with Dr. Mathis-Coleman, and the rest of it became
4    amorphous because it had no purpose --
5    Q.    Okay.
6    A.    -- in its original sense.
7    Q.    Okay.
8          And -- okay.  Okay.
9          Do you have any information to comment
10   Ms. Salehian makes an allegation in her complaint that
11   eight of the ten positions hired or promoted in the
12   College Savings division since Treasurer Conine took
13   office in January 2019 were individuals under the age
14   of 40?
15   A.    Like I said, I'm not involved with classified
16   hires, typically; so I can't speak to anyone's age.
17   Q.    So all of these would have been classified
18   hires?
19   A.    Correct.  With the exception of
20   Dr. Mathis-Coleman.
21   Q.    Okay.
22         MR. BALABAN:  Now, you said you have
23   about -- how long in questions?
24         MS. PRUTZMAN:  I probably have five,
25   ten minutes, tops.

Page 137

1          MR. BALABAN:  Okay.  Yeah.  I won't be that
2    much longer.  I just have to go over a couple more
3    things.
4    BY MR. BALABAN:
5    Q.    So you don't recall ever talking to
6    Ms. Salehian about using online or text to contact
7    customers, opposed to using the phone?
8    A.    I don't recall a specific conversation.  I
9    know we were trying to modernize the office.  Because,
10   again, 500,000 kids that we needed to be able to talk
11   to their families and you can't talk to -- if you have
12   a one minute conversation with them, you run out of
13   time in the day, right?  And so there was some
14   scalability conversations we had about functionality on
15   the website, were there other ways people can contact
16   us, et cetera, but I don't remember a specific
17   conversation about it.
18   Q.    Okay.
19         Do you recall assigning Ms. Salehian a
20   smaller office than a younger deputy who had less
21   seniority in the office?
22   A.    No.  My recollection of Mr. -- of
23   Ms. Salehian's time in the office was that she was in
24   the same space for her entire employment under me.
25   Q.    Okay.

ZACH CONINE - 06/16/2022

Page 142

1    A.    Also, just for the record, I don't see it.  I
2  may miss -- be missing it, the part about driving the
3  treasurer around, but I could be missing it.
4    Q.    Well, I mean, I don't think she's saying that
5  was necessarily part of her job duties, officially, but
6  it was done for the past Treasurer.  But you're
7  saying --
8    A.    Her alle- -- her Complaint seemed to say that
9  that was part of the job duties, which it deeply was
10 not.  Now, I could have been misreading the Complaint,
11 but I just wanted to point out that that was not
12 something we were hiring for.
13   Q.    Okay.
14         And so -- so was this -- so you're -- so
15 this -- even though this wasn't put out, do you know
16 whether this job announcement was created prior to her
17 termination?
18   A.    Yes.  I believe we started creating this job
19 announcement in September.
20   MS. PRUTZMAN:  Counsel, could I just take a
21 quick break to maybe run down the hall to maybe let
22 Mr. Dickson know we're probably not starting his
23 deposition in five minutes?
24   MR. BALABAN:  Yeah.  It shouldn't be much
25 longer.  Let's take a five-minute break.  That's fine.

Page 143

1              (A short break was taken.)
2    MR. BALABAN:  Back on the record.
3  BY MR. BALABAN:
4    Q.    This is Ms. -- and I'm not going to mark it
5  as an exhibit, but Ms. Salehian did some responses --
6  or a timeline for the EEOC.  And, specifically, I
7  wanted to ask you -- because this gets back to the
8  allowing you -- her to drive you around and whatnot.
9  This is specifically -- and I want to see if this
10 refreshes your recollection at all.
11         She says -- this is September 2019.  (As
12 read):
13         "I organized both the Governor Guinn Memorial
14 Scholarship ceremonies with Treasurer Zach Conine set
15 to speak at both UN -- UNLV and UNR on September 23,
16 2019.  And on September 25, 2019, respectfully, despite
17 it being a program and event I was responsible for at
18 the Treasurer -- State Treasurer's office and even
19 helped organized, I was not allowed to drive or ride
20 with Treasurer Conine to the events -- to the event.
21 Both Beth Yeatts and I were in Las Vegas and planning
22 to attend the UNLV luncheon event.  Instead Kirsten
23 Van Ry was asked to take Treasurer Zach Conine to the
24 event.  He did not sit at the table -- at the table
25 Beth and I sat at.  Either I flew up to Reno to the UNR

Page 144

1  event and, again, asked Treasurer Conine if he needed a
2  ride to the -- a ride from the Reno airport, as he was
3  flying in the afternoon of September 25, 2019.  Instead
4  of following me to pick him up and take him -- instead
5  of allowing me to pick him up and take him to the event
6  at UNR in Reno, he had Erik Jimenez drive from Carson
7  City to Reno, Nevada and walk in with him."
8          "In addition, I was originally told by Miles
9  Dickson that I could handle the media outreach and
10 coordinate.  And at the last minute, my name was
11 removed from the press releases and Erik Jimenez's
12 information was put on them, despite the fact that both
13 of these events were part of the program that I had
14 complete administrative responsibility for, and I -- I
15 had been successful in getting the media to in the
16 past.  No explanation was given."
17         How -- that's a specific incident.  How would
18 you respond to that?
19         First, respond to the Las Vegas part.  Is
20 that true what she's saying?
21   A.    So the Las Vegas event, which I believe
22 happened at UNLV, was nestled between one or two
23 different things that I needed to go to.  I had a car
24 in Las Vegas.  I believe I drove myself to that event.
25 I believe I drove myself to that event.  I believe

Page 145

1  Kirsten Van Ry came to that event and took pictures.
2  One of the things that we had found was that we didn't
3  have good content coming from a -- social media and
4  things like that; so I believe Kirsten might have come.
5  As to where I sat?  I'm pretty sure I sat with one of
6  the --
7    Q.    So you're disagreeing with her.  She's saying
8  that you -- she wanted to drive you and instead Kirsten
9  Van Ry --
10   A.    I think I drove myself to that event.
11   Q.    Okay.
12         So you're disagreeing with that, that Kirsten
13 Van Ry --
14   A.    In my recollection, I drove myself to that
15 event.
16   Q.    Okay.
17   A.    I had to move a cone to park at the UNLV
18 Student Union.
19   Q.    And how about the part where you didn't sit
20 at the same table as her and Beth?
21   A.    She's right about that.  I sat at the table
22 with Governor Guinn's son, who is responsible for the
23 program, and his wife Wynn Guinn.  I don't believe Dema
24 was at that event.  That's Mr. Guinn's -- Governor
25 Guinn's wife -- widow.  So it's true.  I sat with, I

ZACH CONINE - 06/16/2022

Page 146

1 think, two regents, governor Guinn's son, who is
2 responsible for -- responsible is the wrong word, but
3 effectively started the memorial scholarship.
4    Q.   Well, then, let me ask you this:  Why did you
5 decide to sit with Governor Guinn's son instead of
6 Ms. Salehian and Ms. Yeatts?
7       It sounds like Ms. Salehian is saying she set
8 up the event and everything and that it would be
9 traditional -- I might be using the wrong word.
10   A.   You would be.
11   Q.   It would be the correct protocol for you to
12 have sat with them instead of someone else?
13   A.   Look, again, I -- this goes back to the just
14 massive pettiness that we were dealing with in the
15 office.  But let me say this.  In an event where there
16 are elected officials there -- the President of UNLV, I
17 believe, was there at the same table, and the son of a
18 Governor, who had started the Millennium Scholarship, a
19 person who is speaking on the program, a well-to-do,
20 well-established member of the community, I'm going to
21 sit with those people, not with staff.  It had nothing
22 to do with Ms. Salehian.  None of this has anything to
23 do with Ms. Salehian, other than her perception that
24 somehow she was wounded because I did not sit at the
25 table she was at.

Page 147

1    Q.   Well, I think the bigger allegation she's
2 making is you just didn't want to sit with her at
3 public events, in general, because her -- because of
4 her age, that you didn't --
5    A.   And that -- that is -- that's specious.  I
6 mean, it's hard to describe how wrong that is.
7 Mr. Guinn -- Governor Guinn's son is certainly over 40.
8 Dema Guinn is in her late 80s, early 90s.  Both of
9 those Reagents were older.  Although, I don't know how
10 old Reagent Perkins is, but none of that matters.
11      The concept that I wouldn't sit with elected
12 people, the president of the university, a provost, I
13 believe, was there, and the people who had paid for
14 memorial scholarship, but instead would sit with two
15 deputies in the office that I saw regularly, is -- it's
16 just nonsense.
17   Q.   During the time that Ms. Salehian was there
18 and you were there, do you remember ever sitting with
19 her at a public event?
20   A.   Yes.
21   Q.   When was that?
22   A.   I sat next to her and her daughter at the
23 Aces game that was down here.  I stood next her before
24 my speech at the UNR version of this event.  I stood
25 next to her before my speech at this event.  But during

Page 148

1 the brief time that I was sitting, I sat with the other
2 elected officials.  Which by-the-by, if you go to any
3 event is what happens, staff are in one place, elected
4 officials are in another place.  That is always the
5 case.  Always the case.
6    Q.   So you're saying when she goes on to talk
7 about the Reno event --
8    A.   So the Reno --
9    Q.   -- you're saying you did with her?
10   A.   No one sat the Reno event.  There was no food
11 at the Reno event.  There was, like, a light standing
12 hors d'oeurve area on the third or fourth floor of the
13 library at UNR -- and I forget the name of that
14 building -- reception room.  I walked in, there were
15 four high-top tables and a buffet of food for, like,
16 passed hors d'oeurve.
17      Reagent Geddes and a few other regent's were
18 there.  I walked in, had an event immediately
19 thereafter with Mr. Jimenez, but walked into that
20 event, talked to the regents, talked to Ms. Salehian,
21 talked to the Memorial Scholarship winners and their
22 parents.  Then Ms. Guinn showed up, I talked to
23 Ms. Guinn at length.  I enjoy Ms. Guinn, she's a Nevada
24 State Treasurer.  Then we gave the speech, and then I
25 left.  There was no sit-down dinner component to that

Page 149

1 event.
2    Q.   Do you know why Ms. Salehian's name was
3 removed from the press releases and Erik Jimenez's
4 information was put on them?
5    A.   Yes.  We removed everyone else's name from
6 all press contacts, and all press went through Erik
7 Jimenez who had --
8    Q.   But if Ms. Salehian set up the event, why --
9    A.   That's not how things work in the world.
10 Press people take care of press things.  Operations
11 staff takes care of operation things.  Ms. Salehian was
12 not a press professional.  Ms. Salehian did not have
13 the relationships with press, all press that we needed
14 her to have.  Specifically, she had almost no contact
15 with Northern Nevada press, and she did not talk to any
16 of the political reporters.  And she didn't talk to any
17 TV reporters that we were able to find that Erik had
18 connections to.  Erik took over the responsibilities
19 that typically get assigned to a public information
20 officer, which the office did not have.  That public
21 information officer or PIO role, means you consolidate
22 all media of all type through one person, and that was
23 Erik.  It had nothing to do with Ms. Salehian.
24      We also removed the contact of the debt
25 individuals from press releases about debt, the contact

ZACH CONINE - 06/16/2022

Page 162

1                   CERTIFICATE OF REPORTER
2   STATE OF NEVADA  )
    COUNTY OF CLARK  )
3           I, Michelle R. Ferreyra, a Certified Court
4   Reporter licensed by the State of Nevada, do hereby
5   certify:  That I reported the deposition of ZACH
6   CONINE, commencing on THURSDAY, JUNE 16, 2022, at
7   10:15 a.m.
8           That prior to being deposed, the witness was
9   duly sworn by me to testify to the truth.  That I
10  thereafter transcribed my said stenographic notes into
11  written form, and that the typewritten transcript is a
12  complete, true and accurate transcription of my said
13  stenographic notes, and that a request has been made to
14  review the transcript.
15          I further certify that I am not a relative,
16  employee or independent contractor of counsel or of any
17  of the parties involved in the proceeding, nor a person
18  financially interested in the proceeding, nor do I have
19  any other relationship that may reasonably cause my
20  impartiality to be questioned.
21          IN WITNESS WHEREOF, I have set my hand in my
22  office in the County of Clark, State of Nevada, this
23  6th day of July, 2022.
24
25              MICHELLE R. FERREYRA, CCR No. 876

Page 163

1       HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE
2   Litigation Services is committed to compliance with applicable federal
3   and state laws and regulations ("Privacy Laws") governing the
4   protection andsecurity of patient health information.Notice is
5   herebygiven to all parties that transcripts of depositions and legal
6   proceedings, and transcript exhibits, may contain patient health
7   information that is protected from unauthorized access, use and
8   disclosure by Privacy Laws. Litigation Services requires that access,
9   maintenance, use, and disclosure (including but not limited to
10  electronic database maintenance and access, storage, distribution/
11  dissemination and communication) of transcripts/exhibits containing
12  patient information be performed in compliance with Privacy Laws.
13  No transcript or exhibit containing protected patient health
14  information may be further disclosed except as permitted by Privacy
15  Laws. Litigation Services expects that all parties, parties'
16  attorneys, and their HIPAA Business Associates and Subcontractors will
17  make every reasonable effort to protect and secure patient health
18  information, and to comply with applicable Privacy Law mandates,
19  including but not limited to restrictions on access, storage, use, and
20  disclosure (sharing) of transcripts and transcript exhibits, and
21  applying "minimum necessary" standards where appropriate. It is
22  recommended that your office review its policies regarding sharing of
23  transcripts and exhibits - including access, storage, use, and
24  disclosure - for compliance with Privacy Laws.
25      © All Rights Reserved. Litigation Services (rev. 6/1/2019)