# EXHIBIT 4

Excerpts of Miles Dickson Deposition
Transcript

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3                              )
    SHEILA SALEHIAN,            )
 4                              )
                  Plaintiff,    )
 5                              )
             vs.                )   CASE NO.:
 6                              )   2:21-cv-01512-CDS-NJK
    STATE OF NEVADA, NEVADA     )
 7  STATE TREASURER'S OFFICE;   )
    ZACH CONINE, STATE          )
 8  TREASURER; DOES 1-50; and   )
    ROE CORPORATIONS 1-50,      )
 9                              )
                  Defendants.   )
10  _____)

11

12

13

14          DEPOSITION OF MILES DICKSON

15            THURSDAY, JUNE 16, 2022

16                  2:51 P.M.

17     AT 3960 HOWARD HUGHES PARKWAY, SUITE 700

18               LAS VEGAS, NEVADA

19

20

21

22

23

24  REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876
                  JOB NO. 888696B
25
```

MILES DICKSON - 06/16/2022

Page 2

```
1              DEPOSITION OF MILES DICKSON,
2  taken at 3960 Howard Hughes Parkway, Suite 700,
3  Las Vegas, Nevada, on THURSDAY, JUNE 16, 2022, at
4  2:51 p.m., before Michelle R. Ferreyra, Certified Court
5  Reporter, in and for the State of Nevada.
6  APPEARANCES:
7  For Plaintiff:
8       LAW OFFICES OF MICHAEL P. BALABAN
        BY:  MICHAEL P. BALABAN, ESQ.
9       10726 Del Rudini Street
        Las Vegas, NV 89141
10      (702) 586-2964
        (702) 586-3223 Fax
11      mbalaban@balaban-lawcom
12
    For Defendants:
13
        OFFICE OF THE ATTORNEY GENERAL
14      BY:  JUDY A. PRUTZMAN, ESQ.
        5420 Kietzke Lane
15      Suite 202
        Reno, NV 89511
16      (775) 687-2113
        (775) 688-1822 Fax
17      jprutzman@ag.nv.gov
18
19
20
21
22
23
24
25
```

Page 4

```
1              EXHIBITS (CONTINUED)
2  Exhibit 15  Complaint                          84
3  Exhibit 16  Timeline that Ms. Salehian         97
               provided to the EEOC
4
   Exhibit 17  Email from Ms. Salehian to        115
5              Mr. Dickson with a copy to Beth
               Yeatts
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2  WITNESS:  MILES DICKSON
3  EXAMINATION                                   PAGE
   Examination By Mr. Balaban                      5
4
5           INDEX TO EXHIBITS
6     EXHIBIT                                    PAGE
7  Exhibit 1   Letter to Ms. Salehian from         5
               Dan Schwartz, State Treasurer,
8              dated January 10, 2017
9  Exhibit 2   Letter of recommendation for        5
               Ms. Salehian
10
   Exhibit 3   Prohibition and Penalties           5
11
   Exhibit 4   Email to both Treasurer Conine      5
12             and Mr. Dickson and Beth Yeatts
13 Exhibit 5   Letter from Thomas Dermatology      5
14 Exhibit 6   FMLA paperwork                      5
15 Exhibit 7   Email from Miles Dickson to         5
               Beth Yeatts and Sheila Salehian
16
   Exhibit 8   Interrogatory responses for the     5
17             State of Nevada
18 Exhibit 8   Separation Agreement and            5
               Release Of All Claims
19
   Exhibit 10  Statement from Ms. Yeatts           5
20
   Exhibit 11  Reference letter for                5
21             Ms. Salehian from Ms. McDowell
22 Exhibit 12  Job announcement                    5
23 Exhibit 13  Severance letter                    5
24 Exhibit 14  Statement of Employment            45
               Termination
25
```

Page 5

```
1      LAS VEGAS, NEVADA, THURSDAY, JUNE 16, 2022;
2                    2:51 P.M.
3                     -oOo-
4            (Exhibits 1 through 12 marked.)
5
6      (Prior to the commencement of the deposition, all of
7  the parties present agreed to waive statements by the
8  court reporter pursuant to Rules 30(b)(5)(A) and
9        30(b)(5)(C) of the NRCP/FRCP.)
10
   Whereupon,
11             MILES DICKSON,
12 having been first duly sworn to testify to the truth,
13 the whole truth and nothing but the truth, was examined
14 and testified as follows:
15
16             EXAMINATION
17 BY MR. BALABAN:
18      Q.   My name is Michael Balaban.  I briefly
19 introduced myself prior.  I represent Sheila Salehian
20 in this case.  And let's get started.
21      Do you understand that you are under oath and
22 these proceedings are being recorded by the court
23 reporter?
24      A.   I do.
25      Q.   Do you also understand that you should not
```

MILES DICKSON - 06/16/2022

Page 18

1  think you liked her when you started?
2      A.   I couldn't speak to how Sheila felt about me
3  or what her perception of me was or what she thought my
4  perception of her was.
5      Q.   Okay.  Well, what -- what was your perception
6  of her when you first met her and whatnot?
7      A.   I was looking forward to meeting her and the
8  rest of the team and excited about a new job
9  opportunity.
10     Q.   Okay.  And -- did -- so your perception when
11 you first met her, you didn't have any animosity
12 towards her or anything like that?
13     A.   No.
14     Q.   Did that change over the time that you were
15 at the State Treasure's office?
16     A.   Did I have animosity for Sheila?
17     Q.   Yeah.
18     A.   No.
19     Q.   Okay.
20          With respect to supervising Sheila, did you
21 have any role in that?
22     A.   Sheila had a supervisor, Beth, and I was
23 Beth's supervisor.  That said, as I got to know not
24 only Sheila but the whole team, I encouraged larger
25 group meetings whenever it was possible, especially

Page 19

1  because it was a smaller office.  So I spent a lot of
2  time trying to get to know every team member.
3          In terms of direct daily supervision we had
4  everything from weekly meetings to -- I was pretty
5  involved in both College Savings and Unclaimed
6  Property, the two divisions that reported under me; so
7  copied on emails a lot, meetings a lot.  So while I
8  wasn't her supervisor, I certainly was, I think, pretty
9  familiar with her and her work.
10     Q.   Okay.  Yeah.  That was -- that was my
11 question.  So you were able to assess her work or job
12 performance as your role as chief of staff; correct?
13     A.   Yes.  I felt that I had a sufficient view and
14 experience of all -- well, at least the two deputies
15 and a Southern deputy in Las Vegas.
16     Q.   Okay.
17          So I'd like to first ask you what was your
18 overall assessment of Ms. Salehian's job performance?
19 Maybe I can break it down for you.  As far as her
20 performing her work accurately, did you think she
21 performed her work accurately?
22     A.   There were inconsistencies in her work that I
23 recall.  Accuracy, as I would define it, was two plus
24 two equals four, didn't feel like the challenge in
25 terms of accuracy.  So we had -- I remember

Page 20

1  conversations or concerns around accuracy of different
2  reports.  Yeah, sorry.  I actually don't recall.  I
3  don't know how to answer on accuracy.
4      Q.   Okay.
5          How about work product, did you think she put
6  out a good work product if she was asked to do
7  something?
8      A.   No.  Not necessarily.
9      Q.   And you say that because of why?
10     A.   My perception of work product was based on, I
11 guess, a few things.  One, just my own experience and
12 sense of what I would look for in terms of quality work
13 product.  The second one was responsiveness to direct
14 feedback about concerns that I had around the office.
15 And I think the third one that really felt defining was
16 quality of work product and quantity of work product
17 relative to her peers, the other deputy treasures.
18     Q.   Okay.  So quality --
19     A.   Meaning that it was less.
20     Q.   Less.  Okay.
21          So can you give me specific instances how the
22 quality of her work product was less?
23     A.   Sure.  So one of the things that was most
24 important to the administration in the first six months
25 was trying to, obviously, learn the office, learn the

Page 21

1  people, learn statutory obligations, learn strategy,
2  et cetera.
3          We were doing that in the middle of a
4  legislative session.  That legislative session, from
5  our office's perspective, was really critical to
6  regain, or at least start to regain, the trust of the
7  legislature, which had been eroded over the last four
8  or five years, resulting in very significant marketing
9  cuts.
10          And so when I think about quality, one of the
11 things that was really vital to the team -- let me say
12 vital to me.  What I thought was really critical for
13 deputies was to be able to articulate a clear strategy
14 and vision for growing their programs, particularly in
15 College Savings where almost from moment zero, Sheila
16 had expressed a disappointment and a frustration with
17 the previous administration's choices.  All right?  So
18 as I think about quality and quantity of work product,
19 I think about the first six months.  What I would have
20 expected from a deputy, who leads a whole office, very,
21 very expensive programs, who on almost day one
22 expressed frustration and disappointment and
23 disagreement with choices of the previous
24 administration, was a clear strategy to shift focus,
25 especially when we, I thought, we're pretty aligned

MILES DICKSON - 06/16/2022

Page 22

1  around where we wanted to go.  That didn't come.  And
2  instead, we spent a very significant amount of time
3  talking about various administrative tasks.
4      Q.   Okay.
5      A.   So for me it was amiss.
6      Q.   Okay.  And so that's quality.  Quantity, you
7  said, was below average -- or below other deputies.
8  Can you be more specific about that?
9      A.   My perception of the College Savings
10  department was that on one hand there was a lot of
11  work.  And on the other hand, there were eight people
12  doing that work.  And so when I thought about the
13  timeliness, how quick we were moving forward, or more
14  specifically, how quick we weren't moving forward, time
15  was real issue.  So coupled with a lack of quality,
16  this quantity issue where we would talk about a problem
17  and then months later, we still wouldn't see a
18  resolution for it, even with eight team members, felt
19  really concerning to me.
20      Q.   Okay.  And -- and did you have talks with
21  Ms. Salehian on this?
22      A.   Yeah.  I expressed pretty openly concerns
23  around programs in terms of are we going the right
24  direction, are we seeing the growth we're looking for,
25  are we reaching all the different potential users or

Page 23

1  partners of the programs.
2          I think in many months, I was pretty open
3  about our concern.  Even in legislative hearings, right
4  into the microphone, the Treasurer testified to
5  concerns around needing to grow the programs.  So I
6  think we were pretty clear, including in hearings,
7  about the need to improve the department and that
8  really being an explanation for why we needed to
9  recapture what was almost 75 percent, I think, of the
10  budget being slashed in the previous four years.
11      Q.   Okay.  And so when -- I mean, time frame
12  wise -- so you were there since January -- you started
13  January of '19?
14      A.   I think like January 31 or February 1; so I
15  started --
16      Q.   So you were, basically, there from the start
17  of Mr. Conine's administration?
18      A.   I trailed him by about a month, I think.
19      Q.   About a month?
20      A.   So I don't remember what day he is sworn in.
21  It was the first few days of January; so I was about
22  30 days behind him.
23      Q.   Okay.
24          So with respect to talking about -- talking
25  to Ms. Salehian about some of the concerns you have as

Page 24

1  far as time frame goes, do you recall when you would
2  have first talked to her about it?
3      A.   One of the first things I did was ask for a
4  pretty exhaustive rundown of where are we at as an
5  office, particularly.  Because unlike some of the other
6  offices, we were pushing for a very large expansion of
7  the budget through the legislative process.  So that
8  requires, as you can imagine, a lot of advocacy work,
9  but a lot of data.
10          And so really early on, we were trying to get
11  our arms around what's happening in the office, what's
12  not happening in the office, where are we trying to go.
13  So really very, very early of me being there, probably
14  the first few days when I started asking for data and
15  reports and really trying to get an understanding of
16  where we were.
17      Q.   Okay.  And do you -- do you recall
18  documenting any of your talks with her, like in emails
19  and stuff?
20      A.   In terms of?
21      Q.   In terms of any counseling you gave her or
22  feedback on, she wasn't doing the job like you wanted
23  it to be done or anything of that nature?
24      A.   Let me first clarify that the feedback that I
25  gave consistently was to an entire department.  The

Page 25

1  administration is concerned that the last four years
2  thing has gotten really difficult.  That feedback was
3  consistently reiterated and agreed with by Sheila and
4  other team members.  So very early on, there was a
5  consistent theme from team members, particularly
6  Sheila, that she understood the last four years were
7  challenging and problematic in the office.  And that we
8  needed to regain the trust of the legislature, and we
9  needed to pick up the pace.  So that was a consistent
10  feedback.
11          So my concern, personally, was that over
12  time, despite that being the consistent feedback really
13  early in the process, us reiterating that to the
14  legislature and articulating very specific goals and
15  metrics for trying to move forward, I never saw the
16  change from the last administration, essentially what I
17  interpreted as the last administration messed
18  everything up, to here's the plan to get back on track.
19      Q.   Okay.
20          So when I took Mr. Conine's deposition -- or
21  Treasurer Conine, he indicated that -- that the
22  department would do stuff verbally, they talk to the
23  employees verbally, but they didn't document much -- or
24  I think he said he didn't know that he documented
25  anything.

Page 30

1    Q.   What do you mean "the first section"?
2    A.   Sorry.  I'm referring to the final page, the
3 acknowledgment that's signed.  I don't recall seeing
4 that.  So I recall seeing this packet.  And if I
5 remember correctly, it was from early on as I was
6 trying to learn processes at the State, and I was asked
7 to sign a work performance review and work performance
8 standards for some of the classified employees.  I
9 started asking more questions, like how does this work?
10 What is this based on.  So I remember in particular
11 this table.
12    Q.   Okay.  So I asked Mr. Conine about it, and
13 I -- he didn't really know, but I kind of got the
14 impression he didn't know for sure, but I kind of got
15 the impression that this was only for classified
16 employees.  Or do you -- can you speak to that or --
17    A.   I don't think I can speak to your impression
18 of what it is, no.
19    Q.   Okay.
20    A.   I can speak to you this paragraph here.  This
21 guide was approved by the State Personnel Commission;
22 thus, it has the same force and effect as other rules
23 and regulations covering classified employees.
24    Q.   Yeah.  And that's what was pointed out at his
25 deposition.  But -- and I don't --

Page 31

1    A.   Let me --
2    A.   Yeah.
3    A.   Let me -- go ahead.  Sorry.
4    Q.   No.  Tell me what --
5    A.   No, go ahead.
6    Q.   I was going to ask you if -- if this
7 was -- and, you know, from looking at the last page, I
8 know she signed this back in 2012.  But if this was for
9 classified employees only, do you know why Ms. Salehian
10 would have signed this?
11    A.   I couldn't speak to why she signed it before
12 I was there.  I don't have any knowledge of that.
13    Q.   Okay.
14         So from what Mr. Conine was telling me, that
15 all non-classified employees work at the pleasure of
16 the Treasurer, meaning that they can be terminated at
17 the pleasure of the Treasurer.
18         Was that your understanding?
19    A.   Yes.
20    Q.   Okay.
21         And from looking at this document --
22    A.   And to correct that, you said
23 "non-classified."  My understanding is unclassified.
24    Q.   Oh, yeah.  Unclassified, excuse me.
25         And so from this document, it would

Page 32

1 have -- it would appear that this goes through
2 a -- before somebody is terminated, it goes through a
3 progressively -- disciplinary type of scenario.
4         Is that accurate to what you're seeing?
5    A.   I think I understand your question, and so
6 let me respond by saying classified employees had a
7 progressive disciplinary policy, and this looks to
8 speak to that.
9    Q.   Okay.  So this -- this document would be
10 inconsistent with unclassified employee to your
11 understanding?
12    A.   I don't know that I would say "inconsistent."
13 I would say not applicable.
14    Q.   Okay.
15         And would you know anyone at the Treasurer's
16 office -- and I know you're not still there -- that
17 would be a better person to ask about this type of
18 document?
19    A.   My impression of the difference
20 between -- difference between classified and
21 unclassified employees, both in terms of the benefits
22 of the role, such as, you know, you don't have to go
23 through the regular hiring process, you don't have to
24 wait for merit pay, you can max out at salary, you get
25 a lot more time off benefits, et cetera, as well as

Page 33

1 you're not subject to the usual progressive
2 discipline -- disciplinary policies.  That distinction
3 seemed ubiquitous to me.  Everybody understood that.  I
4 understood it as an employee who joined.
5    Q.   Okay.  But it sounds like you -- you -- you
6 said this was the first -- I think you said this was
7 the first time you saw Exhibit 3.  And my -- my
8 question was just:  Do you know anyone in the
9 Treasurer's office that might be a better person to ask
10 about Exhibit 3 or why Ms. Salehian would have been
11 asked to sign Exhibit 3, whether other unclassified
12 employees signed something similar to Exhibit 3, stuff
13 like that?
14    A.   To the first part of what I think is your
15 question is who else would be familiar with classified
16 employees' kind of disciplinary prohibitions and
17 penalties.  Any deputy or anybody who supervises
18 classified employees.  I was not one who supervised
19 classified employees.  So I would expect anybody who
20 would be a supervisor would be more familiar with this
21 than I am.
22    Q.   Okay.
23         And so you started to discuss with me about
24 some of Ms. Salehian's -- what you believed were
25 performance issue and whatnot?

MILES DICKSON - 06/16/2022

Page 34

1    A.    (Witness nods.)
2    Q.    Do you recall speaking to Treasurer Conine
3   about her performance issues?
4    A.    Yes.  The Treasurer, as well as the Chief
5   Deputy and I, had numerous conversations throughout the
6   summer about my concern and also comparing notes,
7   trying to figure out does anyone see anything different
8   than what I see.
9    Q.    And when you say "the Chief Deputy" --
10    A.    Tara Hagan.
11    Q.    Tara Hagan?
12    A.    Uh-huh.
13    Q.    Okay.  So throughout the summer, do you
14   recall specific dates, or at least specific months?
15    A.    Yeah.  They were relatively consistent
16   conversations throughout June and July and August.  So
17   part of what we did is we left the legislative -- or
18   closed the legislative -- here -- the legislature,
19   which by the way we were pretty successful in terms of
20   creating new positions and significantly increasing the
21   marketing budget.  Our attention turned to
22   implementation of the things that the legislature just
23   approved.  And, really, it was at that point I think we
24   started looking a lot more carefully and thinking a lot
25   more about the future in terms of what implementation

Page 35

1   of this work, what's the future of this department.  So
2   it would have been really early in June.
3    Q.    Early in June.  Okay.
4         Did you also have any talks about any
5   implementation or performance issues with regard to
6   Beth Yeates?
7    A.    We started talking I think
8   simultaneously -- we started talking I think pretty
9   simultaneously in early June about the Southern Nevada
10   office and particularly relative to Beth and Sheila in
11   College Savings and a concern about if their
12   leadership, particularly Sheila's, would be able to
13   bring about successfully the significant program
14   expansions that we had just secured at the legislature.
15    Q.    Okay.
16         And the reason you started talking about both
17   of them is because, objectively, you were -- you saw
18   problems with both of their performance --
19   performances; is that fair to say or --
20    A.    I would clarify to say that specifically to
21   Beth's role in College Savings.  I was concerned that
22   the person who worked for her, whom she supervised, was
23   not performing at the level we needed to, and Beth
24   wasn't offering solutions for that either.
25    Q.    Okay.

Page 36

1    A.    Additionally, Beth also had taken over, which
2   was at Sheila's request primarily -- that my
3   impression, I should say, was Sheila's request
4   primarily.  But very early in me joining the office,
5   Sheila and Beth asked to meet with me to redistribute
6   Sheila's workload so that Beth could take more of it
7   on.  And it seemed very bizarre to me at the time that
8   the office that, according to Sheila, had less work,
9   less resources, et cetera than it's had years before
10   needed to redistribute work product upwards to a
11   supervisor.  So entire program shifted over to her
12   supervisor, who is supposed to be supervising the
13   person who is supposed to be supervising the program.
14    Q.    Okay.
15         And so at some point, a decision was made to
16   terminate both Ms. Salehian and Ms. Yeates?
17    A.    Yes.
18    Q.    And walk me through that, on how it got to
19   just talking about their performance to, Hey, we've got
20   to make a change here?
21    A.    Yeah.  Let me begin by clarifying what I
22   think the characterization of just talking about
23   performance.  I don't think it's a decision any of us
24   arrived at lightly.  Neither did asking the legislature
25   to more than triple the agency's budget; right?  That

Page 37

1   comes with serious obligations.  We sat in hearings, we
2   committed to do something, we secured the resources to
3   do it, we created multiple new positions, including a
4   commitment with then the senator majority leader to run
5   a program.  So nothing about what we chose to do over
6   the summer was a casual decision.  We felt a high
7   responsibility and obligation to both execute --
8   develop and execute our programs that the Treasurer ran
9   on, that I came to work at, but maybe even more
10   importantly, that the legislature approved and
11   ultimately that the governor signed into law.  So is
12   wasn't a casual series of conversations.  So I want to
13   first clarify that.
14         Over the course of the summer, right -- so
15   about three months, we moved from what felt like early
16   warning signs in the spring for me questions about I'm
17   not really sure why this seems so challenging.  I'm not
18   really sure why we're spending so much time here when
19   it seems like we should be spending it here.  So there
20   were a whole series of question marks.  And for me
21   probably yellow and red flags started coming up
22   throughout this Spring.  Set those aside for the most
23   part, and really started having these conversations in
24   a deep way in June.
25         So over the course of the Summer --

MILES DICKSON - 06/16/2022

Page 38

```
1       Q.   In when?
2       A.   In June.
3       Q.   In June?
4       A.   Uh-huh.
5       Q.   Okay.
6       A.   Over the course of the summer reached the
7  conclusion -- I'll speak for myself -- I reached the
8  conclusion that I did not have confidence that Sheila
9  was going to be the person to lead these programs.  So
10 that happened by Labor Day weekend.  We'd all talked
11 right before the weekend; it was a long weekend.
12      Q.   Right, right.  So that would be end of
13 September?
14      A.   No.  End of August.
15      Q.   End of August.
16      A.   Yeah.
17      Q.   Okay.
18      A.   So last few days of August.  At that point, I
19 had formally said, "I really think we need to make a
20 change.  I believe that's what's best."
21           We all agreed to think about it over the
22 weekend, as I recall, and we reconnected and we started
23 moving.
24      Q.   Okay.  And so that was you, Tara Hagan --
25      A.   (Witness nods.)
```

Page 39

```
1       Q.   -- and Treasurer Conine?
2       A.   Yes.
3       Q.   Okay.
4            And that would have happened end of August.
5       A.   (Witness nods.)
6       Q.   And you are saying you are the one who
7  spearheaded or said, Hey, we need to make a change?
8       A.   I'm speaking that -- I'm saying that I
9  officially said that, but I believe it was a collective
10 decision.  So I don't think the term or the
11 characterization "spearhead" is quite correct.
12      Q.   Okay.
13           And so what happened then?
14      A.   We started writing job descriptions and
15 working on severance letters.
16      Q.   Okay.  Let me --
17      A.   And I would broaden that to say and other
18 kind of practical pieces of figuring out what to do
19 next.
20      Q.   Okay.  So when you say "work on job
21 descriptions" -- let me show you what has previously
22 been marked as 12, which is probably going to be the
23 last exhibit in your pile.
24      A.   Yes.
25      Q.   Is this what you're talking about?  This is a
```

Page 40

```
1  job announcement, but --
2       A.   Yeah.  Pardon my phrasing, yes, job
3  announcement.
4       Q.   Okay.  So you're saying you started working
5  on this -- it would have been sometime in, what, early
6  September?
7       A.   I recall seeing emails that were included as
8  these exhibits that had some more specific dates; so I
9  would rather see those to give you concrete dates.
10 But, yes, generally speaking, early September to
11 mid-September we started talking about what are the job
12 descriptions?  What's the severance letter?
13      Q.   Okay.  And when you say "severance letter" --
14           MR. BALABAN:  This is going to be a new
15 exhibit; so we'll mark it 13.
16           (Exhibit 13 marked.)
17 BY MR. BALABAN:
18      Q.   When you say "severance letter," is this what
19 you're referring to?
20      A.   No.
21      Q.   No?
22      A.   No.
23      Q.   Let me have you look at Exhibit 9.
24      A.   Oh, pardon me.  My poor language, Separation
25 Agreement.
```

Page 41

```
1       Q.   Okay.  So this was talked about back in the
2  start of September?
3       A.   Again, I think you have emails that describe
4  when we started working on it, or at least a reference.
5  So I think early September, mid-September sounds about
6  right.
7       Q.   So you're saying -- I mean, I haven't really
8  seen any emails, but you say there was emails to your
9  recollection back in early September?
10      A.   In which we started looking at job
11 descriptions and separation agreement, yes.
12      Q.   Okay.  So there would have -- I'm assuming
13 the emails would have indicated something about a
14 decision had been made on Ms. Salehian and Ms. Yeatts
15 to move ahead with their termination?
16      A.   I recall an email between Tara and I in which
17 I specifically said I'm working on separation
18 agreements and targeted August -- October 4th for the
19 term date.
20      Q.   Okay.  And you are saying that would have
21 been between you -- that would have been from you to
22 Tara?
23      A.   Back and forth we were coordinating, yes.
24      Q.   Okay.  Okay, yeah.
25           Unless I'm missing something, I didn't see
```

MILES DICKSON - 06/16/2022

Page 50

1    Q.   So what do you recall about the meeting in
2  which she was informed of the termination and the days
3  leading up to that?
4    A.   Could you be a little bit more specific?  Do
5  you want me to talk about the meeting when you say "the
6  days leading up to it?"  Is that two days, is that 20
7  days.
8    Q.   Yeah.  Treasurer Conine indicated that there
9  was supposed to be two meetings before that that
10 possibly her and Ms. Yeates were going to be
11 terminated, but that didn't happen because Mr. Conine
12 wanted to do it in person.
13      Do you recall -- what do you recall of that?
14   A.   We had -- I think in that same email that I
15 referenced earlier, we had agreed that we were
16 targeting October 4th for the termination date for
17 both employees.  The Treasurer, as I recall, did feel
18 very strongly about it in person, and so we coordinated
19 really around his travel schedule.
20   Q.   Okay.
21   A.   So our intent was to terminate on October
22 4th.  I can't recall -- I can't recall why he needed
23 to cancel, but we ultimately needed to cancel that day.
24 I think it was his schedule, but I don't remember for
25 sure.

Page 51

1    Q.   Okay.
2       So your recollection is the 4th was the
3  only -- it was originally going to be on the 4th, and
4  it was because Mr. Conine couldn't be there in person,
5  it was switched to the 28th.
6    A.   That's correct.  We -- I believe target -- we
7  tried one other day in that period.  I don't remember
8  what day it was, but there was also a challenge.  And I
9  think on that time, it was either Sheila or Beth were
10 out of the office.  I don't recall.  But we had two
11 different dates we had tried for termination before the
12 October 28th day.  And, yes, it was because the
13 Treasurer really wanted to be in person.
14   Q.   Okay.  And let me show you what we had
15 previously marked as Exhibit 4.  And take a second to
16 read that over, if you need to.
17   A.   Okay.
18   Q.   Okay.  So do you recall getting this email
19 from Ms. Salehian?
20   A.   Yeah.  Vaguely.  And seeing it jogs my
21 memory, yeah.
22   Q.   Okay.  And she talks about allowing her to
23 work from home for seven days because of her
24 chemotherapy treatment.
25      Do you recall who approved that?

Page 52

1    A.   I recall that Sheila insisted that she wanted
2  to work from home and that we were fine with that.  So
3  when she notified the Treasurer and I in a meeting
4  earlier that month, Beth was present, that she was
5  facing a skin cancer diagnosis, and that she wanted to
6  keep working and she just preferred doing it at home.
7  I recall saying -- you know, having a conversation
8  saying, We're so sorry and, of course, whatever you
9  need.
10   Q.   And with respect to the cancer diagnosis,
11 when was the first time that you were made aware of
12 that?
13   A.   In that meeting.
14   Q.   And that meeting, do you know a date of that
15 meeting?
16   A.   Not off the top of my head, no.
17   Q.   Okay.
18   A.   I believe it was referenced several times in
19 the materials that Judy shared with me, though.  So --
20   Q.   Okay.  So -- so -- but it was -- it was
21 definitely prior to October 22nd.  It was --
22   A.   Yeah.
23   Q.   Okay.
24      And that would have been the first time that
25 you were made aware that she had this cancer diagnosis?

Page 53

1    A.   Yes.
2    Q.   At any point during that meeting or
3  afterwards, do you recall her asking for accommodations
4  on -- for the cancer diagnosis?
5    A.   She said several times over email and in
6  person that she wanted to continue working.  When I
7  reached out, and I did several times while she was at
8  home, to see if there was upcoming events, do you need
9  anything?  She consistently said, "I'm working from
10 home, and I'm okay."  Or not -- pardon me, "I'm okay,
11 but events were covered."
12      And so in that veing, she was very clear she
13 wanted to keep working.  And the -- I don't know that
14 accommodation, pardon me for not knowing the correct
15 language here, but our understanding when she requested
16 to work from home, we said absolutely, and that was
17 never a problem.
18   Q.   Okay.  Did -- did you feel that allowing her
19 to work from home was an accommodation?
20   A.   I don't know that I viewed it as an
21 accommodation or not accommodation.  We had a team
22 member who said she preferred working from home
23 from -- for health reasons and that she was more
24 comfortable at home and she was embarrassed to be in
25 person, and we -- we said that was fine.  She worked

Page 58

1  with Treasurer Conine the meeting prior to sending
2  Exhibit 7 out?
3        A.   Yes.
4             At that point, I presumably would have known
5  for sure that he was going to make it in person.  I
6  don't remember if he flew in that morning or that
7  afternoon.  But at that point, I wouldn't have booked a
8  meeting if I didn't know the Treasurer was going to be
9  there.
10       Q.   Okay.
11            Okay.  And so what do you recall about the
12  meeting?
13       A.   They were -- Sheila's meeting?
14       Q.   Yeah.  That's Sheila's meeting.
15       A.   Relatively brief.  We came in, we let her
16  know that we were terminating.  I presented her with
17  the Separation Agreement -- pardon me, if I'm not
18  saying that right.  Yeah, Separation Agreement.  And
19  encouraged her to consult an attorney and reminded
20  her -- or let her know, I guess I should say, that she
21  would have 21 days to do that.  We stepped out, and
22  that was the extent of the meeting.
23            There was a brief conversation.  Sheila
24  looked shocked.
25       Q.   Okay.

Page 59

1        A.   I remember that.
2        Q.   Do you recall her asking the reason for
3  termination or --
4        A.   I remember vaguely the request to, you know,
5  why is this happening?  I believe we had just indicated
6  we were making a change, and we didn't provide any
7  specifics.
8        Q.   Okay.
9             Let me ask you -- she had written something
10  for a timeline document for the EEOC.  And with respect
11  to the termination she says (as read):
12            "October 28, 2019, I returned to work and was
13  fired at 3:30 p.m. before I could even hand Treasurer
14  Conine my paperwork."
15            Do you recall that, as far as the FMLA
16  paperwork that we referred to, do you recall her having
17  some paperwork in her hand or anything?
18       A.   I -- I recall Sheila often had paperwork in
19  the mix.  So I remember we went in, and we had already
20  agreed that we would start the meeting, just as we had
21  with Beth.  We spoke first, we were very quick and
22  clear that it was a meeting to let her know that she was
23  being terminated.
24       Q.   Okay.
25            And -- and prior to the meeting, you had no

Page 60

1  inkling of any kind that she was going to request FMLA
2  leave at the meeting?
3        A.   No.  No.
4             And I would note that I think she was there
5  all day; so she didn't come and hand me paperwork at
6  any point throughout that day when she was already
7  there.  So I had no reason to believe she was sitting
8  on paperwork to give to me at 3:30.
9        Q.   Okay.
10       A.   I mean, we were 30 feet away from each other
11  all day, I think.
12       Q.   Okay.  Moving on to the next line it says (as
13  read):
14            "When asked why I was being dismissed,
15  Treasurer Conine would not give me a reason.  He just
16  kept saying we are going in a different direction."
17            Do you recall that's what happened?
18       A.   I recall we had a brief meeting, and we
19  expressed we were going in a different direction, and
20  that was about the extent of it.  We didn't provide any
21  additional information to Sheila or to Beth.
22       Q.   Okay.  She says (as read):
23            "I asked" -- and I'm assuming she's referring
24  to Treasurer Conine -- "I asked if he would give me a
25  letter of recommendation, and he said no."

Page 61

1             Do you recall that happening at the meeting?
2        A.   I'm sorry, I don't.
3        Q.   (As read):
4             "I asked him if my dismissal was
5  performance-related, and if so, what had I not done to
6  meet or exceed his expectations?  He said it was not
7  performance-related and that these things are very
8  difficult."
9        A.   We agreed before that meeting that we were
10  not providing specifics, and we didn't.
11       Q.   Do you recall him specifically saying that it
12  was not performance related?
13       A.   No.  I don't recall that.
14       Q.   Let -- let me ask you this.  It -- it seems
15  that I'm going to go through at least one document that
16  indicates it was performance related.  Why would you
17  have not told Ms. Salehian that it was performance
18  related at the meeting?
19       A.   Sorry.  I want to make sure I'm cautious here
20  in terms of conversations that we may have had with
21  counsel.
22       Q.   Yeah.  I don't want you to discuss any
23  conversation that you had with counsel.
24       A.   Okay.  So we had decided to not provide any
25  detail.

MILES DICKSON - 06/16/2022

Page 70

1 a really clear set of procedures, and my impression was
2 that they weren't there. So, yes, we ultimately
3 terminated that program.
4    Q.  Okay.  Next (as read):
5         "Was reluctant to take responsibility for
6 poor work product or outcomes and, instead, often
7 blamed others, such as vendors, partners, or members of
8 past administration."
9         Can you give me an example of that?
10   A.  Yeah.  I think the marketing vendor was a
11 good example, but I can add onto that.  That 529
12 partners who were fiscal partners in 529 programs were
13 largely responsible for helping create marketing
14 materials.  Our goal was more round reviewing them.
15 And a very consistent concern we had for one the big
16 programs was that while it was showing growth
17 nationally -- because it's a national program.  You
18 could live in Kansas and participate -- we weren't
19 seeing the same growth rate here in Nevada.  And so
20 when we pushed on questions about how are Nevadans
21 being served by this office?  How are they benefiting
22 from the investment?  What we would often get is, Well,
23 FSG is not doing their job.  The marketing firm is not
24 doing their job.  The last administration focused on
25 something else.  I don't have enough staff.

Page 71

1    Q.  Okay.
2         Next (as read):
3         "Demonstrated poor overall performance
4 relative to her peers and other deputy treasurers."
5         What was meant by that?
6    A.  What was really clear for me as I joined the
7 team, even in a relatively short period of time as I
8 learned the office, was how detailed and focused and, I
9 think, productive different deputy treasurer were such
10 as the folks who manage debt on behalf of the whole
11 State with an office of two people.  So --
12   Q.  Can you give me names of who you're referring
13 to?
14   A.  Oh, sure.  That was Lori Chadwick, the Deputy
15 Treasurer.  But I'll say all deputy treasurers that I
16 worked with, there were five.  All four of them really
17 felt -- or four, I should say, really felt they were
18 consistently focused on work and got there.  Sheila
19 stood out to me as someone who was not at that level.
20   Q.  Okay.  (As read):
21        "When plaintiff was asked to provide a
22 strategic plan for the department in June of 2019,
23 plaintiff submitted a plan that lacked clarity,
24 priority, and accountability measures; and, therefore,
25 fell short of what was expected of an unclassified

Page 72

1 employee in the plaintiff's position."
2         Can you expand on that at all?
3    A.  Sure.  So as we talked about conducting a
4 strategic planning exercise, our real goal was once we
5 were out of the legislative session, which can be
6 pretty consuming in terms of time and attention, we
7 wanted to shift to where the office was going over the
8 next three and a half years.  We instagated a strategic
9 planning process, we brought all the deputies together
10 and the senior deputies, the leadership team in Carson
11 City, for essentially a day-long event, along with the
12 happy hour kind of thing the evening before.  We were
13 asking folks to be really clear and also ambitious
14 about where they were going with their departments.
15 Again, I think really trying to take everybody -- and I
16 don't even know that it's everybody.  I think it's
17 specifically for College Savings where there was
18 articulated concerns that they were essentially held
19 back -- my words -- from the previous administration.
20 We wanted to give people room to -- to stretch and
21 articulate what their plans were.
22         So we gave the exercise -- folks had, I don't
23 remember the exact time line, but we did a kind of
24 day-long retreat, and then folks had a few weeks to get
25 responses back.  And as Sheila shared responses with

Page 73

1 me -- and Beth Yeatts was in that meeting as well -- I
2 expressed concerns about what it looked like in terms
3 of quality, specificity, accountability, how will we
4 measure it, why we are making these choices, et cetera.
5    Q.  Okay.  And so -- so there was an actual
6 documented specific plan that she prepared for this;
7 correct?
8    A.  They were drafts.  We were doing kind of
9 first-round drafts and second-round drafts, as I
10 recall.  So that was in response to a first-round
11 draft.
12   Q.  Okay.  So there should be something that
13 documents an actual draft?
14   A.  Yeah.  As far as I know, I think she emailed
15 it to me, but we also sat in person and went through
16 it, and so I'm sure it's -- there's some email
17 document.
18   Q.  Okay.  (As read):
19        "Plaintiff also exhibited an unwillingness to
20 adapt to changes requested by senior management."
21        Can you give me an example of that?
22   A.  Two stand out to me.  As we, I think,
23 communicated our concern around financial literacy, in
24 terms of being, it felt like, an outside focus for
25 Sheila compared to the rest of the budget and

MILES DICKSON - 06/16/2022

1  Treasurer's agenda, really saying, Look.  This is not
2  where we're putting energy right now.  We don't even
3  really have a plan to do this work.  The budget has
4  gone unspent, et cetera.  We need to shift and focus on
5  what were real challenges in the office, in terms of
6  growing participation and creating efficiencies of the
7  programs.
8          The resistance, at least for me that I felt
9  in providing that feedback, was consistent.  Sheila
10 regularly went back to, This is why I think financial
11 literacy matter, this is why I think this is a good
12 program, et cetera.  So for me, that was kind of a
13 clear concern around lack of adaptation, lack of
14 willingness to move where our priorities were, or where
15 I believe the Treasurer's priorities were.
16         Similarly, what really dominated, at least
17 the first few months of my experience at the
18 Treasurer's office, was conversations around
19 administrative processes.
20     Q.   Okay.
21     A.   Not agreeing with the reimbursement, not
22 agreeing with travel policies.  Having a sense of, you
23 know, how budgets were being used, et cetera.  We spent
24 months having what felt to me like meeting after
25 meeting after meeting, often with multiple team members

1  from multiple different departments to try to get to
2  the bottom of it, never really resolving it.  I don't
3  know that there was anything to actually resolve,
4  frankly.
5      Q.   Okay.
6      A.   And as we talked about it, we need to move on
7  from the administrative items.  We can't spend this
8  much time talking about mileage reimbursement when we
9  make a few trips a year, and in the meantime we're
10 spending $25 million running a department that seems to
11 have struggles.
12     Q.   Okay.
13     A.   And to clarify or to add on that the
14 unwillingness to adapt changes really was demonstrated
15 by the unwillingness to move on.
16     Q.   Okay.
17         Treasurer Conine had testified about some
18 conflicts Sheila had with employees or team members in
19 the North, such as Tara Hagan.  Did you observe any of
20 that or how would you address that?
21     A.   Could you be more specific?  I don't -- I
22 don't know what Treasurer Conine testified to; so --
23     Q.   Well, he seemed to say that there was
24 friction or -- like, hostile environment type, that
25 it -- there was hostility from the people in the South

1  to the people in the North.  I mean, that's what I
2  recall his testimony.  I mean, if you -- you know, if
3  that doesn't -- if -- if -- if you don't -- if -- if --
4  if you don't have a response, then that's fine.  I'll
5  just move on, but I -- I -- I just want to know if you
6  had any recollection of any of that.
7          MS. PRUTZMAN:  Objection to the form of the
8  question.  I think it misstates Treasurer Conine's
9  testimony.  I don't know if he said there was a
10 "hostile environment."
11 BY MR. BALABAN:
12     Q.   Okay.  Well, that's fine.  I mean, if it
13 doesn't jog your memory or -- or whatnot, that's fine.
14 I'll just move on.
15     A.   Okay.
16     Q.   Okay.
17         Let me have you look at -- let me have you
18 look at Exhibit 1.  And have you seen Exhibit 1 before
19 today?
20     A.   I recall seeing this -- this document
21 mid-Summer of 2019.
22     Q.   Okay.  And in -- did Exhibit 1 have any
23 bearing on your decision to terminate Ms. Salehian?
24     A.   No.  At that point, I had already formed my
25 concerns and my opinions.  And, frankly -- no, it

1  didn't.
2          I want to reiterate that for me, I tried to
3  give a great amount of deference to everybody in the
4  office, to Sheila and any other team members.  I think
5  it's tough to work in an elected office.  And when I
6  say "tough," I think administrations come and go,
7  people come and go; I think that's got to be difficult.
8  And so I know in my role, my role, I try to give a lot
9  of deference to team members and recognize that
10 whatever happened on, you know, December of 20 -- 2018
11 and before was a different administration.  And for me,
12 I was really focused on letting everybody -- for me to
13 learn people and for people to learn me.
14     Q.   Okay.
15         Let me have you look at Exhibit 10.  And you
16 said you've gone through the documents of the
17 case -- or the documents provided by Judy.  So I'm sure
18 you reviewed the Complaint, and there's allegations of
19 age discrimination or age harassment.  And I wanted to
20 ask you, Exhibit 10 represents a -- it's kind of done
21 in a letter form, but it's -- it's essentially a
22 statement from Beth Yeates and in support of
23 Ms. Salehian.  But also, it addresses some concerns
24 that she observed with respect to looking at Page 82.
25 It says (as read):

MILES DICKSON - 06/16/2022

Page 78

```
 1            "Unwelcomed age remarks."
 2            And first of all, let me ask you:  In your
 3  experience in the office, do you recall either yourself
 4  making age -- derogatory age remarks or hearing it from
 5  other people?
 6     A.   Not derogatory age remarks, no.
 7     Q.   When you say "not derogatory" --
 8     A.   You're characterizing remarks I may have made
 9  as derogatory, and I'm disagreeing with that
10  characterization.
11     Q.   Okay.  Well, let's go through some of the
12  things that she said:  Jokes about staff used dot
13  matrix printers and highlighters.
14            Do you recall either hearing that comment or
15  making a remark like that?
16     A.   I don't recall the specific of this
17  conversation or this comment, but I can tell you I
18  remember having multiple conversations about the Guinn
19  Millennium Scholarship.  Again, the one that cost the
20  State, I think, $45 million by any amount and being
21  really concerned about what I felt like a very
22  antiquated process for taking in documents, reviewing
23  them, and what I think the staff described as
24  reconciliation, but fell pretty short of that as a
25  process, and often making comments that I was concerned
```

Page 79

```
 1  that we had not materially updated our processes
 2  especially IT in the nearly 20 -- or since the program
 3  had been created because we were still sitting there.
 4     Q.   And so you're referring to this second bullet
 5  point there; right?
 6     A.   Well, I -- again, I would take issue with the
 7  notion of exaggerated complaint.  But, yes, I remember
 8  talking about being very concerned that we had not
 9  adequately -- or the office had not adequately adopted
10  the information technologies to make the program more
11  efficient and impactful.
12            I recall very specifically folks literally
13  sending manually reconciling processes, manually
14  reconciling reports against each other.  That made zero
15  sense to me.
16     Q.   Okay.
17     A.   And let me go further and say often asked
18  about what's the IT plan?  How are we going to do this
19  better?  You know, we heard complaints from students as
20  well as partners about the lateness of notices and
21  payments from Millennium Scholarship.  I was very
22  concerned about the IT infrastructure or the lack of
23  it.
24     Q.   Okay.  Next bullet point says (as read):
25            "Millennial exasperation over call center
```

Page 80

```
 1  plans and operations."
 2            Do you recall either making any -- any
 3  comment about that or hearing, anybody making a about
 4  comment that?
 5     A.   Sure.  So let me begin by rejecting the
 6  characterization of millenial exasperation and say that
 7  we had two departments that both had relatively high
 8  call volumes, that, at least as I could tell and as I
 9  requested information on several times, we had not
10  implemented a call center plan.
11            So let me go one step further and say there
12  was no call center plan, there was no call center
13  operation.  I asked for both deputies who oversaw
14  departments that had high volumes of inbound calls from
15  direct taxpayers and program participants to start
16  working together on building a call tree and a call
17  system along with the scripts.
18     Q.   Okay.
19     A.   So it was -- it was not a small conversation.
20  It was a conversation that happened many times,
21  focused, again, on what I perceived as an outdated IT
22  system that was not serving program participants -- or
23  not serving them well.
24            MADAM COURT REPORTER:  "Program
25  participants"?
```

Page 81

```
 1            THE WITNESS:  Program participants, yes.
 2  BY MR. BALABAN:
 3     Q.   Did either Ms. Yeatts or Ms. Salehian ever
 4  say anything to you that they felt that either comments
 5  you made or others in the office made were age bias or
 6  anything of that nature?
 7     A.   No.  Never that I recall.  And I spoke very
 8  frequently and often in meetings with teams about the
 9  need to make sure that our communications, our marking
10  programs, our physical outreach, and our IT was
11  accessible for people across all demographics
12  categories, multiple languages, and differences in
13  economic circumstances.  So there was no shortage of
14  opportunity for folks to say, you know, I think the
15  thing you're saying feels insensitive or feels out of
16  touch or feels inaccurate.  We rewrote entire marketing
17  RFPs to be very clear that we wanted to reach diverse
18  audiences.
19     Q.   Okay.
20            Did -- did -- did any -- did either
21  Ms. Yeatts or Ms. Salehian ever say anything to
22  your -- to you about they felt the hiring practice and
23  the hiring practices in the Treasurer department were
24  age biased?
25     A.   Not that I recall.
```

MILES DICKSON - 06/16/2022

Page 102

1  Memorial Scholarship, and that was a program that she
2  helped or she lead.
3          I remember she organized a luncheon, I
4  remember it was in Reno at UNR.  I didn't attend.  In
5  terms of being removed from a press release, Erik did
6  handle most of our essentially, I guess, I think in
7  government terms is a public information officer.
8          So often offices may designate a first person
9  to contact for media requests.  Erik was often our
10  person who labeled on media requests.  So if people had
11  an outreach, they called Erik not me or the Treasurer
12  or Sheila.
13      Q.   But, I mean, even though she organized
14  everything and then was removed from the press release,
15  wouldn't that be unusual to do?
16      A.   No.  A PIO -- I mean, a public information
17  officer in government is typically the first person to
18  contact, I guess like a publicist would be in a private
19  business.  It doesn't mean the publicist is running the
20  program, it doesn't mean the PIO is running the program
21  or the events, it's just for media outreach.
22      Q.   Is it odd for -- it sounds like Sheila set up
23  this event and yet Treasurer Conine is not even
24  allowing her or Beth to sit at the same table as him.
25          Is that unusual in your experience?

Page 103

1      A.   I can't speak to this event.  I wasn't there.
2  I don't know what seating was like.  But I can speak to
3  my personal experience of working with or for elected
4  officials or dignitaries or anybody like that, I think
5  I often sit in the back of the room; the elected folks
6  sit in the front of the room.  So for me, I -- I can't
7  imagine if I was asked -- if I was told my seat was
8  here, I wouldn't have even interpreted that as weird.
9      Q.   When you were present at functions when
10  Treasurer Conine were present and either Sheila and/or
11  Beth were present, did you -- did you ever see
12  Treasurer Conine try to avoid them at public functions?
13      A.   No.  I never saw that.
14          And also, you know, the Treasurer lived in
15  Northern Nevada for pretty much the whole period
16  through midsummer; so I don't think there were that
17  many occurrences of that -- occurrences of -- at least
18  in my own experience -- me, the Treasurer, Sheila, and
19  Beth all being at the same location.
20      Q.   Okay.
21          Ms. Salehian, on the break indicated with
22  respect to her skin cancer that she might have let you
23  and/or Tara and/or Treasurer Conine know about it as
24  early as the end of August of 2019.  Do you -- would
25  you dispute that if -- that she was -- she said that

Page 104

1  she was -- she found out that she needed additional
2  treatments and that she was almost sure that she told
3  one or more of you that -- about her diagnosis and she
4  was going to need more treatment and --
5      A.   You're asking me if she recalls that she may
6  have told me?
7      Q.   No.  If you recall that.  So in other words,
8  I think what --
9      A.   No.  Absolutely not.
10      Q.   So you're -- you're saying the first
11  time -- and you're saying it's in some documents, but
12  from your recollection, the first time that she would
13  have made any of you aware of that would have been
14  early October; correct?  Or --
15      A.   I can't speak for the Treasurer or Tara.  I
16  know that the first time I heard the words, or the
17  phrase skin cancer, was when we were sitting at a table
18  directly across from her.  And I think you already have
19  the date in your time line, and that was when Beth,
20  myself, Sheila, and the Treasurer were present, as best
21  I can tell.  And I believe the Treasurer was by phone.
22  Best I understood afterwards, that was news to the
23  Treasurer as well.
24      Q.   Okay.
25          This document indicates -- 56 I'm looking

Page 105

1  at -- and I agree, this document doesn't indicate
2  August.  It indicates October 8th that she informed
3  yourself, Zach Conine, and Beth Yeatts about the
4  cancer.  So you're thinking that was about -- that
5  would have been the first time, about that date?
6      A.   I don't have a calendar in front of me, but
7  those were the three other people -- well, those were
8  including Sheila, the four people who were in a
9  meeting, it would have happened late in an afternoon in
10  October.  So if it was October 8th, I don't --
11  because I don't have a calendar; so sounds right,
12  though.  But that was, again, the first time I was
13  notified.  And I think it even says it; right?
14  Informed Treasurer, Miles, and Beth and --
15      Q.   Yeah.  But she doesn't say that was the first
16  time, but --
17      A.   But, I mean, it was a pretty extensive list
18  of dates and times.  Having read it, but it looks like
19  it's the first time it's stated here.
20      Q.   Okay.
21          Looking at 57J, Page 57J, if you could read
22  that and tell me whether you agree with what she's
23  saying there, especially the last couple of lines.
24      A.   As I mentioned earlier, there was no call
25  center despite, as I recall, it being a free service

MILES DICKSON - 06/16/2022

Page 122

1    Q.    And why not, again?

2    A.    Largely, because we had never just finished
3    the project.  We had a sense from most of the deputies
4    that there was clarity around where they were going and
5    what they needed to do.  In many ways, the deputies
6    were already executing on their growth plans.  That was
7    happening throughout the office.

8          And, frankly, within a month we were
9    preparing to make a major shift in leadership in the
10   Southern Nevada office, and we shifted gears to writing
11   job descriptions and severance agreements and finding
12   the new leaders who we thought ultimately would need
13   less support and less guidance in writing strategic
14   plans for the departments they lead.

15   Q.    So it sounds like at that point you had
16   already moved on from Ms. Salehian?

17   A.    The exercise had cemented my perception that
18   she was not going to be the leader that moved us or
19   moved the department -- pardon me -- to where we wanted
20   it to go.

21         MR. BALABAN:  Okay.  I don't think I have
22   anything else.

23         MS. PRUTZMAN:  I think I'm good.

24         MR. BALABAN:  Okay.

25         So I'll put on the record the same thing that

Page 123

1    I told Treasurer Conine.

2          THE WITNESS:  Sure.

3          MR. BALABAN:  Per the NRS, you have the right
4    to review your deposition, make any changes, sign it.
5    If you choose not to, a certified copy of your
6    deposition will be admissible at trial for any
7    purposes.  And when we go off the record, the court
8    reporter will tell you about how you'll be able to
9    review it if you choose.

10         THE WITNESS:  Okay.  Thank you.  I
11   understand.

12         MR. BALABAN:  I thank you for your time.

13         THE WITNESS:  You as well.

14         MADAM COURT REPORTER:  Would you like a copy?

15         MS. PRUTZMAN:  Yes, please.

16         (Thereupon, the deposition concluded at
17         6:19 p.m.)

18
19
20
21
22
23
24
25

Page 124

1                  CERTIFICATE OF DEPONENT

2    PAGE    LINE    CHANGE         REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13                    * * * * *

14

15   I, MILES DICKSON, deponent herein, do hereby certify

16   and declare under the penalty of perjury the within and

17   foregoing transcription to be my deposition in said

18   action; that I have read, corrected and do hereby affix

19   my signature to said deposition.

20

21

22                    _____

                           MILES DICKSON, Deponent

23

24

25

Page 125

1                  CERTIFICATE OF REPORTER

2    STATE OF NEVADA  )

     COUNTY OF CLARK  )

3          I, Michelle R. Ferreyra, a Certified Court

4    Reporter licensed by the State of Nevada, do hereby

5    certify:  That I reported the deposition of MILES

6    DICKSON, commencing on THURSDAY, JUNE 16, 2022, at 6:15

7    p.m.

8          That prior to being deposed, the witness was

9    duly sworn by me to testify to the truth.  That I

10   thereafter transcribed my said stenographic notes into

11   written form, and that the typewritten transcript is a

12   complete, true and accurate transcription of my said

13   stenographic notes, and that a request has been made to

14   review the transcript.

15         I further certify that I am not a relative,

16   employee or independent contractor of counsel or of any

17   of the parties involved in the proceeding, nor a person

18   financially interested in the proceeding, nor do I have

19   any other relationship that may reasonably cause my

20   impartiality to be questioned.

21         IN WITNESS WHEREOF, I have set my hand in my

22   office in the County of Clark, State of Nevada, this

23   6th day of July, 2022.

24                    Michelle R. Ferreyra

25         MICHELLE R. FERREYRA, CCR No. 876