Michael P. Balaban   State Bar No. 9370
LAW OFFICES OF MICHAEL P. BALABAN
10726 Del Rudini Street
Las Vegas, NV  89141
(702)586-2964
Fax: (702)586-3023
E-Mail: mbalaban@balaban-law.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SHEILA SALEHIAN,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF NEVADA, NEVADA STATE TREASURER'S OFFICE; ZACH CONINE, STATE TREASURER; DOES 1-50; and ROE CORPORATIONS 1-50,<br><br>Defendants. | CASE NO. 2:21-cv-01512-CDS-NJK<br><br>MEMORANDUM OF POINTS AND AUTHORITES OF PLAINTIFF SHEILA SALEHIAN'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff SHEILA SALEHIAN ("Plaintiff", "Salehian" or "Sheila") submits this Memorandum of Points and Authorities in Response to Defendants STATE OF NEVADA, NEVADA STATE TREASURER'S OFFICE and ZACH CONINE, STATE TREASURER'S (collectively "Defendants" or individually "State Treasurer's Office" or "Conine") Motion for Summary Judgment.

# I.

## PRELIMINARY STATEMENT

As this Court is aware of, on summary judgment the Plaintiff only has the burden of showing that there are material issues of fact that a reasonable jury *could* decide in the non-moving party's favor.

Further Plaintiff's testimony, testimony of others that support Plaintiff's case and other evidence are to be believed and all reasonable inferences are to be made in Salehian's favor.  It is not the court's duty to weigh the evidence on summary judgment.

That is exactly what the Defendants want this court to do, weight the evidence and accept their version of the fact instead of Plaintiff's version.  That is for the jury to decide.  That is why we have juries and a right to a jury under the seventh amendment to the constitution.

Hopefully this court will respect the rule of law with respect to summary judgment and not decide the disputed facts itself like is regularly done in this district.

Ultimately summary judgment will not lie if the dispute about material facts is "genuine", that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

# II.

## STANDARD ON SUMMARY JUDGMENT

Under *Rule 56(c)*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "More important….summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.*

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

"[T]rial courts should act....with caution in granting summary judgment...." *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

Recently the United States Supreme Court reiterated the long standing standard a judge is supposed to use in deciding whether to grant summary judgment.  In the case of *Tolan v. Cotton*, 572 U.S. _____, 134 S.Ct. 1861, 1866 (2014), the Supreme Court reversed the lower court's grant of summary judgment, holding the lower court failed to credit the opposing party's evidence and the reasonable inferences therefrom, which contradicted the evidence of the moving party. *Id.* at 1866-1868.

In the decision the Supreme Court held that, "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'." (Citation omitted).  "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law'." (Citation omitted).  In making that determination, a court must view the evidence 'in the light most favorable to the opposing party'." (Citation omitted)." *Id.* at 1866.

### III.

### STATEMENT OF FACTS

"Salehian, was hired by Defendant on January 9, 2012 as a Senior Deputy Treasurer. Salehian's last position was Executive Director of the Governor Guinn Millennium Scholarship Program. [Salehian Aff. ¶2.]

Salehian was 57 years old (her date of birth is June 2, 1961) when Treasurer Conine took office in January 2019, the second oldest in age (besides Beth Yeatts) of the ten deputy appointees in Nevada State Treasurer's office. [Salehian Aff. ¶3.]

Salehian was terminated along with Yeatts on October 28, 2019, without cause, when Treasure Zach Conine told Sheila that the Treasurer's office was "going in a different direction". [Salehian Aff. ¶4.]

Salehian earned a Bachelor's degree in business administration and worked for Citigroup's credit card division from May 1986 through March 2009 prior to working for the Nevada State Treasurer's office. Salehian was responsible for multiple departments within divisions within the credit card division which supported 60 million credit card customers who used systems Sheila supported. Managed multimillion dollar budgets, wrote RFP's, chose vendors and negotiated contracts. Hired, fired and trained staff and mid-level managers on policies, procedures, regulations and laws and designed and deployed new technology for improved auditing controls. Finally volunteered in community supporting financial literacy initiatives for youths. [Salehian Aff. ¶5.]

Salehian was more than willing take direction and focus on administration priorities from Treasurer Conine when he took office in 2019. She gave no resistance to the changes Treasurer Conine put in place once he took office. [Salehian Aff. ¶6.]

Under Treasurer Conine, Sheila was not only willing to switch direction based on the new Treasurer's priorities, she led many of the initiatives he instructed the office to coordinate and deploy. [Salehian Aff. ¶7.]

Salehian never received any negative job performance feedback from Treasurer Conine, Chief of Staff Dickson or anyone else, for the entire ten months Salehian worked for Treasurer Conine. This included never receiving any written or verbal warnings. [Salehian Aff. ¶8.]

Further neither Treasurer Conine, Chief of Staff Dickson nor anyone else asked to meet with her to discuss concerns with Sheila's performance or that of her department. In addition, neither Salehian or her department were ever put on any performance improvement plan. Furthermore at various office meetings Treasurer Conine, complimented and thanked Sheila for her work. [Salehian Aff. ¶9.]

In addition prior to working for Treasurer Conine, Salehian worked for State Treasurers Kate Marshall and Dan Schwartz, both of whom gave Salehian positive reviews. [Salehian Aff. ¶10, Ex. 1.]

Salehian never had a single complaint or grievance filed against her. [Salehian Aff. ¶11.]

When Salehian worked at the State Treasurer's office, she not only focused on programs that were important to the office, she rolled out new programs which became models for other states, such as the School Savings Programs. She was also asked to represent Nevada nationally at statewide 529 college savings conferences and Financial Literacy convening's multiple times. Sheila was extremely knowledgeable, reliable, and esteemed by her staff and others in the 529 Savings/Prepaid and Scholarship industry space. [Salehian Aff. ¶12.]

In addition, Salehian regularly presented at the College Savings Board all of the accomplishments that she had led her team to achieve, as late as September 19, 2019, one month before she was terminated. [Salehian Aff. ¶13.]

Further Salehian was called upon to testify at the legislative session and wrote the contents for the expansion of The Governor Guinn Memorial Scholarship Program, Senate Bill 414 which was submitted and passed in the 2019 legislative session. [Salehian Aff. ¶14.]

Overall Sheila was passionate and devoted many extra hours to promoting Nevada State Treasurer Office programs in the office, in the field and through volunteering in the community.

On numerous occasions, organization representatives conveyed praise and gratitude for Salehian's significant contributions to their state run and/or nonprofit college savings and financial literacy programs. [Salehian Aff. ¶15.]

Salehian's department goals were shared with Chief of Staff Miles Dickson in July 2019 and neither he, nor Treasurer Conine ever responded to Sheila in writing or verbally. [Salehian Aff. ¶16.]

Furthermore, a full three years after Salehian was terminated from the Treasurer's Office the "Strategic Plan" for the Treasurer's Office was still unwritten. Treasurer Conine and Chief of Staff Dickson gathered all Deputies in Carson City for a 3 day Strategic Planning Session and nothing was ever published for any departmental goals. [Salehian Aff. ¶17.]

Finally Salehian never exhibited any unprofessional conduct towards co-workers, subordinates, or supervisors. Salehian never "yelled and belittled" staff members. [Salehian Aff. ¶18.]

Prior to her termination, Salehian was repeatedly subjected to offensive, humiliating and harassing comments that she felt were directed towards her, her age and her ability to do her job because of her age. [Salehian Aff. ¶19.]

Although Salehian did not make a formal written complaint about the harassment during her employment with Nevada State Treasurer's Office, she told her supervisor Yeatts about the harassment on numerous occasions. She also told other employees about the harassment she was experiencing including Cherie McDowell, who was a Management Analyst IV with the State of Nevada and had worked for the State of Nevada for over twenty years. [Salehian Aff. ¶20.]

Even if she had made a formal complaint before she was fired, nothing would have been done to remedy the situation because the people doing the harassing, ie. State Treasurer Zach Conine, Chief of Staff Miles Dickson and Chief Deputy Treasurer Tara Hagan were also likely the ones who would investigate Plaintiff's allegations. [Salehian Aff. ¶21.]

And even if someone other than these three investigated the allegations, they would know Salehian was the one who made the allegations and Plaintiff feared retaliation from these individuals if she made a formal complaint. [Salehian Aff. ¶22.]

First in March of 2019 Chief of Staff Dickson asked Salehian to walk him through the historical programs on Financial Literacy. Salehian put together a comprehensive summary document and met with Dickson and Beth Yeatts on it. In the meeting Dickson asked Salehian how long she had been with the Nevada State Treasurer's office and when she responded seven years, Dickson said "she had been with the state forever" and commented that that was longer than he had ever worked anywhere. This made Salehian feel embarrassed because she felt that Dickson was trying to point out that Sheila had been around so long as a way to belittle her because of her age. [Salehian Aff. ¶23.]

Second in April of 2019 at a Deputy meeting with all Deputies present, Chief of Staff Dickson made a statement about how outdated the Nevada State Treasurer's websites that he recently reviewed were and mentioned that "all of the deputies that were Millennials at the table and on video conference would much rather look at and appealing website then talk to a public servant" and that it was probably an "age thing" but that the Nevada State Treasurer's websites and ways of interacting with customers would need to change. Salehian felt very offended by the comment and that it was directed at her. She tried to lighten the conversation by saying, "Well in my mind I am a Millennial" to make it less uncomfortable and to convey to Dickson that she felt singled out by the comment. [Salehian Aff. ¶24.]

Shortly after that in April 2019, Chief of Staff Dickson asked to be given an overview of the Governor Guinn Millennium Scholarship Program because he was concerned about the extensive work that was done in the office to reconcile payments made to the Nevada System of Higher Education each semester. [Salehian Aff. ¶25.]

The meeting participants included Salehian, Dickson, Sheila's supervisor Yeatts and Evelyn Castro and Plaintiff tried to explain the reason for the audits and the necessity for them and Dickson made a comment about "how it probably has been 20 years since the policies and procedures were updated". [Salehian Aff. ¶26.]

Salehian was offended and explained that they did not have IT support for over a year and a half and that Plaintiff and her staff had made many changes to streamline servicing since she had been in charge of the program and Dickson responded that he could only imagine when the program was installed there was probably "dot matrix printer" and people spending hours reconciling and that Dickson didn't see much difference now. [Salehian Aff. ¶27.]

Salehian was extremely offended and humiliated by Chief of Staff Dickson's comments which she felt were directed at her age and her ability to do her job because of her age. [Salehian Aff. ¶28.]

Finally in April of 2019 Salehian was invited to represent the State of Nevada Treasurer's Office at an all-expense paid Financial Literacy leadership meeting in Nashville, TN.  Salehian asked the nonprofit to reach out to Treasurer Conine to ensure it was ok if she accepts.  Treasurer Conine informed the nonprofit that he would rather Chief of Staff Dickson attends. [Salehian Aff. ¶29.]

Salehian had to learn of the denial of her attendance by the non-profit partner, in lieu of notification from Treasurer Conine or Chief of Staff Dickson.  When Salehian asked about the reasoning for the denial, given her vast experience in financial literacy vs. newly appointed Chief of Staff Dickson's own admission that "he was not a financial literacy expert", her questions went unanswered. [Salehian Aff. ¶30.]

In September 2019 Chief of Staff Dickson was making plans for the Treasurer's office to move to the fifth floor.  When Salehian asked Dickson about the move, she was told by Dickson that the Nevada State Treasurer's office was moving to a new location to "refresh the office and was interested in fresh faces and starting with a clean slate."  Salehian was offended by Dickson's remark that they were looking for fresh faces and starting a clean slate and took this to mean they wanted younger employees when the office moved. [Salehian Aff. ¶31.]

Salehian was also told that she would be getting a smaller office than younger staff/deputies and when she asked why, Dickson told her that there was no debating it and that was how it was going to be.  This ran in contravention to a prior planned office move a few years earlier in which offices were going to be assigned based on staff level and seniority according to State of Nevada rules. [Salehian Aff. ¶32.]

In addition between February 2019 and October 2019, Salehian experienced a reduction of duties including media outreach responsibilities that were given to younger newly appointed deputies under Treasurer Conine's leadership which Salehian thought was because of her age. [Salehian Aff. ¶33.]

Further during this time frame, Salehian was continually asked for information, reports and data, only to be repeatedly told by Chief of Staff Dickson, that he "had not had a chance to review what he had asked for" despite the urgent need for the information which required client to work numerous extra hours to provide.  In addition Dickson/Conine's servicing letters had to be

reviewed by a much younger appointed employee despite Plaintiff's oversight and seven years of successful experience running the programs and all customer communications. [Salehian Aff. ¶34.]

Also Salehian never allowed to pick up Treasurer Conine and accompany him to public facing meetings or functions, despite the fact that it was a main component of her job for the past 7 years, before Treasurer Conine took office in January 2019. Instead other younger staff, all under 40 years of age, were the only employees allowed to accompany Treasurer Conine to public functions or Treasurer interviews, even when Salehian sourced and set up the interviews. [Salehian Aff. ¶35.]

Finally Tara Hagan assigned staff to review every outgoing long distance phone call Salehian made to make sure the calls were not personal phone calls. When Salehian escalated the disparate treatment to Dickson, he refused to address the issue with Hagan despite the fact *not one* call was ever found to be a personal call made by Salehian. [Salehian Aff. ¶36.]

Further Salehian was treated differently than similarly situated unclassified male deputies at the Nevada State Treasurer's office. [Salehian Aff. ¶37.]

This included Plaintiff being asked to pack her things to leave the workplace within two hours after almost eight years of successful employment at the Nevada State Treasurer's office. [Salehian Aff. ¶38.]

Salehian being told she would be given 21 days to review the "Separation and Release of All Claims Agreement" yet being placed immediately in "Leave without Pay" status which meant she lost her healthcare benefits three days later. [Salehian Aff. ¶39.]

Salehian not being allowed to send an email to staff or colleagues notifying them of her departure, or even properly say goodbye to employees she had worked with for many years. [Salehian Aff. ¶40.]

Salehian not being allowed to purchase additional years of service in PERS, as she was immediately and punitively placed on Leave without Pay. [Salehian Aff. ¶41.]

Salehian being locked out of her computer within 15 minutes of being fired so she was unable to even put an "out of office" notice on her email. [Salehian Aff. ¶42.]

Salehian not being given an offer to retire, only to resign, despite the fact she was the about the same age as male employees, Dennis Stoddard and Richard Foreman, who were given the option to retire. [Salehian Aff. ¶43, Ex. 2.]

Further Salehian's supervisor Beth Yeatts was also treated like her when she was terminated the same day as Sheila and in the same manner. [Salehian Aff. ¶44.]

This was in contrast to how similarly situated unclassified male deputies were treated. [Salehian Aff. ¶45.]

This included emails from Grant Hewitt stating he was leaving State Service and that "Treasurer Conine was supportive in attempting to help find Hewitt another position". Further all employee emails were sent by Hewitt despite the fact that Treasurer Conine had told Salehian and Yeatts, and members of the Unclaimed Property Department that Hewitt was fired for "lying to the Treasurer" in January 2019, days after Treasurer Conine was sworn into office. [Salehian Aff. ¶46.]

Emails sent on behalf of Dennis Stoddard, Mark Ciavola, and Al Kramer written by Chief Deputy Hagan announcing a very cordial employee retirement. [Salehian Aff. ¶47.]

Timesheets from Stoddard that reflected the ability to "ride out" vacation time and extend healthcare benefits and PERS benefits. [Salehian Aff. ¶48.]

Further Salehian and Yeatts were both subjected to a level of scrutiny with respect to the handling of employee travel that Salehian did not witness with any of her male deputy counterparts or subordinates over the almost eight years of her employment including delays in travel approval, questioning policy, & reimbursement, etc. [Salehian Aff. ¶49.]

In addition Chief of Staff Dickson continuously asked Salehian for reports, input, and information related to the programs that Plaintiff was responsible for, ie., 529, prepaid tuition, marketing, etc. and Salehian would wait weeks, and even months without commentary or feedback on items she had been asked to provide to Treasurer Conine or Dickson. [Salehian Aff. ¶50.]

In contrast, if Salehian's male subordinate Troy Watts, or peer Erik Jimenez, would send requested reports or information that Treasurer Dickson or Conine requested, they would respond within days, acknowledging and thanking the male employees for their follow up. [Salehian Aff. ¶51.]

For example Watt's comments on Marketing RFT and requests for support of FAFSA and Jimenez' request for feedback on Facebook marketing key words emails were responded to quickly while Plaintiff's Marketing RFP in August 2019, feedback on strategic goals in July 2019, approval of Mother's Day Blog in May 2019, overview of GGMS Scholarship Program Procedures in April 2019, Financial Literacy Program Feedback in October 2019, Nevada College Kick Start regulations next steps in October 2019 and Ascensus meetings for contract negotiations were ignored. [Salehian Aff. ¶52.]

In the fall of 2019 Salehian was seen by Kristen Addis Brown, M.D. at Thomas Dermatology to treat four skin cancer lesions.  In early October 2019 she began a topical chemotherapy treatment drug for the cancer. [Salehian Aff. ¶53, Ex. 3.]

On October 8, 2019 in a meeting with Treasurer Conine, Chief of Staff Dickson and Yeatts, Salehian's initial accommodations to work from home were approved.  This became necessary because of the scabbing and pain on her face from the treatment. [Salehian Aff. ¶54.]

During this time Salehian continued to update her supervisor Yeatts, Treasurer Conine and Chief of Staff Dickson on her condition and her continued need to work from home as a reasonable accommodation for her disability. [Salehian Aff. ¶55.]

On October 17, 2019 Salehian was again treated by Dr. Brown, who filled out FMLA paper work for intermittent FMLA leave or accommodations for continued intermittent treatment that would be administered on an ongoing basis to treat Sheila's condition. [Salehian Aff. ¶56, Ex. 4.]

On October 18, 2019 Salehian attended a Deputy Treasurer's meeting from home via telephone with Treasurer Conine, Dickson and Yeatts and other deputies up north.  After Salehian completed her project update, she informed Treasurer Conine and all the other people on the call/meeting that she had completed her first round of chemotherapy treatments, ie., two weeks of a six week regiment, and thus had four weeks of treatment left. [Salehian Aff. ¶57.]

Further on October 22, 2019 Salehian sent an email to Treasurer Conine, Chief of Staff Dickson and Yeatts, thanking them for allowing her to work from home during her current chemotherapy treatment and informing them that Sheila will have to undergo two more rounds of chemotherapy treatment in early November and mid-December. [Salehian Aff. ¶58, Ex. 5.]

Then on October 28, 2019, Salehian's first day back in the office, she had a scheduled meeting with Treasurer Conine and Chief of Staff Dickson, along with her Supervisor Yeatts at 3:30 pm. [Salehian Aff. ¶59, Ex. 6.]

Salehian planned to turn in her completed FMLA paperwork at that meeting, since the meeting was in person (normally it was by teleconference), and Salehian thought it would be more appropriate to make the request face to face, at her weekly meeting. Instead of meeting as planned, Chief of Staff Dickson asked Yeatts to "give them a few minutes" before joining the weekly meeting upstairs. [Salehian Aff. ¶60.]

Once Salehian arrived, instead of accepting the FMLA paperwork, Treasurer Conine and Chief of Staff Dickson proceeded to inform Sheila that her employment with the Nevada State Treasurer had ended. Salehian was shocked, surprised and completely caught off guard by the firing and despite repeated requests by Salehian for the reason behind the termination, Treasurer Conine refused to give a reason for the termination, except to say "he was going in a different direction" and Chief of Staff Dickson would present Plaintiff her final paperwork. [Salehian Aff. ¶61, Ex. 7.]

Salehian was terminated without receiving any prior disciplinary action of any kind. Further she was performing her job satisfactorily at the time of her termination and in fact was given letters of recommendation by the past two State Treasurers, Kate Marshall and Dan Schwartz, past supervisor and Chief of Staff at the Treasurer's Office Steve George and past supervisor and Chief Deputy Treasurer at the Treasurer's Office Mark Mathers, as well as her immediate supervisor for the prior two years, Yeatts. [Salehian Aff. ¶62.]

Further when Salehian was terminated, she had just finished coordinating a nationwide training conference for all State Treasurer's offices and had been recognized by the National Association of State Treasurer's, with appreciation for the role that she played in planning the successful statewide conference. The Deputy who co-chaired that conference from the State of Washington thanked Salehian and provided a letter of recommendation. [Salehian Aff. ¶63, Ex. 8.]

Salehian was 58 years old at the time of her termination (her date of birth is June 2, 1961), and Yeatts, Plaintiff's supervisor, age 62 at the time of her termination, was terminated the same day as Salehian without cause like Plaintiff. Further Yeatts was replaced with an employee more than half her age, Kirsten Van Ry, who was 30 years old when she was hired to replace Yeatts, and Plaintiff's replacement, Tya Mathis-Coleman, was 38 years old when she replaced Salehian and thus 20 years her junior. In addition, when Mathis-Coleman replaced Plaintiff, she had no prior experience in financial services. [Salehian Aff. ¶64.]

In fact, nine of the eleven positions hired or promoted in the College Savings Division since Treasurer Conine took office in January 2019 (including the two mentioned above) were individuals under the age of 40. [Salehian Aff. ¶65.]

This included Erik Jimenez who was under the age or 30 when he was hired as Senior Deputy Treasurer-North in January 2019; Kirsten Van Ry who was originally hired by the Nevada State Treasurer in January 2019 when she was 29 years of age to fill the Executive Assistant position which had been vacated by Sandy Dombroski, age 60; Dickson who was under 40 when he was hired as Chief of Staff in February 2019; Evelyn Castro who was under 40 when she was promoted to the open Student Loan Ombudsman position in November 2019; Elizabeth Mares who was under 40 when she was hired as the new Governor Guinn Millennium Scholarship Program Officer 1 in November 2019; Matthew DeFalco who was under the age of 30 when he was hired as the new Executive Assistant for Treasurer Conine in March of 2020; and finally Jamille Walton who was under 40 when hired in July 2020. [Salehian Aff. ¶66.]"

# IV.

# LEGAL DISCUSSION

**A.    THERE ARE MATERIAL ISSUES OF FACT AS TO WHETHER PLAINTIFF WAS TERMINATED BECAUSE OF HER AGE.**

    1.      **The ADEA Prohibits Discharging an Employee Because of the Employee's age.**

The ADEA prohibits employers from failing or refusing to hire, discharging, or otherwise discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1).  ADEA claims based on circumstantial evidence use the burden shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973); *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  Thus, the proof structure in an ADEA case is the same as that of Title VII. *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 674 (9th Cir. 1988).[1]

The plaintiff carries the initial burden of establishing a prima facie case of age discrimination. *Diaz*, 521 F.3d at 1207.  If the plaintiff "has justified a presumption of discrimination," the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.*  If the employer satisfies its burden, the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination.  The plaintiff has the "ultimate burden of proving that age was a 'determining factor' in the employer's alleged unlawful conduct." *Pejic*, 840 F.2d at 674.

"As a general matter, the plaintiff in an employment discrimination action need produce *very little evidence* in order to overcome an employer's motion for summary judgment." *Diaz*, 521 F.3d at 1207; *Chuang v. University of Cal Davis, Board of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

---

[1] Although the United States Supreme Court ruled that "but-for" causation is required in an ADEA case, the Supreme Court has *not* ruled definitively on whether the *McDonnell Douglas* framework still applies to ADEA cases and for that reason courts still use the *McDonnell Douglas* analysis in evaluating disparate treatment cases brought under the ADEA. *Gross v. FBL Fin'l Services, Inc.*, 129 S.Ct. 2343, 2349, fn. 2.s

As will be shown below the evidence in this case at the very least presents an issue of material fact for the jury on whether Plaintiff was terminated because of his age.

**2.    The Evidence in this Case, Especially when Looked at in the Light Most Favorable to Plaintiff, Establishes a Prima Facie Case of Age Discrimination.**

A plaintiff can establish a prima facie case of age discrimination by demonstrating he was "(1) at least forty years old, (2) qualified for the position/performing job satisfactorily, (3) discharged, and (4) replaced by a substantially younger employee(s) with equal or inferior qualifications. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "It is undisputed that petitioner satisfied this burden here: (i) at the time he was fired, he was a member of the class protected by the ADEA (individuals who are at least 40 years of age, 29 U.S.C. §631(a)), (ii) he was otherwise qualified for the position of Hinge Room supervisor, (iii) he was discharged by respondent, and (iv) respondent successively hired three persons in their thirties to fill petitioner's position." *Id.*

The requisite degree of proof necessary to establish a prima facie case is minimal on summary judgment and does not need to meet a preponderance of the evidence standard. *Coglan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005).

The Supreme Court has cautioned that the prima facie requirements for making a Title VII claim "is not onerous" and poses "a burden easily met." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

**a.    At Least Forty Years Old.**

As to the first prong of his prima facie case which is not in dispute, Salehian was born on June 2, 1961 making her 58 years old when she was terminated on October 28, 2019. [Salehian Aff. ¶64.]

**b.    Qualified for the Position/Performing Job Satisfactorily.**

As to the second prong of Salehian's prima facie case, when Plaintiff was terminated from the State Treasurer's on October 28, 2019, she had been employed there since January 9, 2012 (over seven years) as a Senior Deputy Treasurer and then Executive Director of the Governor

Guinn Millennium Scholarship Program. [Salehian Aff. ¶2.]  In addition she had over 23 years of working in financial services with Citigroup prior to that. [Salehian Aff. ¶5.]

Further there is clear evidence that Salehian was performing her job satisfactorily when she was terminate and this is not just from Plaintiff herself.[2]

Virtually everyone other than Treasury Conine, Chief of Staff Dickson and Chief Deputy Treasurer Hagan thought that Salehian did a good job.

This included her direct supervisor Yeatts during the whole time Salehian worked under Treasurer Conine (see Affidavit of Yeatts), Plaintiff's direct supervisor prior to Yeatts Linda English (see Affidavit of English), Cherie McDowell who worked with Plaintiff in the unclaimed property department from approximately September 2015 through October 28, 2019 (see Affidavit of McDowell), the two previous State Treasurers Kate Marshall and Dan Schwartz and the previous Chief of Staff Steve George and previous Chief Deputy Treasurer Mark Mathers. [Salehian Aff. ¶10, Ex. 1.]

And Treasurer Conine when asked by Salehian when she was being terminated, why she was being terminated, didn't say it was because her job performance wasn't satisfactory, but rather that the Treasurer's office was "going in a different direction". [Conine Depo. 94:17-20.]

In fact there is no written documentation in this case that the State Treasurer's Office ever said that Plaintiff was not performing her job satisfactorily until this lawsuit was filed.

### c.    Discharged.

As to the third prong of Salehian's prima facie case, as set forth above, Plaintiff was discharged from her employment on October 28, 2019. [Salehian Aff. ¶4.]

///

///

---

[2] See Affidavit of Beth Yeatts paragraphs 10 and 54 "During the time I worked with Sheila, she never had a single complaint or grievance filed against her" and "Salehian was terminated without receiving any prior disciplinary action of any kind."

**d.    Replaced by a Substantially Younger Employee(s) with Equal or Inferior Qualifications.**

Where there is a substantial difference in age, a plaintiff can make a prima facie case of disparate treatment by showing that he or she was replaced by a substantially younger employee, whether or not the younger employee is also within the protected class of employees aged 40 or older. *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).

Further, although there is no bright line rule on how many years younger a newly hired employee needs to be to be considered "substantially younger", most courts hold that there needs to be at least a five year age difference [See *Williams v. Raytheon*, 220 F.3d 16, 20 (1st Cir. 2000); *Whittington v. Nordam Group, Inc.*, 429 F.3d 986, 996 (10th Cir. 2005)], while some courts hold there must be at least a 10 year difference. See *Radue v. Kimberly-Clark Corp*., 219 F.3d 612, 619 (7th Cir. 2000); *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 659 (7th Cir. 2001).

Here Salehian was replaced by Tya Mathis-Coleman who was 38 years old [Mathis-Coleman 19:22-25] when she replaced Salehian and thus 20 years her junior. [Salehian Aff. ¶64.]

Although Defendants claim Mathis-Coleman had more experience that Salehian.  This is just not the case.  As set forth above Plaintiff had over seven years working for State Treasurer's office some of which was working in the exact position, ie., Executive Director of the Governor Guinn Millennium Scholarship Program for which Mathis-Coleman was hired for. [Salehian Aff. ¶2.]  In addition she had over 23 years of working in financial services with Citigroup prior to that. [Salehian Aff. ¶5.]

This included managing multi million dollars projects similar in size and scope to what she to manage when she worked as Executive Director of the Governor Guinn Millennium Scholarship Program.  Further Mathis-Coleman prior to coming to the State Treasurer's office was helping individuals with the financial aid packages opposed to dealing with multi million dollars 529 savings programs and holding vendors responsible for the same.  Prior to coming to the State Treasurer's office Mathis-Coleman was handling micro type of financial reviews for students

[Mathis-Coleman 9:9-13] opposed to macro financial review that Salehian handled when she was a Senior Relationship Manager at Citigroup and then in her roles with the State Treasurer's office. [Salehian Aff. ¶5.]

Plaintiff also had public sector experience at the Clark County Recorder's office as a recordation administer from December 2009 through January 2012. [Salehian Aff. ¶5.]

Given the minimal burden to establish a prima facie case on summary judgment in the first place, see *Coglan* and *Burdine* above, the evidence presented here definitely meets that burden for summary judgment purposes.

   **3.   Defendant has Met its Burden to Rebut Plaintiff's Prima Facie Cases of Age Discrimination.**

If a plaintiff makes out a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the employment action.  This requires the employer only to set forth a legally sufficient explanation for rejecting the plaintiff. *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir. 1985).  This burden is "one of production, not persuasion, thereby involving no credibility assessment." *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1148-49 (9th Cir. 2006)[citing *Reeves,* 530 U.S. at 142].

Here Defendants claims Plaintiff was terminated for the following reasons:

"Here, Plaintiff was terminated for legitimate nondiscriminatory reasons related to Plaintiff's performance, i.e., Plaintiff's resistance to changes/challenges, her general unwillingness to focus on the new administration's priorities, and her unprofessional conduct towards co-workers.  Furthermore, there is no dispute that Plaintiff was an unclassified state employee who served at the pleasure of the elected State Treasurer. *See* MSJ, page 14, lines 17-21.

Since Defendants' burden to rebut Plaintiffs' prima facie case is only one of production not persuasion, Defendants have met their burden.

///

///

14

**4.    An Issue of Material Fact Exists as to Whether Defendant's Reasons for Terminating Plaintiff are False and a Pretext for Defendants Terminating Plaintiff Because of his Age.**

The final stage of the *McDonnell Douglas* analysis requires Plaintiffs to raise a genuine issue of material fact concerning whether the facially legitimate reasons proffered by Defendant are pretextual. *Reeves,* 530 U.S. at 143.   No additional evidence of discriminatory motive is required. *Reeves,* 530 U.S. at 148.

In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. *Reeves,* 530 U.S. at 147; see also *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1093-94 (9th Cir. 2001).

Moreover, once the employer's stated justification has been eliminated, discrimination may well be the most likely alternative explanation.....especially since the employer is in the best position to put forth the actual reason for its decision. *Reeves,* 530 U.S. at 147.

Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves,* 530 U.S. at 148.

As set forth above, Defendants claim Salehian was terminated for performance reasons, specifically because she was resistance to changes/challenges, her general unwillingness to focus on the new administration's priorities, and her unprofessional conduct towards co-workers.[3]

First Defendants have tried to justify that Plaintiff was terminated for performance reasons after the fact.   There is absolutely *no* evidence in this case that Salehian was talked to or warned about performance issues besides the after the fact self-serving statements of Treasurer Conine, Chief of Staff Dickson and Chief Deputy Treasurer Hagan.

There is not one bit of documentary evidence in this case of Plaintiff receiving emails

---

[3] Defendants also claim that Plaintiff was an unclassified state employee who served at the pleasure of the elected State Treasurer so Salehian could be terminated for any reason or no reason at all like an at will employee.  While this might be true in most cases, once Plaintiff has established a prima facie case of discrimination, it is then the Defendants' burden to show they had a legitimate business reason for terminating the Plaintiff.

about her performance or that she was being terminated because of her performance, text messages about her performance or that she was being terminated because of her performance, written warnings about her performance, being asked to sign a performance improvement plan about her performance, being suspended because her performance, etc. [Conine Depo. 54:25-56:22; 72:11-20; 74:7-12; 98:10-23; 106:12-107:6.][4]

After all this is the information age with all the different means available to communicate with someone and we are dealing with the State of Nevada one of the biggest employer's in the State.

It is absolutely unfathomable that there would not be some kind of "paper trial" made if Salehian's performance was such a problem.

Second if Plaintiff's performance was such a problem then why wasn't her direct supervisor Yeatts informed of the problem.  As Yeatts testified to in her affidavit, she never received any negative job performance feedback from Treasurer Conine, Chief of Staff Dickson or anyone else, for the entire ten months Salehian worked for Treasurer Conine. [Yeatts Aff. ¶7.]

Further neither Treasurer Conine, Chief of Staff Dickson nor anyone else asked to meet with Yeatts or discuss concerns with Salehian's performance or that of her department nor was Yeatts instructed to initiate any improvement measures against Salehian or her department. Furthermore, Yeatts was present at various office meetings when Treasurer Conine, complimented and thanked Sheila for her work. [Yeatts Aff. ¶8.]

Finally the concerns that Defendants state that they had about Salehian's performance are just not supported by the record.

First addressing that Plaintiff was resistance to changes/challenges and was generally unwillingness to focus on the new administration's priorities.  As stated in her affidavit, Salehian was more than willing take direction and focus on administration priorities from Treasurer Conine

---

[4] The only documentary evidence of Plaintiff's alleged performance deficiencies were in response to interrogatories Salehian propounded in this case. [See answer to interrogatory no. 1, Balaban Aff. ¶3.]

when he took office in 2019.  She gave no resistance to the changes Treasurer Conine put in place once he took office.  Under Treasurer Conine, Sheila was not only willing to switch direction based on the new Treasurer's priorities, she led many of the initiatives he instructed the office to coordinate and deploy. [Salehian Aff. ¶¶6-7.]

Further Yeatts agrees with this assessment by Salehian. [Yeatts Aff. ¶¶5-6.]  And English who was Salehian's supervisor before Yeatts agreed that Plaintiff was willing to take direction and focus on the administrative priorities of Dan Schwartz, the Treasurer before Conine. [English Aff. ¶¶4-5.][5]

Second addressing that Plaintiff showed unprofessional conduct towards co-workers. Again Salehian states in her affidavit that she never exhibited any unprofessional conduct towards co-workers, subordinates, or supervisors and never "yelled and belittled" staff members. [Salehian Aff. ¶18.]  Something that her supervisor Yeatts agrees with. [Yeatts Aff. ¶¶17-18.]  In addition English never witnessed Salehian exhibit any unprofessional conduct towards co-workers, subordinates, or supervisors during the time she worked with Plaintiff. [English Aff. ¶11.]

While Defendants have attached depositions testimony or declarations to support these allegations and that Plaintiff's termination was not due to her age (among other things), on summary judgment the court is supposed to look at all the evidence and make all inferences for the non-moving party.

The fact that Defendants say that Salehian's termination was not because of her age is a given.  In one hundred percent of the cases the employer is going to say that they didn't terminate the employee because the protected class at issue.  Why would they say anything else?

But we have employment cases go to trial because there are material issues of fact as to whether the employer is telling the truth.  They say that the termination was related to Plaintiff's performance but when Salehian asked Treasurer Conine why she was terminated he said that the

---

[5] While this doesn't relate directly to Treasurer Conine, it shows that Salehian was willing to take direction and focus on administrative priorities before Treasurer Conine so it at a minimum creates doubt that she would suddenly switch and not take direction and focus on the priorities on Conine.

1  Treasurer's office was "going in a different direction". [Conine Depo. 94:17-20; Dickson Depo.
2  59:2-7; 60:9-21.]

3        The State Treasurer's office also failed to keep and documentation to show that Salehian
4  was not performing up to standard or tell her immediate supervisor Yeatts that Plaintiff was not
5  performing up to standard.

6        Further Treasury Conine, Chief of Staff Dickson and Chief Deputy Treasurer Hagan's
7  claiming that Salehian was not performing up to standard is inconsistent with everyone else's
8  account of Plaintiff's work performance going back almost to when she started with the State
9  Treasurer's office in 2012.

10       In addition Treasury Conine and Chief of Staff Dickson decided to also terminate Yeatts
11  on the same day as Salehian and Yeatts was 62 years of age when she was terminated and replaced
12  by Kirsten Van Ry, someone more than half her age. [Yeatts Aff. ¶56; Salehian Aff. ¶64; Van Ry
13  Depo. 18:25-19:3.]  In fact, nine of the eleven positions hired or promoted in the College Savings
14  Division since Treasurer Conine took office in January 2019 (including the two mentioned above)
15  were individuals under the age of 40 years old. [Yeatts Aff. ¶57; Salehian Aff. ¶65.]

16       So without weighing the evidence and accepting their version of the facts it is hard to
17  imagine how the court could conclude that there are not issues of facts for trial as to whether
18  Plaintiff was terminated because of her age.

19       The court would have to accept that Plaintiff was terminated because of her performance
20  even though she was never told there was a problem with her performance and even when she
21  asked Treasurer Conine why she was terminated and he said the Treasurer's office is "going in a
22  different direction" instead of Salehian's performance was bad.

23       Defendants want this court to accept that Treasurer Conine and Chief of Staff Dickson had
24  the authority to terminate Salehian and because they said it was performance related, it was
25  performance related.  But under the law as it relates to summary judgment, it is reasonable on the
26  facts presented to conclude that once Treasurer Conine took office he preferred having younger
27  employees (and Salehian and Yeatts the two oldest employees at the State Treasurer's and the only
28

employees that Treasurer Conine involuntarily terminated during his time as treasurer [Conine Depo. 73:5-10]), were the casualties of this preference.

Thus the court should deny Defendants' motion for summary judgment as to Plaintiff's first cause of action for age discrimination.

## B.    THERE ARE MATERIAL ISSUES OF FACT AS TO WHETHER PLAINTIFF SUFFERED HOSTILE ENVIRONMENT HARASSMENT BECAUSE OF HIS AGE.

As set forth above, the ADEA protects workers aged forty or older from employment discrimination on the basis of their age.  The ADEA "reflects a societal condemnation of invidious bias in employment decisions." *McKennon v. Nashville Banner Pub. Co., supra,* 513 U.S. at 357.[6]

Although the United States Supreme Court has not addressed this issue, several federal circuits have recognized hostile work environment claims based on age. See *Crawford v. Medina General Hospital*, 96 F.3d 830, 834 (6th Cir. 1996); *Burns v. AAF-McQuay, Inc.*, 166 F.3d 292, 294 (4th Cir. 1999); *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 (11th Cir. 1997); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011); *Stapp v. Curry County Board of County Commissioners*, 672 Fed.Appx. 841, 847 (10th Cir. 2016); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91 (1st Cir. 2018).

The requirements for age harassment claim are as follows:

- employee is at least 40 years old;

- employee was subjected to age-related harassing works or actions;

- the harassment unreasonably interfered with the employee's work performance and created an objectively intimidating, hostile or offensive work environment; and

- there is a basis for holding the employer responsible for the harassment. *Crawford v. Medina General Hospital*, 96 F.3d at 836.

---

[6] Any pleading errors had to be addressed before the Plaintiff's Second Amended Complaint was answered on August 29, 2022. FRCP 12(b); see *Aetna Life Ins. Co. v. Alla Medical Services, Inc.*, 855 F.2d 1470, 1474 (9th Cir. 1988).

Here as alleged above Plaintiff was at least 40 years old (prong one). [Salehian Aff. ¶3.] Further Salehian was subjected to age-related harassing works or actions as set forth above in Salehian Aff. ¶¶ 23-36 (prong two).

Further the harassment unreasonably interfered with Salehian's work performance (prong three). For example the incident that happened March of 2019 when Chief of Staff Dickson asked Salehian how long she had been with the Nevada State Treasurer's office and when she responded seven years, Dickson said "she had been with the state forever" and commented that that was longer than he had ever worked anywhere made Salehian feel embarrassed because she felt that Dickson was trying to point out that Sheila had been around so long as a way to belittle her because of her age. [Salehian Aff. ¶23.]

Further in April of 2019 at a Deputy meeting when Chief of Staff Dickson made a statement about how outdated the Nevada State Treasurer's websites and said that it was probably an "age thing" made Salehian feel very offended by the comment and that it was directed at her. [Salehian Aff. ¶24.]

Shortly after that in April 2019, Chief of Staff Dickson asked to be given an overview of the Governor Guinn Millennium Scholarship Program and made a comment about "how it probably has been 20 years since the policies and procedures were updated" that he could only imagine when the program was installed there was probably "dot matrix printer" and people spending hours reconciling and that Dickson didn't see much difference now was extremely offensive and humiliated to Salehian as she felt the comments were directed at her age and her ability to do her job because of her age. [Salehian Aff. ¶¶25-28.]

Finally in April of 2019 Salehian was denied attendance at a Financial Literacy leadership meeting in Nashville, TN by Treasurer Conine and when she asked about the reasoning for the denial, given her vast experience in financial literacy vs. newly appointed Chief of Staff Dickson her questions went unanswered. [Salehian Aff. ¶¶29-30.]

Further this created an objectively intimidating, hostile or offensive work environment because Plaintiff's supervisor was also aware and offended by the incidents. [Yeatts Aff. ¶¶19-30.]

1    Finally there is a basis her for holding the employer responsible for the harassment (prong

2  four).

3    Although Salehian did not make a formal written complaint about the harassment during

4  her employment with Nevada State Treasurer's Office, she told her supervisor Yeatts about the

5  harassment on numerous occasions.  She also told other employees about the harassment she was

6  experiencing including Cherie McDowell, who was a Management Analyst IV with the State of

7  Nevada and had worked for the State of Nevada for over twenty years. [Salehian Aff. ¶20.]

8    The complaint procedure must allow the victim of harassment to complain to someone

9  other than the offending supervisor. *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998).

10   Further even if she had made a formal complaint before she was fired, nothing would have

11  been done to remedy the situation because the people doing the harassing, ie. State Treasurer Zach

12  Conine, Chief of Staff Miles Dickson and Chief Deputy Treasurer Tara Hagan were also likely the

13  ones who would investigate Plaintiff's allegation. [Salehian Aff. ¶21.]

14

15   Employee not barred from claiming harassment by failing to utilize the employer's formal

16  complaint procedures where it is shown that the person(s) designated by the employer to receive

17  such complaints joined in the harassment. *Swinton v. Potomac Corp.*, 270 F.3d 794, 801 (9th Cir.

18  2001).

19   Harassment is actionable if it is "so severe or pervasive as to alter the conditions of (the

20  victim's) employment and create an abusive working environment." *Clark County School Dist. v.

21  Breeden*, 532 U.S. 268, 270 (2001).

22   Defendants argue that the conduct as a whole was not severe or pervasive, but under the

23  circumstances, especially when looking at the evidence in a light most favorable to Plaintiff and

24  drawing all reasonable inferences in her favor, it hard to conclude that at a minimum an issue of

25  material fact is not left for the jury to decide.

26   After all Salehian has alleged numerous incidents of harassment over a roughly six month

27  period prior to her termination at the end of October 2019, most of which are corroborated by

28  Plaintiff's supervisor Yeatts.

Where the severity or pervasiveness of abuse is questionable, "it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis v. Team Electric Company*, 520 F.3d 1080, 1096 (9th Cir. 2008).

Thus this court should allow a jury to decide whether the numerous incidents Salehian sets forth herein created a hostile work environment for Plaintiff based on her age.

**C.    THERE ARE MATERIAL ISSUES OF FACT AS TO DEFENDANTS INTERFERED WITH PLAINTIFF'S RIGHTS TO TAKE LEAVE UNDER THE FAMILY AND  MEDICAL LEAVE ACT.**

To protect the employee, the FMLA prohibits interference with the exercise of the employee's right to take leave. *29 USC §2615(a)*.  The relevant provision reads "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [and subchapter]." *29 USC §2615(a)(1)*.

Congress has authorized the Department of Labor ("DOL") to issue implementing regulation for the FMLA. *29 USC §2654*.  These regulations are entitled to deference. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984); *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112 n.9 (9th Cir. 2001).

DOL regulations state that "[t]he FMLA prohibits interference with an employee's rights under the law." *29 CFR §825.220(a)*.  Any violation of the FMLA itself or of the DOL regulations constitute interference with an employee's rights under the FMLA. *29 CFR §825.220(b)*.  The DOL interprets "interference" it include "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Id.*  The regulations specify on form of employer interference - i.e., "employers cannot use the taking of FMLA leave as a negative factor in employment actions." *29 CFR §825.220(c)*.

To make out a *prima facie* case of FMLA interference, an employee must establish that "(1)[they] were eligible for the FMLA protections, (2) [their] employer was covered by the FMLA, (3) [they] were entitled to leave under the FMLA, (4) [they] provided sufficient notice of [their] intent to take leave, and (5) [their] employer denied [them] FMLA benefits to which [they]

1    were entitled." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011)

2        Here there is sufficient evidence that Salehian notified Defendants of her intent to obtain

3    FMLA leave prior to her termination. "After an employee alerts the employer of desiring to take

4    leave for a reason that would qualify under the FMLA, the employer will be expected to obtain

5    any additional required information through informal means." *Escriba v. Foster Poultry Farms*,

6    Inc., 743 F.3d 1236, 1243 (9th Cir. 2014).  "The employee need not expressly assert rights under

7    the FMLA or even mention the FMLA…but the employer should inquire further of the employee

8    if it is necessary to have more information about whether FMLA leave is being sought by the

9    employee, and to obtain the necessary details of the leave to be taken." *Id.* (emphasis in

10   original)(citing 29 C.F.R. §825.302(c)).  Salehian received her certification under the FMLA on

11   October 17, 2019, in preparation for the meeting for October 28, 2019. [Salehian Aff. ¶56, Ex. 4.]

12        She further provided Defendants with all necessary information regarding her need for

13   leave, and otherwise performed all duties necessary to take advantage of the rights conferred by

14   the FMLA.

15        This included informing Treasurer Conine, Chief of Staff Dickson and Yeatts of the need to

16   work from home because of the scabbing and pain on her face from the treatment on October 8,

17   2019. [Salehian Aff. ¶54.]  Updating the three on her condition including that she had completed

18   her first round of chemotherapy treatments, ie., two weeks of a six week regiment, and thus had

19   four weeks of treatment left on October 18, 2019. [Salehian Aff. ¶57.]  And finally on October 22,

20   2019 thanking them for allowing her to work from home during her current chemotherapy

21   treatment and informing them that Salehian will have to undergo two more rounds of

22   chemotherapy treatment in early November and mid-December. [Salehian Aff. ¶58, Ex. 5.] .

23        Thus even if Salehian did not explicitly inform Defendants of her intent to take leave under

24   the FMLA, Defendants had an obligation to inquire further whether Salehian was seeking FMLA

25   leave rather than summarily terminating her. *Escriba*, 743 F.3d at 1243.

26        Defendants' argument that Salehian was never denied FMLA leave does not absolve them

27   of their burden to investigate whether Salehian should have appropriately been granted such leave.

28

See *Bachelder v. American West Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001)(holding that a company whose employee provided two doctor's notes regarding her absences "was therefore placed on notice that the leave might be covered by the FMLA, and could have inquired further to determine whether the absences were likely to qualify for FMLA protection").

Thus on the evidence presented, Salehian provided sufficient intent of notice to take leave and by firing Plaintiff instead of allowing her to take leave, Defendants may have denied Salehian FMLA benefits to which she was entitled. Thus material issues of fact exists for trial on whether Defendants wrongly interfered with Salehian right to take leave under the FMLA.

**D.     THERE ARE MATERIAL ISSUES OF FACT AS TO WHETHER DEFENDANT REASONABLY ACCOMMODATED PLAINTIFF DISABILITY AND/OR TERMINATED HER IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT.**

First although Defendants have questioned it, Salehian has shown that she is disabled under that Americans with Disabilities Act ("ADA").

Under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), "[D]isability shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *42 U.S.C. §12102(4)(A).*

> "The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis." *29 C.F.R. §1630.1 (c)(4).*

Further, "[T]he term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." *42 U.S.C. §12102(4)(b).*

Specifically as it applies to the facts of this case:
> "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. Substantially

limits" is not meant to be a demanding standard." *29 C.F.R. §1630.2 (j)(1)(i).*

"The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.  Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 *C.F.R. §1630.2 (j)(1)(iii).*

"The determination of whether an impairment substantially limits a major life activity requires an *individualized assessment*.  However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA." *29 C.F.R. §1630.2 (j)(1)(iv).*[7]

Applying the ADAAA, Plaintiff was clearly disabled under the ADA as set forth below.

Under the ADA "disability" means, with respect to an individual: (a) a physical or mental impairment that substantially limits one or more major life activities; (b) a record of such an impairment; or (c) regarded as having such an impairment. *42 USC §12102(2); 29 CFR §1630.2(g)*; EEOC Compliance Manual §902.1.

Here "[i]n the fall of 2019 Salehian was seen by Kristen Addis Brown, M.D. at Thomas Dermatology to treat four skin cancer lesions.  In early October 2019 she began a topical chemotherapy treatment drug for the cancer.  [Salehian Aff. ¶53, Ex. 3.]  Further on October 8, 2019 in a meeting with Treasurer Conine, Chief of Staff Dickson and Yeatts, Salehian was approved to work from home because of the scabbing and pain on her face from the treatment. [Salehian Aff. ¶54.]

Thus Plaintiff had a physical impairment (ie. four skin cancer lesions that required a topical chemotherapy treatment drug) and the physical impairment substantially limited Salehian "in performing major life activities, including but not limited to working."

---

[7] EEOC's regulations prior to the passage of the ADAAA defined "substantially limited" as: "Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *29 CFR* § 1630.2(j) (2005) but this was superseded by *29 CFR* § 1630.2(j)(1)(i) (2011) (construing "substantially limits" broadly in favor of expansive coverage in accordance with the ADA Amendments Act of 2008 as set forth above.

Further as to the major life activity of working, which is a enumerated major life under the ADAAA[8], Plaintiff has set forth specific evidence that she needed time off on an intermittent because of her physical impairment, "[O]n October 17th, 2019 Salehian was again treated by Dr. Brown, who filled out FMLA paper work for intermittent FMLA leave for continued intermittent treatment that would be administered on an ongoing basis to treat Plaintiff's condition." [Salehian Aff. ¶56, Ex. 4.]

Operation of bodily functions, including but not limited to, functions of the immune system and normal cell growth for someone with cancer are now enumerated major life activities under the ADAAA[9].

Finally there is an issue of material fact as to whether Defendants' are liable for disability discrimination under the ADA for not providing or continuing to provide accommodations to Salehian for a known disability and instead terminating Salehian on October 28, 2019.

Discrimination under the ADA, also includes: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. *42 USC §12112(b)(5)(A)*.

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Memorial Hospitals Association*, 239 F.3d 1128, 1137 (9th Cir. 2001); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805-808 (7th Cir. 2005).

Here on October 8, 2019 Salehian made Treasurer Conine, Chief of Staff Dickson and Yeatts aware of the need to work from home because of the scabbing and pain on her face from

---

[8] See *42 U.S.C.* §12102(4)(A).

[9] See *42 U.S.C.* §12102(2)(B).

the treatment (ie. chemotherapy), which was approved, Plaintiff continued to update them on the need to work from home including via telephone on October 18, 2019 and with an email on October 2019 thanking everyone for allowing her to work from home and informing them she will have to undergo two more rounds of chemotherapy treatment in early November and mid-December. [Salehian Aff. ¶¶54, 55, 57, 58, Ex. 5][10]

Thus because Defendants were aware of Salehian's skin cancer that reasonably was a disability under the ADA, they were required to interact with Plaintiff and provide reasonable accommodations under the law.   Defendants are wrong that Salehian had to ask for accommodations by name under the ADA.  There are multiple authorities that make clear that the "ADA" or "reasonable accommodations" don't even have to be mentioned.  See *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999)-the request need not mention the ADA or use the phrase "reasonable accommodation." A simple request for continued employment is sufficient. No specific accommodation need by requested.  See also *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 955, fn. 5-need not use "magic words" of "reasonable accommodation."

Further a request is not necessary if the employer is already aware of the disability.  If the employer learns from any source that the employee has a potential disability that may require some accommodations, the employer is under a duty to initiate discussions concerning the need for an accommodation. *Taylor v. Phoenixville School District*, 184 F.3d 296, 314-315 (3rd Cir. 1999).  The employer's interactive process duty may be triggered by information or a request from someone other than the employee, such as a friend, family member, medical provider or other representative. *Taylor v. Phoenixville School District*, 184 F.3d 313.

Thus on the facts presented not only did Defendants have an obligation to accommodate Salehian's disability but they could not terminate Plaintiff because of her disability.  Although Defendants claim they did not terminate Salehian because of her disability the fact remains that Plaintiff was told of her dismissal on the first day she was back in the office.

---

[10] Both Treasurer Conine and Chief of Staff  Dickson made clear that they were aware of Salehian's skin cancer and the need for treatment at their depositions. [Conine Depo. 62:6-63:21; Dickson Depo. 51:14-53:17; 104:10-105:19.]

When deciding summary judgment the court is supposed to make all reasonable inferences for the non-moving party and when that is done it is reasonable to conclude that Defendants did terminate Salehian because of her disability. Although Defendants say that they were planning to terminate Plaintiff for some time the lack of documentation to support this create reasonable doubt whether that is true. Further it is reasonable to assume that Treasury Conine and Chief of Staff Dickson were not happy about the prospect of Plaintiff missing time from work to deal with her cancer including more chemotherapy in early November and mid-December.

Thus Defendants' request to grant summary judgment as to disability discrimination and failure to accommodate should be denied so the facts can be presented to a jury at trial.

**E.    THERE ARE MATERIAL ISSUES OF FACT AS TO WHETHER PLAINTIFF SUFFERED SEX/GENDER DISCRIMINATION IN VIOLATION OF TITLE VII.**

Title VII prohibits employers from discriminating on the basis of "race, color, religion, sex, or national origin." *Civil Rights Act of 1964, § 703(a), 42 U.S.C. § 2000e-2 (a)*.

Title VII prohibits employers from failing or refusing to hire, discharging, or otherwise discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment." *42 U.S.C. § 2000e-2 (a)(1)*.

To establish a prima facie case of sex and/or gender discrimination, a plaintiff-employee must generally present evidence showing four things: (1) plaintiff was a member of a protected class; (2) plaintiff was qualified for the position sought or performing satisfactory in the position held (i.e., satisfying the employer's legitimate expectations); (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances suggesting a discriminatory motive (e.g., persons outside the protected class with equal or lesser qualifications were given more favorable treatment). *McDonnell Douglas Corp.*, 411 U.S. 802.

The supreme court has cautioned that the prima facie requirements for making a Title VII claim "is not onerous" and poses "a burden easily met." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here as alleged above Plaintiff was a member of a protected class based on her gender (prong one). [Salehian Aff. ¶37.]   Further Salehian was qualified for the position sought or performing satisfactory in the position held (i.e., satisfying the employer's legitimate expectations) Salehian Aff. ¶¶2, 5, 8, 10, Ex. 1 and 11; Yeatts Aff. ¶¶ 7 and 10 (prong two).

As to prongs three and four, Plaintiff has set forth in her affidavit Salehian Aff. ¶¶38-52, Ex. 2, see also Yeatts Aff. ¶¶ 30-44 how similarly situated unclassified male deputies at the State Treasurer's office were treated more favorable than Salehian thus subjecting Salehian (and for that matter Yeatts) to said adverse employment actions.

The unclassified male deputies at the State Treasurer's office were similarly situated with Salehian because among other things: (1) they all served at the pleasure of the Treasurer; (2) they were all sworn into office by the State Treasurer and took the same oath of office; (3) they were all required to take the same employee training course (see NAC 284.498); (4) they were all entitled to the same annual leave as outlined in NRS 284.350; and (5) they all earned time in the Public Employment Retirement System (PERS) according to the policies, procedures and statutes outlined in NRS Chapter 286.

For purposes of a Title VII discrimination action the plaintiff must show a "materially adverse change in the terms and conditions of employment because of the employer's actions." An adverse employment may consist of a discharge, demotion, wage cut, or any material loss of benefits or "significantly diminished material responsibilities." *Michael v. Caterpillar Financial Services Corporation*, 496 F.3d 584, 593-4 (6th Cir. 2007); *see also Alamo v. Bliss*, 864 F.3d 541, 553 (7th Cir. 2017).

Here Plaintiff has set forth a number of adverse employment action in the way Salehian was treated less favorably than her similarly situated male counterparts when she was terminated.  This included among other things, being able to retire [Salehian Aff. ¶43, 47, Ex. 2], vacation pay, extended health benefits and PERS benefits [Salehian Aff. ¶48], employee travel [Salehian Aff. ¶49] and responding to work requests. [Salehian Aff. ¶50.]

As set forth above these arguable resulted in a material loss of benefits as stated in Defendants' MSJ materially affected the terms, conditions, or privileges of Salehian's employment. See *Davis v. Team Electric Company*, 520 F.3d 1080, 1089 (9th Cir, 2008).

Salehian has met her burden to present a *prima facie* case. As set forth above there is at a minimum an issue of material fact as to whether Plaintiff was performing her job satisfactorily. Further as set forth above, the males in question were arguably similarly situated because they were unclassified employee just like Salehian.

Finally as to the circumstances surrounding Plaintiff's termination being different, there is no evidence to that effect besides Treasurer Conine and Chief Deputy Hagan speculating that to be the case.

Thus on the evidence presented Plaintiff has met her burden on summary judgment with respect to her sex/gender cause of action and this being the case, the cause of action should be able to go to trial.

## V.

## CONCLUSION

For all the reasons set forth above, Plaintiff respectfully asks the District Court to deny Defendant's motion for summary judgment and allow the matter to proceed to a jury trial on its merits.


DATED:  10/31/2022                LAW OFFICES OF MICHAEL P. BALABAN


BY: /s/ Michael P. Balaban
    Michael P. Balaban
    LAW OFFICES OF MICHAEL P. BALABAN
    10726 Del Rudini Street
    Las Vegas, NV  89141

## **CERTIFICATE OF SERVICE**

I hereby certify that pursuant to FRCP Rule 5(b)(3), and this Court's Special Order #109, a true and correct copy of the foregoing document was electronically served via the Court's CM/ECF electronic filing system to the following person:

Judy A. Prutzman, Esq.
Brandon R. Price, Esq.
*Attorneys for Defendants State of Nevada, Nevada State*
*Treasurer's Office and Zach Conine, State Treasurer*

DATED:  10/31/2022                /s/ Michael P. Balaban
                                             Michael P. Balaban